IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| DARRELL WILCOX and MICHAEL MCGUIRE, individually and as representatives of a class of participants and beneficiaries in and on behalf of the GEORGETOWN UNIVERSITY DEFINED CONTRIBUTION RETIREMENT PLAN, the GEORGETOWN UNIVERSITY VOLUNTARY CONTRIBUTION RETIREMENT PLAN,<br><br>Plaintiffs,<br><br>vs.<br><br>GEORGETOWN UNIVERSITY, CHRISTOPHER AUGOSTINI, and GEOFF CHATAS,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT – CLASS ACTION** |
|---|---|

1. Plaintiffs Darrell Wilcox and Michael McGuire, individually and as representatives of a class of participants and beneficiaries of the Georgetown University Defined Contribution Retirement Plan ( the "DC Plan") and the Georgetown University Voluntary Contribution Retirement Plan (the "Voluntary Plan") (collectively, the "Plans") bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plans against Defendant Georgetown University for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

2. The duties of loyalty and prudence are among the highest known to the law and require fiduciaries to perform their obligations solely in the best interests of the participants and beneficiaries. As fiduciaries to the Plans, Defendants were obligated to act for the exclusive benefit

of participants and beneficiaries in the Plans like Plaintiffs for the sole purpose of providing them retirement benefits. One of the principal functions of a fiduciary in participant-directed individual account retirement plans like the Plans is the selection of designated investment alternatives into which plan participants can direct the investment of their retirement savings accounts. "[T]he [US] Department [of Labor] points out that the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA Section 404(c) plan is a fiduciary function [.]"[1]

3. Another critical function of a retirement plan's named fiduciaries is to ensure that plan expenses are reasonable in relation to the services being provided to plan investors like Plaintiffs here. "When the fees for services are paid out of plan assets, fiduciaries will want to understand the fees and expenses charged and the services provided. While the law does not specify a permissible level of fees, it does require that fees charged to a plan be 'reasonable.'"[2] Because the marketplace for retirement plan services is established and competitive and because the Plans have over a billion dollars in assets, the Plans have tremendous bargaining power to demand low-cost administrative and investment management services and well-performing investment funds.

4. But instead of leveraging the Plans' substantial bargaining power to benefit participants and beneficiaries, Defendants failed adequately to evaluate and monitor the Plans'

---

[1] Final Regulation Regarding Participant Directed Individual Account Plans (ERISA § 404(c) Plans), 57 Fed. Reg. 46906, 46924, n.27 (Oct. 13, 1992).

[2] *Meeting Your Fiduciary Responsibilities*, Employee Benefit Security Administration, US. Dept. of Labor, February 2012, p. 5; available at *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf*; last viewed Aug. 11, 2017.

expenses and caused the Plans to pay unreasonable and excessive fees for investment and administrative services.

5.      Defendants' first breach of duty here was to fail to select a suitable, single service provider to provide administrative and recordkeeping services to the Plans in exchange for a reasonable amount of compensation.

6.      Rather than negotiating a separate, reasonable and fixed fee for recordkeeping with a single administrative provider to the Plans, Defendants continuously retained three different service providers – the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF" or "TIAA"), The Vanguard Group and/or Vanguard Fiduciary Trust Company ("Vanguard") and Fidelity Investments ("Fidelity"). Each of these recordkeepers supplied the Plans with a separate menu of investment choices including mutual fund share classes that charged higher fees than (i) other less expensive investment alternatives that offered the same investment strategies or (ii) less expensive share classes of the exact same investment fund, or (iii) both.

7.      Fees for administrative services were charged and paid to these three companies as a percentage of the overall expenses paid for investing in the various investment options offered within the Plans (including expensive choices and/or share classes).  As a result, Plaintiffs paid asset-based fees for administrative services, which continued to increase as the value of their accounts increased through additional contributions and investment returns even though no additional services were being provided to Plaintiffs as their fees went up.

8.      Each of these three platform providers maintained separate and exclusive menus of investment choices, effectively creating three investing segments for each of the Plans: a TIAA segment, a Vanguard segment and a Fidelity segment.  Plaintiffs and other investors in the Plans

had to choose from among the three and could invest in only the investment choices available in one of these three segments. For instance, a participant in the Plans could not invest simultaneously in both the TIAA and Vanguard investment choices.

9. With respect to each of the three segments, the selection of investment choices reflected fiduciary failure by Defendants. Consider the following features of the aforementioned three investment segments in the Plans:

a. the TIAA segment offered a guaranteed interest annuity, nine variable annuities that operated like mutual funds, and thirty-one mutual funds;

b. the Vanguard segment offered nearly ninety mutual funds; and

c. the Fidelity segment offered roughly one hundred and ninety mutual funds.

10. The sheer volume of three hundred total investment choices for retirement investors like Plaintiffs indicates that Defendants failed properly to monitor and evaluate the historical performance and expense of each of these funds, compare that historical performance and expense to a peer group of funds and/or even compare the three segments against one another. Defendants have done what the US Department of Labor ("DOL") and at least one federal appellate court have warned against: stuff retirement plans' investment menus with hundreds of possible investments and then shift to the retirement plans' participants the responsibility for choosing among this vast array. This strategy chosen by Defendants results in the inclusion of many investment alternatives that a responsible fiduciary should exclude and which unreasonably burdens plan participants who do not have the resources to pre-screen investment alternatives in the way Defendants do.[3] The designation of three hundred investment alternatives made available under the Plans reflects an

[3] *Hecker v. Deere & Co.,* 569 F.3d 708, 711 (7th Cir.2009).

attempt by Defendants as ERISA plan fiduciaries to insulate themselves from ERISA liability at the expense of participants in the Plans, including Plaintiffs.  Plan participants are not likely to have the investment expertise and sophistication to build an appropriate asset allocation from the hundreds of available investment choices.

11.     In addition, Defendants selected and maintained investment options for the Plans that historically and consistently underperformed their benchmarks and charged excessive fees.

12.     There is further evidence of a flawed fiduciary process here: namely, approval of a TIAA loan program for University employees who elected to borrow against their retirement plan savings.  This program (i) required excessive collateral as security for repayment of these loans, (ii) required an illegal transfer of plan assets to TIAA as collateral for the loan repayment when no such transfer is necessary or permitted, and (iii) violated DOL rules for retirement plan participant loan programs.

13.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) and to restore to the Plans all losses resulting from each breach of fiduciary duty.

## I.     JURISDICTION AND VENUE

14.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

15.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plans are  administered, where at least one of the alleged breaches took place and where the Defendants reside.

## II.    THE GEORGETOWN UNIVERSITY DEFINED CONTRIBUTION AND VOLUNTARY CONTRIBUTION RETIREMENT PLANS

16.    The Georgetown University Defined Contribution and Voluntary Contribution Retirement Plans (the "Plans") are defined contribution, individual account, employee pension benefit plans as defined under 29 U.S.C. §1002(2)(A) and §1002(34).

17.    The Plans are established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

18.    Eligible faculty and staff members of Georgetown University are able to participate in the Plans. The Plans provide a primary source of retirement income for many employees of Georgetown University.   Contributions to the Plans are based upon deferrals of employee compensation and employer matching contributions.  The ultimate retirement benefit provided to investors in the Plans – who in retirement plan-speak also are known as  "plan participants" or just "participants" and are referenced as such in this complaint –  depends on the performance of investment options chosen for the Plans by the Defendants net of fees and expenses.  Participants like Plaintiffs have a right to direct the investment of their accounts among the available investment choices

19.     Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion). With an aggregate value of over $1 billion in assets as of December 31, 2015, the Plans, taken together, qualify as a "Mega" plan.

## III. THE PARTIES

### a. Plaintiffs

20. Plaintiff Darrell Wilcox, a resident of Washington, DC, is a participant in both Plans as defined under 29 U.S.C. §1002(7) because he has a vested account balance in both of the Plans, and his beneficiaries are or may become eligible to receive benefits under the Plans. Through the Plans he is invested in the TIAA Traditional Annuity, the CREF Bond Account (one of the variable annuities), and eleven of the TIAA mutual funds.

21. Plaintiff Michael McGuire, a resident of Stafford, VA, is a participant in both Plans as defined under 29 U.S.C. §1002(7) because he has a vested account balance in the both Plans, and his beneficiaries are or may become eligible to receive benefits under the Plans. Through the Plans he is invested in the CREF Stock Account, the CREF Equity Index Account, the TIAA Real Estate Account, the CREF Inflation-Linked Bond Fund Account, the CREF Bond Market Account and the TIAA-CREF Growth and Income Account.

### b. Defendants

22. Defendant Georgetown University (the "University") is a private university with its principal place of business in Washington, D.C. It is governed by a Board of Trustees.

23. The University is designated as the Plan Administrator under 29 U.S.C. §1002(16)(A)(i) and the "named fiduciary," and is responsible for the management of the Plans and the Plans' assets, with complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable it properly to carry out such responsibilities. These include the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made

available to participants for the investment of their contributions and provision of their retirement income.

24.     The University is an ERISA fiduciary to the Plans because it has exercised and continues to exercise discretionary authority or discretionary control respecting the management of the Plans and the management and disposition of their assets, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii). The University has acknowledged that it is the Plan Administrator in the Plans' 5500's.

25.     Defendant Christopher Augostini ("Augostini") was formerly the Senior Vice President and Chief Administrative Officer of the University until May, 2017, and was given discretionary authority and powers necessary to administer the Plan.  He therefore was a fiduciary to the Plans.

26.     Defendant Geoff Chatas (together with the University and Augostini, "Defendants") assumed the duties and responsibilities of Defendant Augostini on February 20, 2018.

## IV.    FACTS APPLICABLE TO ALL COUNTS

### A.    Plan investments

27.     Defendants exercised and continue to exercise discretionary authority over the investment options that are included in the Plans. The Plans' investments are designated by Defendants as available investment alternatives offered under the Plans.

28.     The Plans offer TIAA retirement investment funds, including fixed and variable annuities, registered investment companies and a pooled separate account.

29.     At various times since 2010 the Plans have also offered eighty-six investment choices managed by Vanguard, which are all mutual funds. It also has offered approximately one

hundred and ninety Fidelity funds and eight AXA investment funds (the AXA funds are frozen to new contributions).

30. The TIAA Traditional Annuity offered in the Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of TIAA and are dependent on the claims-paying ability of TIAA.

31. The Plans' CREF Stock Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Account and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plans' investments in these variable annuities changes over time based on investment performance and expenses of the accounts.

32. Multiple layers of expense charges comprise the expense ratio of the CREF variable annuity accounts. For the R1 share class, which was the only share class offered by TIAA prior to 2015, those expenses consisted of the following:

a. "administrative expense" charge (39.5 bps); [4]

b. "distribution expense" charge (16.5 bps);

c. "mortality and expense risk" charge (0.5 bps); and

d. "investment management expense" charge (ranging from 4 to 15 bps).

33. The TIAA Real Estate Account is an insurance company separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that

[4] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2016, these charges consisted of the following:

      a. "administrative expense" charge (26.5 bps);

      b. "distribution expense" charge (12.5 bps);

      c. "mortality and expense risk" charge (0.5 bps);

      d. "liquidity guarantee "(17 bps); and

      e. "investment management expense" charge (32 bps).

34. The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, which commonly are known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing and other expenses, depending on the type of investment and share class.

**B.     Defendants' actions caused participants in the Plans to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

35. Recordkeeping is a necessary service for every defined contribution retirement plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace capable of providing a high level of service to large defined contribution plans like the Plans. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

36. To ensure that retirement plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution

retirement plans solicit competitive bids for recordkeeping and administrative services at regular intervals of approximately five years.

37.     The cost of recordkeeping and administrative services depends on the number of retirement plan participants, the number of investment choices, the complexity of plan features and similar factors that generally do not vary over time.  The actual cost of those services does not turn on the asset balance of a retirement plan or the amount of savings held in a particular plan participant's account. Thus, the cost of providing recordkeeping services to a retirement plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same number of participants and a $5,000 average account balance. For this reason, prudent ERISA fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the fees paid to a recordkeeper will increase without any change in the services provided.

38.     "Mega" defined contribution plans like the Plans generate tremendous economies of scale for recordkeeping and administrative services. As the number of participants in a retirement plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for retirement plans with a greater number of participants.

39.     A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based compensation for the retirement plan recordkeeper, (that is, recordkeeping fees calculated as a percentage of total plan assets), prudent ERISA fiduciaries

monitor the total amount of revenue sharing a retirement plan recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided. A prudent fiduciary will see that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee.  Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation.   In fact, it is a best practice among retirement plan fiduciaries to acquire the share class for a particular investment choice that charges the lowest expense ratio and pays no revenue sharing, and for the fiduciary then to negotiate a fixed (not asset-based) fee for recordkeeping.  That practice insures that the fiduciary actually knows how much their retirement plan is paying for recordkeeping and ensures that participants in the plan are paying the least expense for investments and recordkeeping.

40.     Prudent fiduciaries of defined contribution plans the size of the Plans use a single recordkeeper rather than hiring multiple recordkeepers. This leverages all plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees while also simplifying personnel and payroll data feeds, reducing electronic fund transfers and avoiding duplication of services when more than one recordkeeper is used.

41.     According to a 2013 survey of 403(b) plans, more than 90% of retirement plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, 403(b) Plan Sponsor Research (2013).[5]

42.     It is well known in the defined contribution retirement plan industry that plans with

---

[5] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

> **1. The choices are overwhelming**. Studies show that when people are given too many choices of anything, they lose confidence or make no decision.
>
> **2. The multi-recordkeeper platform is inefficient**. It does not allow plan sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[6]

43. The benefits of using a single recordkeeper are clear:

> By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[7]

44. In a study titled "How 403(b) Plan Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", Aon Hewitt similarly recognized:

> 403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:
>
> – Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.
>
> – Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.
>
> – Leveraging aggregate plan size and scale to negotiate competitive pricing.

Aon Hewitt, *How 403(b) Plan are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[8]

---

[6] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[7] 5*Id.*

[8] 6Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1
1685d2a64078/How_403(b)_Plan_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

45.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[9]

46.     Others in the industry agree. *See, e.g.*, Kristen Heinzinger, Paring Down Providers: A 403(b) Sponsor's Experience, PLANSPONSOR (Dec. 6, 2012) ("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[10] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010) (identifying, among other things, the key disadvantages of maintaining a multi-provider retirement plan recordkeeping platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").[11] Use of a single recordkeeper is also less confusing to participants and avoids

---

[9]   Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[10]     Available     at     http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[11] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

excessive recordkeeping fees charged to the retirement plans. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[12]

47. Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants contracted with ***three*** platform providers (TIAA-CREF, Fidelity and Vanguard) for the (ostensible) benefit of Plaintiffs and the Plans. This inefficient and costly structure maintained by Defendants has caused Plans' participants including Plaintiffs to pay and continue to pay duplicative, excessive and unreasonable fees for recordkeeping and administrative services. There is no loyal, prudent or practical reason for Defendants' failure to engage in a process to reduce duplicative services and the fees charged to the Plans or to continue with multiple platform providers to the present. . In fact, any number of university plans provide for a single recordkeeper with investment choices offered by multiple fund managers.

48. Moreover, Defendants apparently failed to evaluate even the differences in compensation paid to each of the three platform providers engaged by the Plans in the form of revenue sharing or additional fees supposedly charged for administrative services. And if they did perform such an evaluation, they failed to take the appropriate corrective action that any reasonable

[12] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

fiduciary would have undertaken given the unmistakable results of such an evaluation: that participants investing through the TIAA and Fidelity segments were paying far more for administrative services than were those investing through the Vanguard segment.

49.     Each of the Plans' platform providers received or currently receive compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plans and their investments for providing these duplicative services.

50.     Upon information and belief and according to industry experts and the prospectus for the CREF Retirement Equities Fund, which includes the eight CREF variable annuities, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF investments prior to 2015 were:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 56 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 39 bps |
| TIAA Traditional Annuity | 15 bps |

51.     The Plans pay Vanguard for recordkeeping services based on internal revenue sharing the Plans receive from mutual funds sold to the Plans.

52.     In addition, the Plans' recordkeepers receive additional indirect compensation, including revenue sharing for "float," securities lending revenue, distribution fees, surrender charges, spread and redemption fees and, in the case of the annuities in the TIAA segment, mortality and expense charges.

53.     Based on information currently available to Plaintiffs regarding the Plans' features, the nature of the administrative services provided by the Plans' platform providers, the Plans' participant levels, and the recordkeeping market, benchmarking data indicates that a reasonable

recordkeeping fee for the Voluntary Plan would have been a fixed amount between $500,000 and $650,000 and for the Defined Contribution Plan an amount between $350,000 and $500,000 (approximately $35 per participant with an account balance).

54. An examination of the prospectuses for the TIAA funds available as investment choices and the Plans' financial data show that the Plans have paid at least hundreds of dollars per participant per year from 2010 to 2015 for recordkeeping –much more than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year and millions of dollars in damage to Plaintiffs and the proposed class every year.

55. Based on calculations derived from examination of the Plans' DOL Form 5500's, TIAA received indirect compensation for recordkeeping and administrative services of $8.4 million from just the CREF variable annuities, the TIAA CREF Real Estate Account and the TIAA Traditional Annuity without regard to any other indirect compensation received from, for example, plan loans and revenue sharing from the TIAA mutual funds. None of this indirect compensation was reported on any of the Plans' Annual Returns filed with the U.S. Department of Labor ("DOL") Employee Benefit Security Administration ("EBSA") on Form 5500, in violation of the explicit obligation to do so under federal law.

56. The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The EBSA has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[13]

[13] 11 Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

57.     Defendants also failed to control recordkeeping costs as assets in the Plans grew. From December 31, 2009 to December 31, 2014, the Plans' assets increased by 60% from $1.26 billion to $2.02 billion. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plans' platform providers became even more excessive as the Plans' assets grew (even though the administrative services provided to the Plans remained the same). Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plans but failed to do this.

58.     Defendants failed prudently to monitor and control the compensation paid by the Plans for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plans' platform providers. Had Defendants monitored the compensation paid to the Plans' platform providers and ensured that participants like Plaintiffs were charged only reasonable fees for administrative and recordkeeping services, Plan participants including Plaintiffs would not have lost millions of dollars in their retirement savings in the last six years alone.

59.     Annual Returns on the relevant Form 5500's provide substantial evidence of that failure.  The Plans' 5500's are essentially the Plans' annual tax returns. DOL rules expressly require that plan service providers report all direct and indirect compensation received for the year in connection with the services they provide.   None of the Plans' 5500's filed since 2009 disclose any amount of indirect compensation being received by TIAA.   Whether these egregious reporting errors were caused by TIAA's reporting deficiencies or by the University's misrepresentation of TIAA's accurate reporting, the implication is the same: Defendants failed in their obligations to the Plans and their participants to adequately evaluate and report the Plans' expenses.

60.     Further evidence of the carelessness of Defendants in the exercise of their fiduciary obligations appears in the participant fee disclosure required by 29 CFR 2550.404(a)(5) to be delivered annually to each participant, a disclosure provided by TIAA.  Among other information, the disclosure must provide an historical record of the investment return for the fund as well as the "expense ratio," which is the aggregate expense investors pay for investing in the fund, stated in "basis points" as a percentage of the amount invested.  An expense ratio of 50 basis points, for example, charges 0.5% as a fee for investing.

61.     As previously alleged, participants can choose to invest in the TIAA products or in a variety of funds offered by Vanguard or Fidelity.  The participant fee disclosure includes investment return and expense information for the Vanguard funds, the Fidelity funds and the TIAA funds. The reporting for the Vanguard funds, however, does not appear to be accurate.  The following table provides a significant sample of the available Vanguard funds with their corresponding expense ratios as reported in the respective funds' prospectuses and as reported in a recent participant fee disclosure. As seen below, differences in the reporting of the expense ratios amount to as much as twelve basis points:

| Georgetown U. Defined Contribution Retirement Plan— Vanguard Fund Reported Expense Ratios | | | |
|---|---|---|---|
| Fund (Investor shares) | Expense from Prospectus | Expense Reported by TIAA | Differential |
| Emerging Markets Stock Index Fund | 32 | 33 | 1 |
| Equity Income Fund I | 26 | 29 | 3 |
| Explorer Fund | 46 | 53 | 7 |

| | | | |
|---|---|---|---|
| Growth Index Fund | 22 | 23 | 1 |
| International Explorer | 41 | 40 | 1 |
| International Growth Fund | 46 | 47 | 1 |
| Mid-Cap Index Fund | 20 | 23 | 3 |
| Mid-Cap Growth Index | 20 | 23 | 3 |
| Mid-Cap Value Index | 20 | 23 | 3 |
| Mid-Cap Growth | 36 | 46 | 10 |
| Morgan Growth Fund | 38 | 40 | 2 |
| REIT Index Fund | 26 | 26 | 0 |
| PRIMECAP | 32 | 44 | 12 |
| Selected Value Fund | 35 | 44 | 9 |
| Small-Cap Index Fund | 20 | 23 | 3 |
| Intermediate Term Bond Index | 16 | 20 | 4 |
| Long-Term Bond Index | 16 | 20 | 4 |
| Short-Term Bond Index | 16 | 20 | 4 |
| Total Bond Market Index Fund | 16 | 20 | 4 |
| Total International Stock Index Fund | 18 | 22 | 4 |
| U.S. Growth Fund | 46 | 47 | 1 |

| | | | |
|---|---|---|---|
| Wellesley Income Fund | 22 | 23 | 1 |
| Windsor II Fund | 33 | 36 | 3 |

62. These rather extensive reporting errors demonstrate the cavalier attitude with which Defendants regarded their ERISA duties to give retirement investors like Plaintiffs accurate information about their retirement investments in the Plans. It should have been uncovered and corrected.

63. But, even worse, if it turns out that the participant fee disclosure is correct, and that someone was padding the bill, and overcharging participants who chose the Vanguard funds or Fidelity funds, the University apparently did not know.

64. As of December 31 2016, Defendants continued to include approximately 82 Vanguard mutual funds as investment options. That menu of funds included asset classes such as bond funds, balanced funds (stocks and bonds), domestic stock funds, international stock funds, and specialty stock funds like real estate.

65. The Plans' Vanguard fund offerings include both retail "investor" share classes and "institutional" (or Admiral, depending on the fund) share classes of mutual funds. The retail share classes of mutual funds are designed for small individual investors, not large defined contribution retirement plans like the Plans, and are identical in every respect to institutional share class funds, except for much higher fees.

66. For 42 of the 82 Vanguard funds available to Plans' investors, Defendants have designated only the retail "investor" share class as available investment alternatives offered under the Plans. Of the other 40 available Vanguard funds offered by the Plans, either Admiral

(institutional) shares are offered with substantially lower fees, or the funds offer only one share class.

67.     As shown by the sampling of those funds in the table below, Defendants could have designated the Admiral or institutional share class for the designated investment options, as opposed to investor share classes, at substantially lower cost to participants in the Plans. Such Admiral or institutional class funds are available to large investors like the Plans.

68.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. For example, Vanguard discloses in the prospectuses for the Vanguard Target Retirement Funds, "Certain Vanguard clients may meet the minimum investment amount by aggregating separate accounts within the same Fund or across the lineup of Vanguard Institutional Target Retirement Funds and/or Vanguard Target Retirement Funds." Thus, it is commonly understood by investment managers of large pools of assets that, for a retirement plan of the Plans' sizes, if requested, the investment provider would make available lower-cost share classes for the Plans, if there were any fund that did not individually reach the threshold.

69.     There is no rational basis for selecting institutional class shares for some of the investment choices and investor class shares for 42. If the selection of investor/retail share class was intended to offset the cost of recordkeeping, it was an exceedingly poor decision, considering the amounts being collected for recordkeeping services.  Despite the availability of these far lower-cost options, then, Defendants selected and continue to retain investment options with far higher costs in the Plans.  This hurt Plaintiffs and the proposed class.  The following table lists examples

of the Plans' designation of investor as opposed to lower-cost Admiral or institutional classes as investment options with respect to Vanguard mutual funds:

**EXPENSE RATIO COMPARISON: Vanguard Investor Shares vs. Institutional Shares**

| INVESTOR SHARES OFFERED BY THE PLANS | EXPENSE RATIO | INSTITUTIONAL (ADMIRAL) SHARES, FOR THE SAME FUNDS, NOT OFFERED BY THE PLANS | EXPENSE RATIO |
|---|---|---|---|
| **Bond Funds** | | | |
| Inflation-Protected Securities Inv. (VIPSX) | 0.20% | Inflation-Protected Securities Institutional Shares (VIPIX) | 0.07% |
| Long-Term Bond Index (VBLTX) | 0.16%* | Long-Term Bond Index Institutional Shares (VBLLX) | 0.06% |
| Intermediate-Term Bond Index-Inv (VBIIX) | 0.16%* | Intermediate-Term Bond Index-Inst (VBIMX) | 0.06% |
| Intermediate-Term Investment-Grade-Inv (VFICX) | 0.20% | Intermediate-Term Investment-Grade-Adm (VFIDX) | 0.10% |
| Intermediate-Term Treasury-Inv (VFITX) | 0.20% | Intermediate-Term Treasury-Adm (VFIUX) | |
| **Balanced Funds** | | | |
| Vanguard Target Retirement 2020 Fund (VTWNX) | 0.14% | Institutional Target Retirement 2020 Fund (VITWX) | 0.10% |
| Vanguard Target Retirement 2030 Fund (VTHRX) | 0.15% | Institutional Target Retirement 2030 Fund (VTTWX) | 0.10% |
| Vanguard Target Retirement 2040 Fund (VFORX) | 0.16% | Institutional Target Retirement 2040 Fund (VIRSX) | 0.10% |
| Vanguard Balanced Index Fund Investor Shares (VBINX) | 0.22% | Balanced Index Fund Institutional Shares (VBAIX) | 0.07% |
| **Stock Funds** | | | |
| Vanguard FTSE Social Index Fund Investor Shares (VFTSX) | 0.22% | FTSE Social Index Fund Institutional Shares (VFTNX) | 0.12% |
| Vanguard Wellington Fund Investor Shares | 0.25% | Vanguard Wellington Fund Admiral Shares Shares | 0.16% |

| | | | |
|---|---|---|---|
| (VWELX) | | (VWENX) | |
| Vanguard Small-Cap Growth Index Fund Investor Shares (VISGX) | 0.20% | Small-Cap Growth Index Fund Institutional Shares (VSGIX) | 0.07% |
| Vanguard Small-Cap Value Index Fund (VISVX) | 0.20% | Small-Cap Value Index Fund Institutional Shares (VSIIX) | 0.07% |
| **International** | | | |
| Vanguard Emerging Markets Stock Index – Inv (VEIEX) | 0.32% | Vanguard Emerging Markets Stock Index-Inst (VEMIX) | 0.11% |
| Vanguard European Stock Index-Inv (VEURX) | 0.26% | Vanguard European Stock Index-Inst (VESIX) | 0.08% |

*The participant fee disclosure reports that participants were being charged 20 basis points to invest in these funds although the expense ratios reported in the fund prospectuses were actually 16 basis points.

70. As of December 31 2016, Defendants continued to include approximately 126 Fidelity mutual funds as investment options, presenting an array of investment choices that could be evaluated, understood and managed by only a seasoned investment professional. But, as demonstrated above with respect to the Vanguard fund selection, not even the Plans' fiduciaries could adequately evaluate the performance and fees associated with the Fidelity funds. In fact, a sampling of the fee reporting for the Fidelity funds demonstrates even more glaring errors than in connection with the reporting of Vanguard fees. The table below presents a sample of fifteen Fidelity funds whose ***actual*** fees, as reported by the funds' prospectuses, were between 2 and 31 basis points ***less than*** the fees reported as being charged by the participant fee disclosure required by ERISA §404(a)(5):

| Georgetown U. Defined Contribution Retirement Plan— Fidelity Fund Reported Expense Ratios | | | | |
|---|---|---|---|---|
| Fund | Expense | | Delta | Notes |
| | from Prospectus | From 404(a)(5) | | |
| Fidelity Blue Chip Growth K | 59 | 70 | 11 | |
| Fidelity Capital Appreciation K | 41 | 72 | 31 | |
| Fidelity Contrafund K | 58 | 61 | 3 | |
| Fidelity Diversified International Fund K | 82 | 87 | 5 | |
| Fidelity Europe | 100 | 1.03 | 3 | |
| Fidelity Freedom 2030 | 61 | 65 | 4 | |
| Fidelity Freedom 2040 | 64 | 67 | 3 | |
| Fidelity Large Cap Value Enhanced Index | 39 | 45 | 6 | Premium/Inst class available for 5 bps |
| Fidelity Large Cap Growth Enhanced Index | 39 | 45 | 6 | Premium/Inst class available for 5 bps |
| Fidelity Low-Priced Stock | 58 | 78 | 20 | |
| Fidelity Mid Cap Value | 73 | 86 | 13 | |
| Fidelity Mid Cap Index Fund - Premium Class | 5 | 7 | 2 | |
| Fidelity Mid Cap Stock | 46 | 61 | 15 | |
| Fidelity New Millennium | 54 | 74 | 20 | |
| Fidelity Select Retailing | 78 | 81 | 3 | |

### C. Defendants imprudently retained historically underperforming Plan investments.

71. Given Defendants' failure to conduct appropriate due diligence in selecting and

retaining Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plans.

**i. CREF Stock Account**

72. Investments in the CREF Stock Account as of December 31, 2016 represent roughly 16 percent of the Plans' assets, and the CREF Stock Account has been included as an investment option in the Plans from at least 2009 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has for years historically underperformed and continues to underperform its benchmark and other, lower-cost actively and passively managed investments that were available to the Plans.

73. On information and belief, TIAA-CREF imposed restrictive provisions on the specific annuities that must be provided in the Plans. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity, the CREF Money Market Account and six other CREF variable annuities. Defendants provided these mandatory offerings in the Plans without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. Prior to creation of three separate share classes for the CREF Stock Account in mid-2015, the CREF Stock Account annually paid 56 basis points in fees for revenue sharing as administrative expense and "distribution fees," which exceeded other TIAA-CREF investments by over 50%.

74. Prudent ERISA fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed retirement funds, particularly "large cap" ones

like the CREF Stock Account, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the best interests of plan participants like Plaintiffs and the proposed Class to offer an actively managed large cap option for the particular investment style and asset class.

75.     In providing the Stock Account as a fund option, Defendants failed to conduct such a prudent analysis, despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market and that active managers do not outperform passive managers net of fees in this investment style.

76.     Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large cap retirement plan investment performance index after fees. That is in fact what occurred.

77.     Rather than performing poorly in a single year or two, the CREF Stock Account has registered poor performance persistently for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the CREF Stock Account's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Pl) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.



78.     The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2016, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

79.     Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the Vanguard Capital Opp. (Adm) (VHCAX).



80. The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[14]

[14] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.

CREF Stock Account
One-Year Investment Returns Compared to
Actively Managed Benchmarks
(as of Dec. 31, 2009)
6%–53%
greater than
CREF return
50%
45%
40%
35%
30%
1 Year
CREF Stock Account
VDEQX
VPMAX
VHCAX

CREF Stock Account
Five-Year Investment Returns Compared to
Actively Managed Benchmarks
(as of Dec. 31, 2009)
174%–206%
greater than
CREF return
6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
5 Year
CREF Stock Account
VPMAX
VHCAX

81. Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 70 bps during most of the relevant period , was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (36 bps), the Vanguard PRIMECAP (Adm) (32 bps), and the Vanguard Capital Opp. (Adm) (37 bps).

82. Given the foregoing, the CREF Stock Account was recognized as an imprudent investment in the industry. In March 2012, a prominent independent investment consultant, Aon Hewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plans. Aon Hewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[15] This recommendation was due to numerous factors, including the historical underperformance, high turnover of asset management executives and

[15]Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

portfolio managers and the fund's over 60 separate underlying investment strategies, which taken together greatly reduced the fund's ability to generate excess returns over any substantial length of time. *Id*. at 4–5.

83. The Supreme Court recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its continuing underperformance compared to lower-cost investment alternatives readily available to the Plans (and the opinion of one of the foremost authorities in the retirement investment industry that ***no*** retirement plan should own this fund).

84. Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans.

85. Had the Defendants removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives or the passively managed lower-cost alternatives, as set forth in ¶¶97 and 99, participants in the Plans like Plaintiffs would not have lost millions of dollars' worth of their retirement savings.

**ii. TIAA Real Estate Account**

86. Defendants selected and continue to offer the TIAA Real Estate Account as a real estate investment option in the Plans. The fund has far greater fees than are reasonable, has

historically underperformed and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

87.    With an expense ratio of 88.5 basis points as of December 31, 2014, the TIAA Real Estate Account is nearly eleven times more expensive than the Vanguard REIT Index (Inst), which has an expense ratio of eight basis points.



88.    Simply stating the expense ratio, of course, does not tell the whole story of a retirement fund's expenses.  TIAA disclosures indicate that included in the TIAA Real Estate Account's investment management fees is the expense of an independent fiduciary that is retained to approve appraisers of the Account's assets, ensure that acquisitions meet the Account's investment guidelines, and various other aspects of the operation of the Account that are and should

be the obligations of TIAA as the fund manager.  In fact, TIAA selects the appraisers and the funds' investments and determines all other matters relating to the management of the fund that are then subject to the approval of the independent fiduciary.  The reason, however, that the Account needs the services of an independent fiduciary is to ensure that TIAA, as the manager of the fund, does not engage a variety of prohibited transactions, including self-dealing transactions. By obtaining the approval of the independent fiduciary, TIAA is able to engage in transactions with parties-in-interest, including related parties, which it otherwise could not engage in.  In other words, the independent fiduciary is required in order to allow TIAA to actually manage the Real Estate Account and offer it as an investment choice to retirement plans.  It is an expense that should be borne entirely by TIAA as a cost of engaging in the business, not a legitimate expense of the operation of the fund.

89.     The TIAA Real Estate Account had a long history of substantial under-performance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009. Despite this, Defendants selected and continues to retain it in the Plans.



90.      This underperformance occurred for years before 2009 and has continued afterward. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2014.



91.     The very design of the TIAA Real Estate Account creates such operational difficulties, and burdens investors in the fund with such significant additional expense, that a reasonable plan fiduciary should have questioned whether the fund was an appropriate investment at all for participant-directed individual account plans like the Plans.

92.     The TIAA Real Estate Account is an insurance company pooled separate account, meaning that all the assets held in the account are plan assets and all the transactions involving those assets are subject to the prohibited transaction rules of ERISA § 406. As a result, TIAA has had to obtain an individual prohibited transaction exemption from the Employee Benefit Security Administration of the DOL just to be able to offer the fund as an investment choice to ERISA

plans. One of the conditions of that exemption is that TIAA must retain the services of an independent fiduciary to review and approve nearly every transaction in which the fund engages, adding significant additional expense to the operation of the fund.

93.     Additionally, the fund invests directly in real property assets that are highly illiquid. In order to manage the liquidity problem, TIAA guarantees the liquidity of participant accounts invested in the Real Estate Account – but it charges participants in the Plans an additional 17 basis points for that liquidity guarantee.

94.     The Real Estate Account charges participants 29.5 basis points for recordkeeping expense, whereas the R3 share classes of the variable annuities currently charge only 14.5 basis points.  A reasonable fiduciary would have questioned why, for a participant invested in the Real Estate Account, recordkeeping should cost double what it costs a participant invested in the variable annuities, and would have determined that there is no difference in cost, especially when all the accounting, appraisal and other costs associated with valuation are already being paid by the Real Estate Account.

95.     Finally, the Real Estate Account has and continues to charge 12.5 basis points for "distribution fees."  Any reasonable fiduciary would have questioned why TIAA is charging a distribution fee to distribute its own fund; this is a fee that gets paid to TIAA.  The fact that TIAA may require plans to include the Real Estate Account in a plan's menu of investment choices only adds insult to injury.

96.     The Real Estate Account's poor performance coupled with 44.5 basis points in excessive fees makes the TIAA Real Estate Account an exceedingly poor choice by any measure and speaks for itself in evaluating the performance of Defendants' fiduciary obligation to act solely

in the best interest of participants for the exclusive purpose of providing them benefits under the Plans.

97. As the Supreme Court unanimously ruled in *Tibble*, prudent ERISA fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. In contrast, Defendants here failed to conduct such a process and continue to retain the TIAA Real Estate Account as an investment option in the Plans despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

98. Had Defendants removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index, Plans participants including Plaintiffs would not have lost millions of dollars' worth of their retirement savings.

**iii. TIAA Non-Benefit Responsive Traditional Annuity**

99. The TIAA Non-Benefit Responsive Traditional Annuity prohibits participants from re-directing their investment in that Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives change. The Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they paid a 2.5% surrender charge that bore no relationship to any reasonable risk or expense to which the fund was subject.

100. The TIAA Traditional Annuity is an insurance company general account product, meaning that all of the assets supporting the annuity contract are held in TIAA's general account, and invested along with all the other assets in TIAA's general account. All of the assets of the TIAA general account are available to support the obligations of the Traditional Annuity.

101. Under ERISA, a contract or agreement between a retirement plan like the Plans and an investment manager like TIAA is deemed not to be reasonable within the meaning of section 408(b)(2) of ERISA if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous.

102. As expressly noted in 29 CFR 2550.408b-2(c)(3), a provision in a contract or other arrangement which reasonably compensates the service provider or lessor for loss upon early termination of the contract, arrangement, or lease is not a penalty. For example, a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty. Similarly, a provision in a lease for a termination fee that covers reasonably foreseeable expenses related to the vacancy and re-letting of the office space upon early termination of the lease is not a penalty. Such a provision does not reasonably compensate for loss if it provides for payment in excess of actual loss or if it fails to require mitigation of damages.

103. The 2.5% surrender charge imposed by the TIAA Traditional Annuity on lump sum withdrawals here is a clear and patent violation of the prohibition on a penalty for early withdrawal from the contract. Suppose, for example, that in connection with the investment of participant accounts in the Traditional Annuity in the Plans, TIAA acquired long-term bonds paying an interest rate of 4%. Suppose further that Plaintiff Darrell Wilcox has invested in the Traditional Annuity for twenty years before his retirement. If, at his retirement, those bonds have increased in value by 10% due to changes in prevailing interest rates, and he requests a lump sum distribution, TIAA could easily sell those bonds at a profit and pay Darrell his lump sum distribution. Instead, getting a lump sum distribution will cost Darrell a 2.5% surrender charge, ostensibly to protect TIAA from a loss it would not incur. A surrender charge that is always imposed for the life of a contract, regardless of the term of a participant's investment in the contract

and regardless of the financial condition of TIAA's general account at the time of withdrawal is *per se* unreasonable because it will invariably result in charges that are wholly unrelated to any actual loss.

104.    To have accepted these conditions for the investment of plan assets indicates that either (i) Defendants failed in its obligation to thoroughly understand the terms of the contract or (ii) failed to act in the best interest of plan participants in accepting such unreasonable terms.

105.    Even if the Defendant was blissfully and excusably unaware of the nature of the surrender change at the time of the initial investment in the contract, the DOL's release of its final regulation under ERISA § 408(b)(2), *Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure* (the "408b-2 Disclosure Rule"), on February 2, 2012 should have alerted it to issue.

106.    Release of the 408b-2 Disclosure Rule was a big deal. No reasonable responsible ERISA plan fiduciary could have missed it, since it required affirmative compliance of virtually every plan service provider and fiduciary by July 2012.

107.    As noted above, the 408b-2 Disclosure Rule contains an express provision in 29 CFR 2550.408b-2(c)(3) addressing the requirement for contacts to be terminable on reasonably short notice without penalty.  In fact, insurance companies discussed the issue of surrender charges with the DOL prior to the issuance of the final rule.  As noted in the Preamble to the Interim Final Rule:

> ***Other commenters raised questions as to whether certain fees and market value adjustments, generally associated with insurance or insurance-type services and investments, constitute "penalties" for purposes of this paragraph of the regulation***. The regulation provides specifically that "a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty." ***The Department believes that questions as to whether, for any particular contract, the charges for contract termination are in fact "penalties," rather than***

> ***a service provider's recoupment of reasonable start-up costs, are inherently factual questions; accordingly, the Department did not amend the rule in response to these comments.*** After consideration of all of the comments on paragraph (c )(2) of the proposal, the Department has determined to adopt that paragraph, without change, in the interim final rule, except that this provision has been moved to a new paragraph (c )(3) of the interim final rule.

(Emphasis added.)

108. Accordingly, the very existence of a 2.5% surrender charge that never varies regardless of the financial consequence of the withdrawal is unreasonable, and the acceptance of such terms, a breach of fiduciary duty under ERISA.

**ERISA'S FIDUCIARY STANDARDS**

109. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciary of the Plans. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

110. Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

111. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the Plans.

112. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

113. 29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

114. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans

under 29 U.S.C. §1109(a).

115.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Plans from April 28, 20March 1, 2012, through the date of judgment, excluding the Defendants or any participant who is a fiduciary to the Plans.

116.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class includes over 24,000 members and is so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plans-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the time period at issue in this action, and all participants in the Plans were harmed by Defendants' misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plans during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of its fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

117.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

118. Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g).

**COUNT I**

**Breach of Duty of Prudence—Unreasonable Administrative Fees**

119. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

120. The scope of the fiduciary duties and responsibilities of the Defendants includes discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries in the Plans, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA. Defendants are directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

121. Defendants selected and retained as the Plans' investment options investment funds and insurance company annuities that caused the Plans to incur far higher administrative fees and expenses relative to the size and complexity of the Plans.

122. For years Defendant failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plans to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided.

123. Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans

to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.

124.    Defendants' failure to properly evaluate the reasonableness of amounts being charged to the Plans have caused Plaintiffs and the Class millions of dollars in direct economic loss.  The Plans' total losses will be determined after complete discovery in this case and are continuing.

125.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT II

### Breach of Duty of Prudence—Unreasonable Investment Management Fees and Performance Losses

126.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

127.    The scope of the fiduciary duties and responsibilities of the Defendants include managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans's assets are invested prudently.

128.    As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

129. Defendants selected and retained as the Plans' investment options investment funds and insurance company annuities with far higher expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

130. Rather than consolidating the Plans' many investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained duplicative investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower-cost share classes of certain investments.

131. Defendants failed to engage in a prudent process for the selection and retention of the Plans' investment options. Rather, Defendants used more expensive funds with inferior historical performance than investments that were available to the Plans.

132. CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments ***and actively managed investments with similar underlying asset allocations***.

133. TIAA Real Estate Account: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plans despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

134. TIAA Traditional Annuity: Defendants failed to thoroughly evaluate the surrender charges imposed on plan participants wishing to take a lump sum distribution or worse, knowingly saddled participants with severe restrictions on their ability to withdraw from the Traditional Annuity, even at retirement, without the imposition of a penalty.

135. Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for

reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

136. Total losses to the Plans will be determined after complete discovery in this case and are continuing.

137. Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated participants and beneficiaries, respectfully request that the Court:

• Find and declare that Defendants have breached their fiduciary duties as described above;

• Find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duties, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

• Determine the method by which the Plans' losses under 29 U.S.C. §1109(a) should be calculated;

• Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

• Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

• Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

• Reform the Plans to include only prudent investments;

• Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

• Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schneider Wallace Cottrell Konecky Wotkyns LLP and Berger & Montague P.C. as Class Counsel;

• Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

• Order the payment of interest to the extent it is allowed by law; and

• Grant other equitable or remedial relief as the Court deems appropriate.

Dated: February 23rd, 2018

By: *<u>/s/ Garrett W. Wotkyns</u>*

Garrett W. Wotkyns
John J. Nestico*
Michael McKay*
SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0145
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
mmckay@schneiderwallace.com
jnestico@schneiderwallace.com

Todd M. Schneider*
Kyles G. Bates*
James A. Bloom*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California  94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
kbates@schneiderwallace.com
jbloom@schneiderwallace.com

Todd S. Collins*
Shanon J. Carson*
Ellen T. Noteware*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365
Telephone: (215) 875-3000
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

*Attorneys for Plaintiffs*

*(Pro Hac Vice application forthcoming)