# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DARRELL WILCOX and MICHAEL MCGUIRE, individually and as representatives of a class of participants and beneficiaries in and on behalf of the GEORGETOWN UNIVERSITY DEFINED CONTRIBUTION RETIREMENT PLAN, the GEORGETOWN UNIVERSITY VOLUNTARY CONTRIBUTION RETIREMENT PLAN, <br><br> *Plaintiffs*, <br><br> v. <br><br> GEORGETOWN UNIVERSITY, CHRISTOPHER AUGOSTINI, and GEOFF CHATAS, <br><br> *Defendants*. | Civil Action No. 1:18-cv-00422 <br><br><br><br> Hon. Rosemary M. Collyer |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Nancy G. Ross (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Brian D. Netter (D.C. Bar No. 979362)
  bnetter@mayerbrown.com
Michelle N. Webster (D.C. Bar No. 985265)
Matthew A. Waring (D.C. Bar No. 1021690)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 3

    A.    Tax-Deferred Annuity Plans Under I.R.C. § 403(b) ................................... 3

    B.    Georgetown's Plans ................................................................................ 5

    C.    Plaintiffs' Complaint .............................................................................. 8

ARGUMENT ...................................................................................................... 9

I.    This Court Lacks Jurisdiction Over Plaintiffs' Challenges To The Vanguard Mutual Funds, The TIAA Real Estate Account, And The TIAA Traditional Annuity. ................................................................................................. 11

    A.    Plaintiffs lack standing to challenge the fees associated with Vanguard mutual funds because they do not allege that they ever elected those funds. ........ 13

    B.    Plaintiffs lack standing to challenge the TIAA Real Estate Account because it outperformed Plaintiffs' recommended alternative during the proposed class period. ........................................................................... 14

    C.    Plaintiffs' challenge to the TIAA Traditional Annuity is unripe because Plaintiffs have not been injured by the surrender charge. ........................... 15

II.    Plaintiffs Have Failed To State A Claim Related To Recordkeeping Fees. ..................... 16

    A.    Defendants' use of multiple recordkeepers fails to support an inference of a flawed decision-making process. ......................................................... 17

    B.    Plaintiffs' allegations that overall recordkeeping fees were too high are inadequate to state a claim. .................................................................. 18

III.    Plaintiffs Have Failed To State A Claim Relating To The Plans' Investment Options. ............................................................................................... 21

    A.    Plaintiffs do not adequately allege that the University failed to monitor investment fees. ................................................................................. 21

    B.    Courts have repeatedly dismissed allegations, such as Plaintiffs' here, that plans offered too many options. ........................................................... 24

    C.    Plaintiffs' protests concerning investment selection do not state a plausible claim. .............................................................................................. 25

CONCLUSION ................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Group, Inc.*,
  99 F. Supp. 3d 1110 (C.D. Cal. 2015) ....................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................9

*Barchock v. CVS Health Corp.*,
  886 F.3d 43 (1st Cir. 2018) ...................................................................................26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................................9

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ............................................................................10, 23

*Brown v. Medtronic, Inc.*,
  628 F.3d 451 (8th Cir. 2010) ...............................................................................15

*Bunch v. W.R. Grace & Co.*,
  555 F.3d 1 (1st Cir. 2009) .....................................................................................25

*Chao v. Merino*,
  452 F.3d 174 (2d Cir. 2006).................................................................................10

*Chao v. Tr. Fund Advisors*,
  2004 WL 444029 (D.D.C. Jan. 20, 2004).............................................................25

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)..............................................................................................16

*Coburn v. Evercore Tr. Co., N.A.*,
  844 F.3d 965 (D.C. Cir. 2016) .............................................................................26

*Cunningham v. Cornell Univ.*,
  2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017)................................................24, 31

*DaimlerChrysler v. Cuno*,
  547 U.S. 332 (2006)..............................................................................................12

*Davis v. FEC*,
  554 U.S. 724 (2008)..............................................................................................12

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*DeBruyne v. Equitable Life Assur. Soc'y of U.S.*,
920 F.2d 457 (7th Cir. 1990) ............................................................................26

*Donovan v. Mazzola*,
716 F.2d 1226 (9th Cir. 1983) ..........................................................................11

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) ............................................................................9

*Ellis v. Fid. Mgmt. Tr. Co.*,
883 F.3d 1 (1st Cir. 2018) ................................................................................28

*Fifth Third Bancorp v. Dudenhoeffer*,
134 S. Ct. 2459 (2014) ...............................................................10, 25, 26, 29

*Fink v. Nat'l Sav. & Tr. Co.*,
772 F.2d 951 (D.C. Cir. 1985) ....................................................................10, 11

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000) ..........................................................................................12

*Gartenberg v. Merrill Lynch Asset Mgmt.*,
694 F.2d 923 (2d Cir. 1982) ..............................................................................20

*Harris v. Koenig*,
815 F. Supp. 2d 26 (D.D.C. 2011) ...............................................................10, 11

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ......................................................................23, 25

*Henderson v. Emory Univ.*,
252 F. Supp. 3d 1344 (N.D. Ga. 2017) ...............................................................24

*Hinton v. Corr. Corp. of Am.*,
624 F. Supp. 2d 45 (D.D.C. 2009) .......................................................................9

*Jenkins v. Yager*,
444 F.3d 916 (7th Cir. 2006) ............................................................................26

*Jones v. Harris Assocs. L.P.*,
559 U.S. 335 (2010)..........................................................................................20

*Kansas Corp. Comm'n v. FERC*,
881 F.3d 924 (D.C. Cir. 2018) ..........................................................................16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Kelly v. Johns Hopkins Univ.*,
 2017 WL 4310229 (D. Md. Sept. 28, 2017) ........................................................................24

*Kendall v. Emps. Ret. Plan of Avon Prods.*,
 561 F.3d 112 (2d Cir. 2009) ...............................................................................................12

*Kramer v. Time Warner, Inc.*,
 937 F.2d 767 (2d Cir. 1991) ...............................................................................................10

*Laboy v. Bd. of Trs. of Building Serv. 32 BJ SRSP*,
 513 F. App'x 78 (2d Cir. 2013) ..........................................................................................20

*LaRue v. DeWolff, Boberg & Assocs.*,
 552 U.S. 248 (2008) .......................................................................................................4, 12

*Loomis v. Exelon Corp.*,
 658 F.3d 667 (7th Cir. 2011) ...............................................................................13, 23, 25

*Loren v. Blue Cross & Blue Shield of Mich.*,
 505 F.3d 598 (6th Cir. 2007) ..............................................................................................13

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)......................................................................................................11, 12

*Mass. Mut. Life Ins. Co. v. Russell*,
 473 U.S. 134 (1985).............................................................................................................12

*Meiners v. Wells Fargo & Co.*,
 2017 WL 2303968 (D. Minn. May 25, 2017)......................................................................30

*Millennium Pipeline Co., L.L.C. v. Seggos*,
 860 F.3d 696 (D.C. Cir. 2017).....................................................................................11, 12

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
 513 U.S. 251 (1995).............................................................................................................6

*Newman-Green, Inc. v. Alfonzo-Larrain*,
 490 U.S. 826 (1989).............................................................................................................12

*O'Shea v. Littleton*,
 414 U.S. 488 (1974).............................................................................................................12

*Pfizer Inc. v. Shalala*,
 182 F.3d 975 (D.C. Cir. 1999).....................................................................................12, 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Piazza v. Ebsco Indus., Inc.*,
   273 F.3d 1341 (11th Cir. 2001) ...........................................15

*Renfro v. Unisys Corp.*,
   671 F.3d 314 (3d Cir. 2011)...........................................22, 23

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   2016 WL 7494320 (D. Conn. Dec. 30, 2016)...........................2, 23

*Ross v. Walton*,
   668 F. Supp. 2d 32 (D.D.C. 2009) .......................................15

*Sacerdote v. New York Univ.*,
   2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017)........................22, 24, 31

*Sacerdote v. New York University*,
   2017 WL 4736740 (S.D.N.Y. Oct. 19, 2017) ............................22

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ...................................................11

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.*
   *Mgmt. Co.*,
   712 F.3d 705 (2d Cir. 2013)...........................................10, 22, 26

*Sweda v. Univ. of Pa.*,
   2017 WL 4179752 (E.D. Pa. Sept. 21, 2017) ......................... *passim*

*Taylor v. KeyCorp*,
   680 F.3d 609 (6th Cir. 2012) ...........................................15

*Texas v. United States*,
   523 U.S. 296 (1998).......................................................12

*Tibble v. Edison Int'l*,
   729 F.3d 1110 (9th Cir. 2013) ...........................................25

*Tracey v. Mass. Inst. of Tech.*,
   2017 WL 4453541 (D. Mass. Aug. 31, 2017) ...........................24

*Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
   131 F. Supp. 3d 103 (S.D.N.Y. 2015)....................................15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Tussey v. ABB, Inc.*,
850 F.3d 951 (8th Cir. 2017) ...................................................30

*In re UBS ERISA Litig.*,
2014 WL 4812387 (S.D.N.Y. Sept. 29, 2014)...................................13

*White v. Chevron Corp.*,
2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ..................................23

*Winfield v. Citibank, N.A.*,
842 F. Supp. 2d 560 (S.D.N.Y. 2012)..................................10

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
165 F.3d 43 (D.C. Cir. 1999)..................................12

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
325 F. App'x 31 (2d Cir. 2009) (Sotomayor, J.)...................................20

**CONSTITUTIONAL PROVISIONS, STATUTES, RULES, AND REGULATIONS**

U.S. Const. art. III, § 2, cl. 1 ...................................................11

15 U.S.C. § 80a–35(b) ...................................................19

I.R.C.
§ 401(k)...................................................4
§ 403(b)...................................................3, 4
§ 403(b)(7)...................................................4
§ 406(a) ...................................................31, 32
§ 408(b)(2) ...................................................31

29 U.S.C. § 1104(a)(1)...................................................11

29 U.S.C. § 1104(a)(1)(B) .................................................. *passim*

Act to Incorporate the Carnegie Foundation for the Advancement of Teaching, ch.
636, 34 Stat. 59 (Mar. 10, 1906)...................................................3

Technical Amendments Act of 1958, Pub. L. No. 85-866, § 23, 72 Stat. 1606 ...........................4

Pub. L. No. 93-406, § 1022(e), 88 Stat. 829 (1974) ...................................................4

26 C.F.R. § 1.408-3...................................................29

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

29 C.F.R.
  § 2550.404a–1(b)(2)(i).............................................................................22
  § 2550.404a-5(a)...................................................................................27
  § 2550.404a-5(d)(1)(iii)......................................................................7, 28
  § 2550.408b-2.......................................................................................31
  § 2550.408b-2(a)..................................................................................31
  § 2550.408b-2(c)(3)..............................................................................32

75 Fed. Reg. 64,910 (Oct. 20, 2010)..........................................................7, 28

Fed. R. Civ. P. 12(b)(6)...........................................................................16

**OTHER AUTHORITIES**

AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016), https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting _Nearly_$10_Billion_Annually_Whitep;................................................17

David Pratt, *To (b) or Not to (b): Is That the Question? Twenty-First Century Schizoid Plans Under Section 403(b) of the Internal Revenue Code*, 73 ALB. L. REV. 139 (2009) ..............................................................................5

Deloitte, Defined Contribution Benchmarking Study (2017), https:// www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-hc-defined-contributions-benchmarking-survey-report.pdf............................5

GAO, 401(k) Plans: DOL Could Take Steps to Improve Retirement Income Options for Plan Participants, GAO-16-433 (2016), https://www.gao.gov/assets/680/678924.pdf ..........................................4

Internal Revenue Serv., *Instructions for Schedule C (Form 5500)* bit.ly/2HcXRyx....................20

Morningstar, TIAA Real Estate Account (QREARX), http://www.morningstar.com/funds/XNAS/QREARX/quote.html ..........................14

Morningstar, Vanguard Real Estate Index Institutional (VGSNX), http://www.morningstar.com/funds/xnas/vgsnx/quote.html................................14

Plan Sponsor Council of Am., 2017 403(b) Plan Survey (2017)..................................5

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Standard Retirement Servs., Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach* (Nov. 2009), http://web.archive.org/web/20081221040932/http://www.standard.com/pensions/publications/fixing_your_403b.pdf ........................................................ 17

Statement of Principles on Academic Retirement and Insurance Plans, https://www.aaup.org/file/retirement-and-insurance-plans.pdf ................................................. 4

TIAA, *College Retirement Equities Fund Prospectus* (May 1, 2017), https://www.tiaa.org/public/pdf/cref_prospectus.pdf ........................................................ 7, 27

TIAA, *CREF Stock Account, Class R3* (Dec. 31, 2017), https://www.tiaa.org/public/pdf/ffs/194408126.pdf ................................................................ 7

TIAA, *Our History*, https://www.tiaa.org/public/why-tiaa/who-we-are ........................................ 3

TIAA, *TIAA Real Estate Account Prospectus* (May 1, 2017), https://www.tiaa.org/public/pdf/realestate_prosp.pdf ................................................. 7, 8, 29, 30

TIAA, *TIAA Traditional questions & answers* (2017), https://www.tiaa.org/public/how-do-traditional-annuities-work ............................................ 33

Vanguard, *Vanguard Institutional Target Retirement Funds Prospectus* (2018), https://www.vanguard.com/pub/Pdf/i1673.pdf; ........................................................ 23

Vanguard, *Vanguard REIT Index Fund Prospectus*, https://www.vanguard.com/pub/Pdf/i3123.pdf .................................................... 14, 30

WILLIAM C. GREENOUGH, COLLEGE RETIREMENT AND INSURANCE PLANS (1948). ........................ 3

## INTRODUCTION

Georgetown University ("Georgetown") provides its employees with a generous package of benefits, including two retirement plans at issue here: the Georgetown University Defined Contribution Retirement Plan ("Defined Contribution Plan") and the Georgetown University Voluntary Contribution Retirement Plan ("Voluntary Plan") (collectively, "the Plans").

Georgetown contributes money to the Plans on behalf of each eligible participant, and participants are incentivized to make voluntary contributions to the Plans as well. Participants decide how to invest those funds across a wide array of investment options designed to meet the individual participant's circumstances and preferences.

The Plans are governed by the Employee Retirement Income Security Act ("ERISA"). Pursuant to ERISA, the Plans are administered by fiduciaries, who owe duties to Plan participants to act as would reasonable individuals "in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). ERISA thus imposes a relative standard of care that obligates fiduciaries to heed the practices of their peers.

In this action, Plaintiffs challenge various attributes of the Plans—in particular, the cost of the Plans' recordkeeping arrangement and the desirability of certain investment options. The fundamental theory of their case is that Georgetown breached its fiduciary duties by failing to administer the Plans in a way that Plaintiffs, viewing the matter in retrospect, contend would have been best for Plan participants. But to prove a claim for fiduciary breach, Plaintiffs must establish both that Georgetown employed a defective process and that its decisions were out of step with those of comparable institutions.

Plaintiffs' complaint plausibly alleges neither. The complaint says nothing about Georgetown's fiduciary processes. As for the design of the Plans, Plaintiffs merely make superficial and conclusory allegations that are no more than simple truisms, and that could be made

1

about virtually any retirement plan in America. Such assertions create no plausible inference of impropriety.  In particular, Plaintiffs say that recordkeeping fees could have been reduced; but they fail to account for the services and investment features that would have been sacrificed to attain those lower fees.  They say that Georgetown should have offered different investment options that, according to Plaintiffs, performed better than the options offered by Georgetown; but, in leveling those accusations, Plaintiffs rely on hindsight rather than the information that was available to Georgetown when it made those decisions.  Separately, Plaintiffs criticize Georgetown for failing to comport with supposed norms in the defined-contribution marketplace. Such concerns are based on the unstated premise that nonprofit 403(b) plans ought to look like corporate 401(k) plans; but ERISA's prudence standard "protects plan participants' reasonable expectations in the context of *the market that exists*," not the ideal market that plaintiffs supposedly would prefer. *See Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, at *17 (D. Conn. Dec. 30, 2016) (emphasis added).

Nor, for that matter, can Plaintiffs meaningfully allege that Georgetown's peer institutions have done things differently.  To the contrary, lawsuits virtually identical to this one are now pending against 17 large, private universities—a consideration that, standing alone, belies any suggestion that Georgetown has been an outlier.[1]

---

[1]     *See Sweda v. Univ. of Pa.*, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017), *appeal docketed*, No. 17-3244 (3d Cir. Oct. 13, 2017); *Short v. Brown Univ.*, No. 17-cv-318 (D.R.I. filed July 6, 2017); *Cates v. Trs. of Columbia Univ. in the City of N.Y.*, No. 16-cv-6524 (S.D.N.Y. filed Aug. 28, 2016); *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (S.D.N.Y. filed Aug. 17, 2016); *Clark v. Duke Univ.*, No. 16-cv-1044 (M.D.N.C. filed Aug. 10, 2016); *Henderson v. Emory Univ.*, No. 16-cv-2920 (N.D. Ga. filed Aug. 11, 2016); *Stanley v. George Washington Univ.*, No. 18-cv-878 (D.D.C. filed Apr. 13, 2018); *Kelly v. Johns Hopkins Univ.*, No. 16-cv-2835 (D. Md. filed Aug. 11, 2016); *Divane v. Northwestern Univ.*, No. 16-cv-8157 (N.D. Ill. filed Aug. 17, 2016); *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (S.D.N.Y. filed Aug. 9, 2016); *Nicolas v. Trs. of Princeton Univ.*, No. 17-cv-3695 (D.N.J. filed May 23, 2017); *Daugherty v. Univ. of Chi.*, No. 17-cv-3736 (N.D. Ill. filed May 18, 2017); *Munro v. Univ. of S. Cal.*, No. 16-cv-6191 (S.D. Cal. filed Aug. 17, 2016); *Cassell v. Vanderbilt Univ.*, No. 16-cv-2086 (M.D. Tenn. filed Aug. 10, 2016); *Davis v. Wash. Univ. in St. Louis*, No. 17-cv-1641 (E.D. Mo. filed June 8, 2017); *Vellali v. Yale Univ.*, No. 16-cv-1345 (D. Conn. filed Aug. 9, 2016).

In sum, it always is possible to engage in Monday morning quarterbacking by identifying, after the fact, aspects of a retirement plan that could have been changed.  But to state a claim for breach of fiduciary duty, Plaintiffs must allege facts to support the inference that Georgetown's 403(b) retirement plans fell short of fiduciary standards as informed by industry norms.  Plaintiffs have failed to do so, and the complaint accordingly should be dismissed.

## BACKGROUND

### A.    Tax-Deferred Annuity Plans Under I.R.C. § 403(b)

The Plans at issue in this case are organized under section 403(b) of the Internal Revenue Code.  That provision, entitled "Taxation of employee annuities," provides a different set of rules for certain plans sponsored by nonprofit employers. Section 403(b) reflects the heritage of the collegiate retirement system.  The unique attributes of that system provide relevant background, given Plaintiffs' false suggestion that there is a cohesive market for "defined contribution plans"—a category that includes both nonprofit 403(b) plans and corporate 401(k) plans.

Annuities have formed the backbone of the collegiate retirement system for more than a century.  In 1905, Andrew Carnegie endowed a $10 million gift to fund pensions at thirty universities.[2]  The following year, Congress chartered the Carnegie Foundation for the Advancement of Teaching to provide a system of retiring pensions for university professors.[3] By 1918, however, the aspirations of the Carnegie Foundation had outgrown its means.  So the Carnegie Foundation founded the Teachers Insurance and Annuity Association, which is now known as TIAA.[4]  TIAA developed annuity contracts with "fundamental provisions specially designed for college retirement plans," with an eye toward "advanc[ing] the cause of education as a whole."[5]

---

[2]    WILLIAM C. GREENOUGH, COLLEGE RETIREMENT AND INSURANCE PLANS 9 (1948).

[3]    Act to Incorporate the Carnegie Foundation for the Advancement of Teaching, ch. 636, 34 Stat. 59 (Mar. 10, 1906).

[4]    *See* TIAA, *Our History*, https://www.tiaa.org/public/why-tiaa/who-we-are.

[5]    GREENOUGH, *supra* note 2, at 14, 17.

The launch of the collegiate retirement system of annuities predates by decades enact-ment of I.R.C. § 403(b), which was enacted in 1958 to provide favorable treatment to so-called "tax-sheltered annuities."[6] In 1974, Congress permitted 403(b) plans to begin offering invest-ments other than annuities, thus allowing 403(b) plans to include both annuities and custodial accounts containing mutual funds.[7] Nevertheless, even today, annuities remain the hallmark of 403(b) plans.[8] The U.S. Government Accountability Office has endorsed this emphasis on life-time income; a 2016 GAO report recommended that the Secretary of Labor "help encourage plan sponsors to offer lifetime income options" as part of their retirement plans.[9]

Unlike 403(b) plans, corporate 401(k) plans were designed to supplement pensions. When ERISA was enacted in 1974, section 401(k) had not yet been enacted. At that time, "the defined benefit plan was the norm of American pension practice." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008) (alteration and internal quotation marks omitted). In 1978, Congress enacted I.R.C. § 401(k) to govern profit-sharing and stock option plans. Such plans were envisioned as supplements to pensions, so early 401(k) plans were not built around annui-ties. Although the market for for-profit retirement plans has changed dramatically in the past forty years—such that "defined benefit plans are now largely limited to the public sector, very

---

[6]     Technical Amendments Act of 1958, Pub. L. No. 85-866, § 23, 72 Stat. 1606, 1620-21 (codified at 26 U.S.C. § 403(b)).

[7]     ERISA, Pub. L. No. 93-406, § 1022(e), 88 Stat. 829, 1072 (1974) (codified as amended at 26 U.S.C. § 403(b)(7)).

[8]     The American Association of University Professors and the Association of American Colleges (now known as the Association of American Colleges and Universities) jointly endorse a Statement of Principles on Academic Retirement and Insurance Plans. *See* https://www.aaup.org/file/retirement-and-insurance-plans.pdf. The Statement encourages member-institutions to "provide for a plan of retirement annuities" that will generate, for a typical individual retiring at a normal age, "two-thirds of the yearly disposable salary (after taxes and other mandatory deductions) during the last few years of full-time em-ployment." *Id.*

[9]     GAO, 401(k) Plans: DOL Could Take Steps to Improve Retirement Income Options for Plan Par-ticipants 55, GAO-16-433 (2016), https://www.gao.gov/assets/680/678924.pdf.

large employers, and multi-employer plans of large national unions such as the Teamsters"[10]—
401(k) plans have largely retained their original structures.

Existing retirement plan data reflect the differences between 403(b) and 401(k) plans:
Whereas 68% of 403(b) retirement plans (which includes plans sponsored by educational institu-
tions and by other nonprofits) offer annuities among the plan investment options, only 6% of
401(k) plans do.[11]

### B.    Georgetown's Plans

The Plans reflect Georgetown's commitment to help its faculty and staff to prepare for re-
tirement.

Participants in the Plans have individual accounts.  For the Defined Contribution Plan,
Georgetown automatically contributes on each participant's behalf an amount equal to 5% of that
employee's salary.  Participants may voluntarily contribute an additional 3% of their salary to the
Defined Contribution Plan, which is matched by Georgetown on a 1.67-to-1 basis, such that an
employee contributing 3% of his/her salary will receive a 5% match.  Participants who wish to
contribute more than 3% of their salary may make additional contributions to the Voluntary Plan.

For each Plan, the participant directs how the money is to be invested from a broad menu
of investment options that includes fixed and variable annuities offered by TIAA and mutual
funds offered by TIAA, Vanguard, and Fidelity.  Compl. ¶¶ 28-29.[12]  The Plans' investment op-
tions charge certain fees to plan participants, which are disclosed pursuant to law through pro-
spectuses and periodic statements.  One component of those fees compensates the investment

---

[10]    David Pratt, *To (b) or Not to (b): Is That the Question? Twenty-First Century Schizoid Plans Un-
der Section 403(b) of the Internal Revenue Code*, 73 ALB. L. REV. 139, 144 (2009).

[11]    *Compare* Plan Sponsor Council of Am., 2017 403(b) Plan Survey tbl.58 (2017), *available at* Doc.
134-5, *Sacerdote v. N.Y. Univ.*, No. 1:16-cv-06284-KBF (S.D.N.Y. filed Jan. 10, 2018), *with* Deloitte,
Defined Contribution Benchmarking Study 20 (2017), https:// www2.deloitte.com/content/dam/Deloitte/
us/Documents/human-capital/us-hc-defined-contributions-benchmarking-survey-report.pdf.

[12]    During earlier periods, participants could also invest in investment funds provided by AXA, but
those funds stopped accepting additional contributions.  Compl. ¶ 29.

manager for overseeing the assets.  Another component of those fees compensates the recordkeeper for administering the Plans.

The Plans include, among a wide variety of investment options, the following three investment options:

The **TIAA Traditional Annuity** is a fixed annuity.  An annuity is effectively an insurance policy.  "Under a classic fixed annuity, the purchaser pays a sum certain and, in exchange, the issuer makes periodic payments throughout, but not beyond, the life of the purchaser."  *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 262 (1995).  When a participant elects to invest in the Traditional Annuity, TIAA enters into a direct contractual relationship with the Plan participant.  The terms of the Traditional Annuity are different for the Defined Contribution Plan and the Voluntary  Plan.  A participant who invests Voluntary Plan contributions in the Traditional Annuity may withdraw the funds at any time with no penalty; a participant who invests funds from the Defined Contribution Plan in the Traditional Annuity may not withdraw those assets until the termination of employment; upon termination, a participant who elects not to annuitize the funds must pay a 2.5% surrender charge to receive a lump-sum payout of the funds.  Because of the difference in the liquidity terms, contributions to the Defined Contribution Plan yield greater interest than contributions to the Voluntary Plan—typically 0.75% per year.  Participants in the Traditional Annuity have an individual, contractual right to invest in two of TIAA's variable annuity products—the CREF Stock Account and the CREF Money Market Account—meaning that Georgetown cannot discontinue contributions to the variable annuities without also discontinuing contributions to the Traditional Annuity contracts.

The **CREF Stock Account** is a variable-annuity investment fund. According to its prospectus, the Stock Account seeks to achieve "[a] favorable long-term rate of return through capi-

tal appreciation and investment income by investing primarily in a broadly diversified portfolio of common stocks."[13]  The Stock Account is globally diversified and "seeks to maintain the weightings of its holdings as approximately 65–75% domestic equities and 25–35% foreign equities."[14] Because of this blended strategy, the prospectus explains, no single benchmark gauges the Stock Account's performance:

> The benchmark for the Stock Account is a composite index composed of two unmanaged indices: the Russell 3000® Index and the MSCI All Country World ex USA Investable Market Index ("MSCI ACWI ex USA IMI"). The weights in the composite index change to reflect the relative sizes of the domestic and foreign segments of the Account and to maintain its consistency with the Account's investment strategies.[15]

Because the applicable federal regulations do not permit the use of a composite benchmark (*see* 29 C.F.R. § 2550.404a-5(d)(1)(iii); Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 Fed. Reg. 64,910, 64,916-17 (Oct. 20, 2010)), certain participant disclosures reference only the domestic, Russell 3000 component of the benchmark.  As of year-end 2017, the independent analyst Morningstar rates CREF Stock as a 5-star investment option.[16]

The **TIAA Real Estate Account** is a variable annuity account that "seeks favorable long-term returns primarily through rental income and appreciation of real estate and real estate-related investments."[17] The Real Estate Account invests primarily in commercial real estate, an asset class not widely available to retail investors in a variable annuity or mutual fund.[18] The

---

[13]      TIAA, *College Retirement Equities Fund Prospectus* 27 (May 1, 2017), https://www.tiaa.org/public/pdf/cref_prospectus.pdf.
[14]      *Id.* at 28.
[15]      *Id.*
[16]      TIAA, *CREF Stock Account, Class R3* (Dec. 31, 2017), https://www.tiaa.org/public/pdf/ffs/194408126.pdf.
[17]      TIAA, *TIAA Real Estate Account Prospectus* 3 (May 1, 2017), https://www.tiaa.org/public/pdf/realestate_prosp.pdf.
[18]      *Id.* at 37.

Real Estate Account is not a real-estate investment trust; as the prospectus explains, "REIT investments are securities and generally publicly traded," such that "they may be exposed to market risk and potentially significant price volatility due to changing conditions in the financial markets and, in particular, changes in overall interest rates, regardless of the value of the underlying real estate such REIT may own." Because the Real Estate Account invests primarily in real property, its returns are driven by the appraised "fair value" of the real estate properties in its portfolio, and the income generated by those properties.[19]

### C.    Plaintiffs' Complaint

Plaintiffs Darrell Wilcox and Michael McGuire filed this action against Georgetown and its current and former Senior Vice President and Chief Administrative Officers on February 23, 2018.[20]  Plaintiffs seek relief under four theories:

*First*, Plaintiffs allege that Georgetown improperly allowed TIAA-CREF, Vanguard, and Fidelity separately to provide recordkeeping services for their own respective investments.   In Plaintiffs' view, consolidating recordkeeping services was a readily available option that would have reduced the Plans' costs.  Compl. ¶¶ 119–25.

*Second*, Plaintiffs allege that Georgetown offered investment options that were more expensive than other investment options that could have been offered.  Compl. ¶ 129.

*Third*, Plaintiffs allege that Georgetown offered too many investment options. Compl. ¶ 130.

*Fourth*, Plaintiffs challenge the inclusion in the Plans of the Stock Account, the Real Estate Account, and the Traditional Annuity.  Plaintiffs allege that Georgetown should have elimi-

---

[19]     TIAA, Real Estate Account Prospectus 55 (May 1, 2017), https://www.tiaa.org/public/pdf/realestate_prosp.pdf.

[20]     The Complaint does not distinguish actions taken by the University from those supposedly taken by the Chief Administrative Officers Augostini and Chatas.  Accordingly, all references to Georgetown in this motion should be construed to encompass both Messrs. Augostini and Chatas.

nated the Stock Account from the Plans because of its historical underperformance relative to the Russell 3000 index and to passively managed mutual funds that track the Russell 3000 index. Compl. ¶¶ 72-85.  Plaintiffs next allege that Georgetown should have removed the Real Estate Account in favor of the Vanguard REIT Index (Institutional) mutual fund, which they say had lower fees and better performance.  Compl. ¶¶ 86-98.  Finally, Plaintiffs contend that offering the Traditional Annuity was unreasonable because the applicable contracts impose a 2.5% surrender charge under some circumstances.  Compl. ¶¶ 99-108.

Plaintiffs allege that the decisions about plan administration and the inclusion of each of those options in the Plans' investment lineup violated Defendants' fiduciary duty of prudence under Section 404 of ERISA (29 U.S.C. § 1104(a)(1)(B)).

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "plausibility" standard is satisfied only if a complaint alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

At this stage of the proceedings, a court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *See, e.g.*, *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). If the complaint "necessarily relies" on particular documents, they are considered to be incorporated in the complaint "even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Hinton v. Corr. Corp. of*

*Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009). Consistent with these standards, courts routinely rely upon formal plan documents and disclosures required by statute when resolving motions to dismiss in ERISA cases.[21]

Plaintiffs' claims all pertain to ERISA's duty of prudence. Motions to dismiss duty-of-prudence claims are a crucial "mechanism for weeding out meritless [ERISA] claims," requiring "careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014). "Prudence under ERISA is measured according to the objective prudent person standard developed in the common law of trusts." *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 955 (D.C. Cir. 1985). The duty looks to what "a prudent man acting in a *like capacity* and familiar with such matters would [do] in the conduct of an *enterprise of a like character and with like aims*." 29 U.S.C. § 1104(a)(1)(B) (emphases added).

Ordinarily, a claim for breach of fiduciary duty must allege shortcomings in the fiduciary's *processes* that led the fiduciary to deviate from industry customs. A complaint that *lacks* "allegations relating directly to the methods employed by the ERISA fiduciary" may survive a motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Co.*, 712 F.3d 705, 718, 727 (2d Cir. 2013) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)). "ERISA does not impose a duty to take any particular course of action if another approach seems preferable." *Harris v. Koenig*, 815 F. Supp. 2d 26, 32 (D.D.C. 2011) (quoting *Chao v. Merino*, 452 F.3d 174, 182

---

[21]     *See Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 568 n.3 (S.D.N.Y. 2012) (plan and summary plan description "plainly are integral" to ERISA cases); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Group, Inc.*, 99 F. Supp. 3d 1110, 1126 (C.D. Cal. 2015) (DOL Form 5500 subject to judicial notice); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991) (prospectuses subject to judicial notice).

(2d Cir. 2006)).  Rather, a fiduciary need only act reasonably "*under the circumstances then pre-vailing*." *Id.* at 31-32 (quoting 29 U.S.C. § 1104(a)(1)). "A court's task," then, is "to inquire 'whether the individual trustees, at the time they engaged in the challenged transactions, em-ployed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Fink*, 772 F.2d at 955 (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)).

## I.    This Court Lacks Jurisdiction Over Plaintiffs' Challenges To The Vanguard Mutu-al Funds, The TIAA Real Estate Account, And The TIAA Traditional Annuity.

As a threshold matter, three of Plaintiffs' claims must be dismissed for failure to satisfy the minimum requirements of Article III.  Plaintiffs cannot establish injury-in-fact with respect to their challenges to the Vanguard mutual funds or the Real Estate Account and have no ripe claim as to the Traditional Annuity.

"Article III of the Constitution limits [federal courts'] jurisdiction to 'Cases' and 'Con-troversies.'" *Millennium Pipeline Co., L.L.C. v. Seggos*, 860 F.3d 696, 699 (D.C. Cir. 2017) (quoting U.S. Const. art. III, § 2, cl. 1). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). That doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong" and "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood." *Id.*

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As the D.C. Circuit has explained:

> To satisfy the case-and-controversy requirement, a [plaintiff] must allege (i) that it suffered an injury in fact; (ii) that a causal connec-tion exists between the injury and challenged conduct; and (iii) that it is likely, as opposed to speculative, that the injury will be re-dressed by a favorable decision.

*Millennium Pipeline*, 860 F.3d at 699 (citing *Lujan*, 504 U.S. at 560-61); *see also Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000). Plaintiffs must demonstrate standing for "'each claim'" and "'for each form of relief that is sought.'" *Davis v. FEC,* 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler v. Cuno,* 547 U.S. 332, 352 (2006)). In a class action, the *named* plaintiffs must demonstrate that they have constitutional standing (*O'Shea v. Littleton,* 414 U.S. 488, 494 (1974)), measured at the time the complaint was filed (*Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 830 (1989)). "The party invoking federal jurisdiction bears the burden of establishing these elements … with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Article III also precludes courts from hearing claims that are not ripe for adjudication. *See, e.g.*, *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999). "'A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Pfizer Inc. v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999) (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)).

In an ERISA breach-of-fiduciary-duty action, plaintiffs "cannot claim that either an alleged breach of fiduciary duty to comply with ERISA, or a deprivation of an entitlement to that fiduciary duty, in and of themselves constitutes an injury-in-fact sufficient for constitutional standing." *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 121 (2d Cir. 2009). In a case involving a plan with a defined *benefit*, plan participants share a "common interest … in the financial integrity of the plan" (*Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985)) that can be injured by a fiduciary breach that "creates or enhances the risk of default by the entire plan" (*LaRue*, 552 U.S. at 255). In a defined *contribution* plan, by contrast, the interests of plan participants are not always aligned. Where, as here, participants "choose how their retirement

12

assets will be invested," (*Loomis v. Exelon Corp.*, 658 F.3d 667, 669 (7th Cir. 2011)) a fiduciary misstep might have no impact on a participant's individual interests, as, in the most extreme case, when a plan participant alleges a fiduciary breach respecting an investment fund he did not elect. Thus, in an ERISA action for breach of fiduciary duty, plaintiffs must "establish individual standing" in order to maintain a lawsuit. *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608 (6th Cir. 2007).

A.  **Plaintiffs lack standing to challenge the fees associated with Vanguard mutual funds because they do not allege that they ever elected those funds.**

Plaintiffs' complaint alleges that Georgetown "used more expensive funds … than investments that were available to the Plans." Compl. ¶ 131. In support of that claim for relief, Plaintiffs challenge the particular share classes of Vanguard funds that were available to Plan participants. *See id.* ¶ 65. But Plaintiffs have no standing to challenge the Vanguard funds offered by the Plans, because they never elected any of those funds. To the contrary, Plaintiffs allege that the TIAA, Vanguard, and Fidelity investment options were segmented into separate platforms and that "investors in the Plans had to choose from among the three and could invest in only the investment choices available in one of these three segments." *Id.* ¶ 8. Plaintiffs both elected TIAA. *Id.* ¶¶ 20-21. As such, they lack any cognizable interest in the particulars of the Vanguard lineup. *Accord, e.g.*, *In re UBS ERISA Litig.*, 2014 WL 4812387, at *6 (S.D.N.Y. Sept. 29, 2014) ("Plaintiff can only demonstrate a constitutionally sufficient injury by pointing to her *individual account's specific losses*."), *aff'd sub nom. Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015).[22]

---

[22]  The same reasoning would apply to the Fidelity lineup. Although Plaintiffs disparage certain disclosures pertaining to Fidelity's investment lineup (Compl. ¶ 70), they do not appear to be challenging the inclusion of any of the Fidelity funds. To the extent their complaint could be construed as making such a challenge, this Court would lack jurisdiction for the same reasons that apply to the Vanguard funds.

**B.      Plaintiffs lack standing to challenge the TIAA Real Estate Account because it outperformed Plaintiffs' recommended alternative during the proposed class period.**

In challenging the Real Estate Account, Plaintiffs claim that they were injured because they should instead have been offered the Vanguard REIT Index (Institutional) mutual fund.[23] Plaintiffs insist that "[h]ad Defendants removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index, Plan participants including Plaintiffs would not have lost millions of dollars' worth of their retirement savings." Compl. ¶ 98.

Like the bulk of their complaint, Plaintiffs' allegations against the Real Estate Account were copied from other cases, which covered different time periods.[24]  But Plaintiffs evidently failed to investigate whether the allegation stands up under the time period covered by their complaint.  It does not.  If an individual had invested $10,000 in the Real Estate Account on March 1, 2012 (the start date of Plaintiffs' proposed class period), that investment would have been worth $15,783.15 on February 23, 2018, the date on which Plaintiffs filed their complaint.[25] If, by contrast, the individual had invested $10,000 in the Vanguard REIT Index (Institutional) Fund on March 1, 2012, the investment would have been worth $15,739.50 on February 23, 2018.[26]

---

[23]      This fund is now known as the "Vanguard Real Estate Index Fund."  *See* Vanguard, *Vanguard REIT Index Fund Prospectus* 1, https://www.vanguard.com/pub/Pdf/i3123.pdf.

[24]      *Compare, e.g.*, Compl. ¶ 90 ("The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five- and ten-year periods ending December 31, 2014."), *with* Consol. Compl. ¶ 200, *Cates*, ECF No. 76-1 (same), *and* Corrected Amended Compl. ¶ 200, *Cunningham*, ECF No. 81 (same but using "significantly" instead of "vastly").

[25]      *Compare* Morningstar, TIAA Real Estate Account  (QREARX), http://www.morningstar.com/funds/XNAS/QREARX/quote.html ("Growth of 10K" chart for period beginning 3/1/2012 and ending 2/23/2018); *with* Morningstar, Vanguard Real Estate Index Institutional (VGSNX), http://www.morningstar.com/funds/xnas/vgsnx/quote.html (chart for Vanguard fund over same time period).

[26]      *See* Morningstar, Vanguard Real Estate Index Institutional (VGSNX), http://www.morningstar.com/funds/xnas/vgsnx/quote.html ("Growth of 10K" chart for period beginning

For standing purposes, a plan participant obviously has no right to pursue the claim that he should have been entitled to make *less* money than he did.  *See, e.g.*, *Taylor v. KeyCorp*, 680 F.3d 609, 615 (6th Cir. 2012) (holding that ERISA plaintiff lacked standing because, after netting her gains and losses over the class period, "it is clear that [she] has suffered no actual injury"); *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1354 (11th Cir. 2001) ("Since Piazza was not injured by the alleged pre-sale undervaluations (which, if anything, increased his retirement distributions), he lacks standing to raise a claim based on the pre-sale undervaluation of the EBSCO stock."); *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 131 F. Supp. 3d 103, 126 (S.D.N.Y. 2015) (plaintiff lacked standing to bring ERISA claim "[b]ecause of the huge gain Plaintiff realized"); *see also, e.g.*, *Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2010) (holding that, in an ERISA case, "at a minimum, a plaintiff must allege a net loss in investment value that is fairly traceable to the defendants' challenged actions" in order to establish standing). As such, Plaintiffs' challenge to the TIAA Real Estate Account must be dismissed for lack of standing.

### C.  Plaintiffs' challenge to the TIAA Traditional Annuity is unripe because Plaintiffs have not been injured by the surrender charge.

Plaintiffs likewise cannot assert their challenge to the TIAA Traditional Annuity because they have not alleged any respect in which they have sustained injury.  Plaintiffs' challenge to the Traditional Annuity is that Georgetown allegedly "failed to thoroughly evaluate the surrender charges imposed on plan participants wishing to take a lump sum distribution or worse, knowingly saddled participants with severe restrictions on their ability to withdraw from the Traditional Annuity, even at retirement, without the imposition of a penalty."  Compl. ¶ 134.

---

3/1/2012 and ending 2/23/2018).  The Court can rely on these figures because Plaintiffs incorporated documents memorializing the respective performance of the two funds in their complaint. *See* Compl. ¶ 90. Alternatively, the Court may take judicial notice of the publicized prices of these securities. *See, e.g.*, *Ross v. Walton*, 668 F. Supp. 2d 32, 41 n.7 (D.D.C. 2009) ("Generally, courts may take judicial notice of publicized stock prices without converting a motion to dismiss into summary judgment.").

The problem is that neither of the Plaintiffs alleges that he was injured by the surrender charges. Plaintiff McGuire does not allege that he invested in the Traditional Annuity at all; thus, he plainly has no standing to challenge any attributes of that investment option. While plaintiff Wilcox alleges that he invested in the Traditional Annuity, he has not specified whether he has invested in the Traditional Annuity through the Defined Contribution Plan (which is the only Plan to which the surrender charge applies), and he does not allege that he has been injured by the surrender charge. Plaintiffs allege only that *if*, at retirement, Wilcox *hypothetically* decides that he wants to forgo the annuitization feature of his annuity, *then* he will incur a 2.5% surrender charge. Compl. ¶ 103. But under the doctrines of standing and ripeness, such speculation does not amount to a concrete and particularized injury triggering this Court's authority to intervene. *See, e.g.*, *Kansas Corp. Comm'n v. FERC*, 881 F.3d 924, 930 (D.C. Cir. 2018) (dismissing petitions for review for lack of standing because "[t]he particularized effect of FERC's orders will not be felt by [petitioner] unless an 'attenuated chain of possibilities' occurs") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)); *Pfizer*, 182 F.3d at 979 (petitioner's challenge to FDA decision was not ripe because petitioner could not "point to any imminent hardship" arising from the decision).

## II.      Plaintiffs Have Failed To State A Claim Related To Recordkeeping Fees.

Plaintiffs' claims fare no better under Rule 12(b)(6). Plaintiffs allege in Count I that the University breached its fiduciary duty by overpaying for recordkeeping services. This Count encompasses two related allegations: (1) that the Plans should not have permitted TIAA, Vanguard, and Fidelity to maintain separate records for their own accounts; and (2) that the overall costs of recordkeeping were excessive. But those allegations do not plausibly raise an inference of fiduciary misconduct. On the contrary, Plaintiffs' allegations show that Defendants' practices were in line with common practices within the relevant industry—403(b) plans sponsored by institutions

16

of higher education.

### A. Defendants' use of multiple recordkeepers fails to support an inference of a flawed decision-making process.

Rather than pleading a plausible case of flawed fiduciary process, Plaintiffs allege, categorically and conclusorily, that "[p]rudent fiduciaries of defined contribution plans the size of the Plans use a single recordkeeper rather than hiring multiple recordkeepers." Compl. ¶ 40. But such categorical allegations do not state a claim.

Plaintiffs compare Georgetown's Plans to "defined contribution plans"—a term that encompasses university plans like Georgetown's as well as corporate 401(k) plans that look nothing like Georgetown's. But Plaintiffs' allegations must support a plausible inference that Georgetown's fiduciary processes were out of step with those of "prudent [fiduciaries] acting in a like capacity . . .in the conduct of an enterprise of a like character and with like aims." 29 U.S.C § 1104(a)(1)(B), i.e., *with those of its peer institutions*. As demonstrated by the authorities invoked by Plaintiffs in their complaint, Georgetown's approach to recordkeeping was fully consistent with the norms of higher-education plans. Those authorities establish that "[t]he traditional 403(b) plan has historically been implemented through a multi-provider recordkeeper platform."[27] That arrangement remains "[t]he most prevalent model by far."[28]

Plaintiffs' effort to compare Georgetown's 403(b) Plans to corporate 401(k) plans—non-annuity plans that differ fundamentally from university 403(b) plans—cannot move the needle on Plaintiffs' burden to allege that Georgetown's conduct reflects an imprudence or unjustifiable deviation from the conduct of its peers. Plaintiffs' only effort to compare the Plans to the appro-

---

[27]     AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It*, at 3 (Jan. 2016), https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitep; *see* Compl. ¶ 44.

[28]     Standard Retirement Servs., Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 (Nov. 2009), http://web.archive.org/web/20081221040932/http://www.standard.com/pensions/publications/fixing_your_403b.pdf; *see* Compl. ¶ 42.

priate cohort is the conclusory allegation that "any number of university plans provide for a single recordkeeper with investment choices offered by multiple fund managers."  Compl. ¶ 47. Plaintiffs do not identify any such plans (and their assertion that "any number" of such plans exist conflicts with the authorities Plaintiffs themselves cite in the Complaint.)  And, meaningfully, Plaintiffs do not allege that Georgetown could have consolidated recordkeeping without also changing its investment lineup.

So the thrust of Plaintiffs' allegations is that Georgetown could have constructed an entirely different retirement plan, with different investment options, using a single recordkeeper. But the fact that Georgetown could have made *many* different decisions hardly supports the inference that Georgetown's *recordkeeping* decision was impermissible when viewed in isolation. As the *Sweda* court recognized, "there are rational bundling reasons to allow separate recordkeepers." 2017 WL 4179752, at *8. In the recordkeeping market, as in other markets, certain investment firms bundle services together—for example, by pairing an investment offering with recordkeeping services.  "[I]t is rational to comply with [a provider's] requirement that they serve as recordkeeper if that is required to gain access to the desired [provider's] portfolio."  *Id.*

Plaintiffs' abstract preference for a single-recordkeeper platform does not state a claim for fiduciary malfeasance.

**B.    Plaintiffs' allegations that overall recordkeeping fees were too high are inadequate to state a claim.**

Plaintiffs' challenge to overall recordkeeping fees fails for similar reasons.  Plaintiffs' assertion is that Georgetown could have made different decisions that would have reduced recordkeeping expenses. *See, e.g.*, Compl. ¶¶ 4, 36-37, 39, 48, 53, 57.  While perhaps true, such allegations do not plausibly show a fiduciary breach.

The gap in Plaintiffs' attempted syllogism arises from the truism that valuable services

cost money.  Georgetown could have abandoned annuities, which are more expensive to administer, but in doing so would have caused participants to lose important and meaningful benefits. Likewise, Georgetown could have chosen vendors that offer subpar investments coupled with below-market recordkeeping fees intended to attract business.  Or Georgetown could have designed its Plans taking a "no-frills" approach whereby participants received only the minimum disclosures required by law instead of access to advisors who provide valuable one-on-one retirement planning services.

Plaintiffs make the striking allegation that the Plans could have been administered for $35 per participant per year.  But what would such Plans have looked like?  Plaintiffs do not allege that Georgetown could have offered TIAA annuities or Fidelity mutual funds for $35 per participant per year.  Plaintiffs' allegations thus amount to nothing more than a claim that a different product could have been obtained for a different price.  As many courts have emphasized, the responsibility of ERISA's fiduciaries is not to minimize a plan's costs; it is to balance fairly the costs of administration with the provision of reasonable services.  *See, e.g.*, *Sweda*, 2017 WL 4179752, at *8 ("Even if there *were* cheaper options available for recordkeeping fees, ERISA mandates that fiduciaries consider options besides cost.").  Thus, Plaintiffs' cost allegations do not plausibly demonstrate that Georgetown was imprudent in the administration of the Plans. Indeed, if identifying an opportunity to cut costs were enough to plead a breach of the duty of prudence, then any retirement plan in America could be subjected to such a lawsuit.

In view of the parallels between ERISA's fiduciary duty to monitor fees and the fiduciary obligations prescribed by the Investment Company Act when investment advisers set mutual fund fees (15 U.S.C. § 80a–35(b)), in considering a motion to dismiss, several courts have "consider[ed] the standard for excessive fee claims articulated in the context of the Investment Com-

pany Act ('ICA') useful for reviewing [a] claim that excessive fees violated ERISA." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.); *accord Laboy v. Bd. of Trs. of Building Serv. 32 BJ SRSP*, 513 F. App'x 78, 80 n.4 (2d Cir. 2013). Under the ICA standard, to give rise to a claim of excessive fees, "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982); *see Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 345–46 (2010) (endorsing *Gartenberg*); *see also Laboy*, 513 F. App'x at 80 (suggesting that a claim that a fiduciary exposed an ERISA plan to excessive fees will typically exist only where there are plausible allegations of self-dealing).

Nothing in the complaint plausibly alleges such a disconnect between the services that the Plans provided and the fees paid for those services. In fact, the complaint does not allege anything about the services the Plans received. Plaintiffs base their claims on "the nature of the administrative services provided by the Plans' platform providers," but they do not allege what those services are. Compl. ¶ 53.  Having failed even to identify the services that were provided, Plaintiffs plainly cannot "allege that the fees were excessive *relative 'to the services rendered*,'" (*Young*, 325 F. App'x at 33 (quoting *Gartenberg,* 694 F.2d at 928)) (emphasis added), let alone that it was imprudent for defendants to agree to pay those fees for those services.[29]  Thus, Plain-

---

[29]     Plaintiffs' allegation that the Plans' Forms 5500 filed with the Department of Labor failed to report indirect compensation paid to TIAA (Compl. ¶ 55) demonstrates a misunderstanding of the facts and the law. Form 5500's Schedule C, which pertains to compensation paid to service providers, instructs a plan to identify service providers that received only "eligible indirect compensation"—*i.e.*, " indirect compensation that is fees or expense reimbursement payments charged to investment funds and reflected in the value of the investment or return on investment of the participating plan." Internal Revenue Serv., *Instructions for Schedule C (Form 5500)* at 26, bit.ly/2HcXRyx. Such service providers need only be identified by name in Part I, Schedule 1 of the form; the amount of compensation need not be stated. *See* Ex. 1 at 1 (Form 5500, stating "[i]f a person received **only** eligible indirect compensation for which the plan received the required disclosures, you are required to answer line 1 but are not required to include that person when completing the remainder of this Part."). The Plans' Forms 5500 complied with that

tiffs' one-size-fits-all statement that recordkeeping fees were too high is not sufficient to state a claim for breach of fiduciary duty.[30]

### III.   Plaintiffs Have Failed To State A Claim Relating To The Plans' Investment Options.

In Count II, Plaintiffs allege that the University breached its fiduciary duties (1) by offering mutual funds that were too expensive; (2) by offering too many investment options; and (3) by offering the Stock Account and the Real Estate Account, which they allege to have been underperformers; and the Traditional Annuity, which they allege to have contained undesirable terms. None of those allegations states a plausible claim of fiduciary breach.

#### A.   Plaintiffs do not adequately allege that the University failed to monitor investment fees.

Plaintiffs first seek to impose liability on defendants for allegedly failing to include the lowest-fee options within the mutual-fund menu. But ERISA requires only that the processes followed by Defendants in making decisions about what to offer satisfy standards of prudence.  To state a claim against Defendants, Plaintiffs would need to allege that Defendants had inadequate processes in place to satisfy their fiduciary duties. But Plaintiffs are inexcusably silent with respect to those processes, and they nowhere allege that those processes were inadequate.

Moreover, even if it were appropriate to focus only on outcomes, the mix of investments offered belies Plaintiffs' allegations of imprudence. Fiduciaries satisfy their duties under ERISA by "offer[ing] participants meaningful choices about how to invest their retirement savings," a standard that accounts for "the range of investment options and the characteristics of those in-

---

procedure. *See, e.g.*, *id.* (Defined Contribution Plan Form 5500 for plan year 2016, identifying TIAA as recipient of only eligible indirect compensation).

[30]     On a related note, Plaintiffs allege that "prudent ERISA fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets."  Compl. ¶ 37.  The assumption underlying that allegation is that per-participant fees would be lower than percentage-of-asset fees.  Whether or not that assumption has merit, Plaintiffs have not alleged that per-participant recordkeeping fees were even *available* in the marketplace for 403(b) plans offering annuities.

cluded options—including the risk profiles, investment strategies, and associated fees." *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011). The standard is thus whether a fiduciary has given "'appropriate consideration' to whether an investment 'is reasonably designed, as part of the portfolio … to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment.'" *St. Vincent*, 712 F.3d at 716 (quoting 29 C.F.R. § 2550.404a–1(b)(2)(i)).

Applying that standard, several courts in similar university retirement-plan class actions have rejected identical claims that university 403(b) plans should have offered exclusively institutional share classes of mutual funds. As the court in *Sacerdote v. New York University* explained in rejecting a similar claim, the question is not whether "the inclusion of any specific investment was imprudent," but whether "the <u>mix</u> of investments was unreasonable" (2017 WL 4736740, at *11 (S.D.N.Y. Oct. 19, 2017) (opinion denying motion for reconsideration)).  Courts have repeatedly approved mixes of investments with expense ratios that include many retail share classes (*Sacerdote v. New York Univ.*, 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017) (granting motion to dismiss in part)). There are good reasons why a plan's mix of investments would include retail share classes for mutual funds, not least because a plan can use the revenue sharing that such funds incorporate as the means for paying for plan administration and record-keeping expenses—as Plaintiffs themselves acknowledge that the Plans did. Compl. ¶ 7. If the Plans did *not* rely on this kind of revenue sharing, their participants would have to pay for administration and recordkeeping services separately. In other words, as the court in *Sweda* explained, "[s]witching from retail to institutional shares is not a matter of checking a different box. It requires fiduciaries to balance the menu of options given to plan beneficiaries against the fees." *Sweda*, 2017 WL 4179752, at *9. Indeed, the prospectus cited by Plaintiffs for the proposi-

tion that it would be costless to switch from retail to institutional shares discloses that Vanguard is entitled to collect "additional recordkeeping fees for institutional clients whose accounts are recordkept by Vanguard."[31]  Plaintiffs have not alleged that the balance struck by Defendants was inappropriate.

Moreover, this sort of myopic focus on investment price alone has also been rejected by numerous courts outside the university 403(b) context. These courts have recognized that "where, as here, a plan offers a diversified array of investment options, the fact that some other funds might offer lower expense ratios is not relevant, as ERISA does not require fiduciaries to scour the market to find and offer the cheapest possible funds (which might, of course, be plagued by other problems)." *White v. Chevron Corp.*, 2016 WL 4502808, at *10 (N.D. Cal. Aug. 29, 2016) (citations and internal quotation marks omitted). Applying that standard, the Third Circuit affirmed the dismissal of a claim challenging the inclusion of retail mutual funds because the expense ratios ranged from 0.10% to 1.21%. *Renfro*, 671 F.3d at 319, 327–28. The Seventh Circuit affirmed the dismissal of a similar claim, where the fees ranged from 0.07% to "just over 1%." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *accord Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th Cir. 2011); *cf. Braden*, 588 F.3d at 596 (acknowledging that a fiduciary might "have chosen funds with higher fees for any number of reasons, including potential for higher return, lower financial risk, more services offered, or greater management flexibility").

Here, the Plans offered investment options with fees as low as 0.03%—and more than 100 options at 0.40% or less. *See* Ex. 2 (2017 fee disclosure to participants). This is well within the reasonable range for investment options. *See Rosen*, 2016 WL 7494320, at *15 (granting mo-

---

[31] Vanguard, *Vanguard Institutional Target Retirement Funds Prospectus* 105 (2018), https://www.vanguard.com/pub/Pdf/i1673.pdf; *see* Compl. ¶ 68 (invoking the prospectuses for "Vanguard Target Retirement Funds" as the basis for Plaintiffs' claim).

tion to dismiss excessive fees claim because, "[t]aken as a whole, the total menu of investment options resulted in expense ratios ranging from 0.04% to 1.02%."). Plaintiffs thus have failed to state a claim related to the investment fees charged by the Plans' mutual funds.[32]

### B. Courts have repeatedly dismissed allegations, such as Plaintiffs' here, that plans offered too many options.

Like plaintiffs in the other 403(b) cases, Plaintiffs maintain that the Georgetown Plans offered participants too many investment options. They argue that, if the Plans had offered participants fewer choices of funds, they could have "qualif[ied] for lower-cost share classes of certain investments." Compl. ¶ 130.

But courts in the other ERISA class actions against universities have held time and again that claims based on the number of investment options offered by the universities' 403(b) plans are not viable. *See, e.g.*, *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *6 (S.D.N.Y. Sept. 29, 2017); *Kelly v. Johns Hopkins Univ.*, 2017 WL 4310229, at *1 (D. Md. Sept. 28, 2017); *Tracey v. Mass. Inst. of Tech.*, 2017 WL 4453541, at *10 (D. Mass. Aug. 31, 2017), *adopted in relevant part by* 2017 WL 4478239 (D. Mass. Oct. 4, 2017); *Sacerdote*, 2017 WL 3701482, at *11; *Sweda*, 2017 WL 4179752, at *9; *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1350 (N.D. Ga. 2017) ("Having too many options does not hurt the Plans' participants, but instead provides them opportunities to choose the investments that they prefer.").

In so doing, those courts have recognized that suggesting that Plan participants would have benefited from *less* choice is anathema to the free choice that is the hallmark of ERISA in-

---

[32]     Plaintiffs allege that the expense ratios that Vanguard reported to participants in the Plans were inaccurate, citing an unidentified "recent participant fee disclosure" (Compl. ¶ 61), and suggest that "someone" (presumably at Vanguard) may have been "padding the bill" and that Defendants were negligent in not uncovering this (*id.* ¶ 63).  It is unclear where Plaintiffs derive the figures they cite, many of which do not align with the most recent fee disclosure to participants in the Plans.  *See* Ex. 2 (2017 fee disclosure).  But in any event, Plaintiffs' half-suggestion that someone at Vanguard was "padding the bill" is conclusory and implausible on its face and should be disregarded.  The notion that Vanguard could seek to make extra money off the Plans by charging the Plans higher expense ratios than those listed in the public prospectuses for the funds in question is self-evidently nonsensical.

dividual account plans. "Because participant choice is the centerpiece of what ERISA envisions for defined-contribution plans, these sorts of paternalistic arguments have had little traction in the courts." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1134–35 (9th Cir. 2013), *vacated and remanded on other grounds*, 135 S. Ct. 1823 (2015). Indeed, courts have *encouraged* rather than *penalized* increased choice. Choice is important because different investment vehicles have different features and characteristics that will make them attractive to different investors. *See id.* at 1135; *Loomis*, 658 F.3d at 671–72; *Hecker*, 556 F.3d at 586. The same analysis applies here: the number of investment options offered by the Plans does not in any way suggest that Defendants' investment-management process was inadequate.

### C. Plaintiffs' protests concerning investment selection do not state a plausible claim.

Among all the investment options in the Plans, Plaintiffs allege that two should have been removed from the Plans for underperformance—the Stock Account and the Real Estate Account (Compl. ¶¶ 71-98)—and that a third, the Traditional Annuity, should not have been offered because it imposes a 2.5% surrender charge on lump-sum distributions of participants' investments. Plaintiffs do not state a claim for relief with respect to any of these funds.

"[T]he test of ERISA prudence focuses on the defendant's conduct in investigating, evaluating and making the challenged investment."  *Chao v. Tr. Fund Advisors*, 2004 WL 444029, at *2 (D.D.C. Jan. 20, 2004) (quotation marks and brackets omitted).  The test is "not a test of the result of performance of the investment." *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009).  "Whether a fiduciary's actions are prudent cannot be measured in hindsight."  *Id.*; *accord Dudenhoeffer*, 134 S. Ct. at 2471 ("the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts") (quoting 29 U.S.C. § 1104(a)(1)(B)) (omission in original).

That standard makes good sense.  With the benefit of hindsight, it will always be possible to observe that certain investment decisions were rewarded while others were not.  Indeed, it will always be possible to identify investment funds that have underperformed their peer-group median—as half of all funds will do in any given period.

As the First Circuit recently held, an ERISA plaintiff does not state a claim that survives a motion to dismiss when an investment fund meaningfully pursues the "investment objective that had been disclosed to the plan participants," even if other investment funds ended up achieving better performance.  *Barchock v. CVS Health Corp.*, 886 F.3d 43, 49 (1st Cir. 2018).  That standard reflects two complementary principles.  In addition to the prohibition on reviewing decisions with the benefit of hindsight, Judge Barron's opinion in *Barchock* reflects the Supreme Court's acknowledgment that the nation's securities markets are presumed to be efficient.  *See Dudenhoeffer*, 134 S. Ct. at 2471-72; *accord Coburn v. Evercore Tr. Co., N.A.*, 844 F.3d 965, 969 (D.C. Cir. 2016). Thus, differences in performance between two broadly available investment vehicles is the result of differences in the *risk* profiles of the funds—and is not plausible evidence that one fund was imprudent.

Under this standard, claims against funds that have *lost* much of their principal are routinely dismissed. *E.g.*, *St. Vincent*, 712 F.3d at 721; *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006); *DeBruyne v. Equitable Life Assur. Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) ("We cannot say that Equitable was imprudent merely because the Balanced Fund lost money."). Plaintiffs' challenges to the Stock Account and the Real Estate Account—both of which have appreciated considerably—likewise fail to state a claim.

> a. **The CREF Stock Account.** Plaintiffs contend that the Stock Account should have been removed as a Plan investment option because it has "historically underperformed and con-

tinues to underperform its benchmark and other, lower-cost actively and passively managed investments that were available to the Plans." Compl. ¶ 72. But this claim fails for numerous reasons.

The core of Plaintiffs' claim is that the Stock Account underperformed the Russell 3000, an index that broadly tracks the performance of the U.S. stock market. But they fail meaningfully to demonstrate why the Stock Account should have outperformed the Russell 3000 index.  As explained above, the Stock Account's judicially noticeable prospectus discloses that it "seeks to maintain the weightings of its holdings as approximately 65–75% domestic equities and 25–35% foreign equities."[33]  Thus, the Stock Account is globally diversified.  Plaintiffs' comparison to the Russell 3000 index plausibly demonstrates only that, during the periods covered by their data, U.S. stocks outperformed their international counterparts.  But that hardly states a federal claim that Plan participants should have been forbidden from diversifying their retirement accounts with international assets.

Plaintiffs claim that the performance of the Stock Account is appropriately measured against the Russell 3000 because "[i]n participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as *the appropriate benchmark* to evaluate the CREF Stock Account's investment results."  Compl. ¶ 77 (emphasis added).  But that assertion miscomprehends the governing law.

The U.S. Department of Labor has interpreted ERISA's fiduciary duties to encompass an obligation to provide plan participants with "sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant thereto, to make informed decisions with regard to the management of their individual accounts."  29 C.F.R. § 2550.404a-5(a).  In particular, fiduciaries must make annual disclosures

---

[33]     TIAA, *College Retirement Equities Fund Prospectus, supra* n. 13, at 28.

that identify the expenses associated with each investment option, the historical returns of the investment option, and

> the name and returns of an appropriate broad-based securities mar-
> ket index over the 1-, 5-, and 10-calendar year periods (or for the
> life of the alternative, if shorter) . . . and which is not administered
> by an affiliate of the investment issuer, its investment adviser, or a
> principal underwriter, unless the index is widely recognized and
> used.

*Id.* § 2550.404a-5(d)(1)(iii).  In promulgating the requirement to specify a "broad-based securi-ties market index" on the annual disclosures, the Department of Labor *rejected* a proposal to permit the disclosures to use "composite or customized benchmarks," favoring the use of benchmarks that are "recognizable and understandable to the average plan participant" to those that more accurately reflect the fund's expected performance.  75 Fed. Reg. at 64,916-17.  Thus, the Stock Account's alleged failure to attain the performance of the Russell 3000—as compared to the benchmark in its prospectus, which actually reflects the investment strategy of the Stock Account (see p. 7, *supra*)—creates no plausible inference that the Stock Account should have been removed from the Plans.  *Accord, e.g.*, *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 4 (1st Cir. 2018) (affirming grant of summary judgment to defendants on fiduciary duty claims involving investment that "fully achieved its objective").

Moreover, and as alleged by Plaintiffs themselves (Compl. ¶ 73), the Stock Account could have been removed from the Plans only if *all* TIAA annuities were discontinued.  It thus is not enough for Plaintiffs to allege that the Stock Account, in isolation, should not have been in-cluded in the Plans.  Because the Stock Account was offered as a bundle with other desirable in-vestment options, Plaintiffs would need to be able to allege that it was imprudent to offer TIAA's suite of investments altogether. They have made no such allegation.

In any event, the behavior of the market itself confirms that including the Stock Account

in the Plans was prudent.  More than $100 *billion* is invested in the Stock Account.  If, as the Supreme Court held in *Dudenhoeffer*, it is permissible for fiduciaries to rely on the market's assessment of an investment, it was unquestionably prudent for Georgetown to include the Stock Account, an enormously popular investment, in the Plans.[34]  *See* Br. of TIAA as *Amicus Curiae* in Support of Appellee at 6, *Sweda v. Univ. of Pa.*, No. 17-3244 (3d Cir. Apr. 12, 2018) (noting that the Stock Account has $122 billion in assets and that "[o]f TIAA's 200 largest clients with at least one 403(b) plan, 198 held assets in CREF Stock as of 2016").

> ***b.***    ***The TIAA Real Estate Account.*** As explained *supra*, at 14-15, Plaintiffs lack Article III standing to bring any claim related to the performance of the TIAA Real Estate Account, which performed better over the class period than their preferred alternative, the Vanguard REIT Index fund.  But even if Plaintiffs had standing, their claims regarding the Real Estate Account would fail for similar reasons as their claim regarding the Stock Account: the difference in performance between the Real Estate Account and the Vanguard REIT Index mutual fund is explained by differences in the fund objectives and, therefore, differences in their risk profiles.

The Real Estate Account, like the Stock Account, is a variable annuity.  The Real Estate Account "seeks favorable long-term returns primarily through rental income and appreciation of real estate and real estate-related investments."[35] As the complaint itself emphasizes, the Real Estate Account "invests directly in real property assets that are highly illiquid" (Compl. ¶ 93), which means that its performance depends largely on the returns generated by particular parcels

---

[34]    Plaintiffs' presumption that Plan fiduciaries had the *authority* to remove Plan investments from the Stock Account is also unfounded. The contracts governing the rights of the named Plaintiffs who invested in the Stock Account prove otherwise—an employer plan may limit access to "an account *other* than the CREF Stock Account or the CREF Money Market Account." Ex. 3 (Wilcox TIAA Traditional Annuity contract), at E3 (emphasis added); 26 C.F.R. § 1.408-3; *see* Compl. ¶ 73.

[35]    TIAA, *TIAA Real Estate Account Prospectus*, *supra* n.16, at 3.

of real property.[36]

The Vanguard REIT Index fund that Plaintiffs prefer is an entirely different investment. It is a mutual fund, rather than a variable annuity, which makes comparisons between it and the Real Estate Account specious from the start. *See* p. 26, *supra*. Moreover, the Vanguard fund invests in an index of stocks in U.S. real estate investment trusts—*i.e.*, companies that own and manage real estate—rather than direct ownership of real property. As a result, the Vanguard fund's returns reflect the performance of real estate companies (and general stock-market trends) and "may not correspond to returns from direct property ownership."[37]

Indeed, as one might expect, the historical performance of these two investment vehicles shows that they reflect different strategies with different investment objectives and different risk profiles, making comparisons between them meaningless. *See, e.g.*, *Meiners v. Wells Fargo & Co.*, 2017 WL 2303968, at *2 (D. Minn. May 25, 2017) ("[A] comparison of the returns for two different funds is insufficient because 'funds ... designed for different purposes ... choose their investments differently, so there is no reason to expect them to make similar returns over any given span of time.'") (quoting *Tussey v. ABB, Inc.*, 850 F.3d 951, 960 (8th Cir. 2017)). In the six-year period 2011-2016, the Real Estate Account performed better than the Vanguard REIT Index in three years, and the Vanguard REIT Index performed better than the Real Estate Account in three years.[38] Indeed, plotting the performance of these investment options against each

---

[36]     Plaintiffs complain that the Real Estate Account's direct investment in real property requires it to retain an independent fiduciary to review the transactions and that this is "an expense that should be borne entirely by TIAA as a cost of engaging in the business, not a legitimate expense of the operation of the fund." Compl. ¶ 88. But these complaints do not state a claim, because as explained *supra*, at 2, 10-11, ERISA looks to the prudence of defendants' decisions in the context of the market that exists—and in that market, TIAA passes its operating costs—including the costs of retaining independent fiduciaries to comply with ERISA—on to investors. Plaintiffs' laments that TIAA does not choose to bear these costs itself have no bearing on whether defendants complied with ERISA.

[37]     Vanguard, *Vanguard REIT Index Fund Prospectus*, *supra* n. 21, at 9.

[38]     *Compare TIAA Real Estate Account Prospectus*, *supra* n. 16, at 11, *with Vanguard REIT Index Fund Prospectus*, *supra* n. 21, at 4.

other shows that Plaintiffs' proposed "better" option is far more volatile than the Real Estate Account.[39]

In sum, Plaintiffs' allegations do no more than establish that there are mutual funds with strategies that differ from the $22.4 billion Real Estate Account.  They establish no plausible basis for believing that the Real Estate Account is inferior, or that Defendants lacked appropriate processes for reviewing the Real Estate Account (a topic about which the complaint says nothing at all).[40]

   *c.*      ***The TIAA Traditional Annuity.*** Plaintiffs' challenge to the TIAA Traditional Annuity does not pertain to its performance, but to a 2.5% surrender charge assessed on lump-sum distributions of participants' investments in the annuity. Compl. ¶ 99. According to Plaintiffs, this charge "bore no relationship to any reasonable risk or expense to which the fund was subject" and was unlawful under Department of Labor regulations. Plaintiffs are incorrect.

For their argument that the 2.5% surrender charge is "clear[ly] and patent[ly]" unlawful (Compl. ¶ 103), plaintiffs rely on 29 C.F.R. § 2550.408b-2, a Department of Labor regulation promulgated under ERISA. The regulation pertains to contracts between ERISA plans and parties in interest "for office space or any service" that is "necessary for the establishment or operation of the plan." 29 C.F.R. § 2550.408b-2(a). Its purpose is to clarify when certain contracts between plans and landlords or service providers are exempted, under ERISA Section 408(b)(2), from ERISA Section 406(a)'s prohibition on transactions with parties in interest. Section 408(b)(2) requires that any contract so exempted be "reasonable," and the DOL regulation clari-

---

[39]      Compl. ¶ 99, *Doe v. Columbia Univ.*, No. 1:16-cv-06488 (S.D.N.Y. Aug. 17, 2016), ECF No. 3.

[40]      Plaintiffs allege, in passing, that the TIAA Real Estate Account charges a "liquidity guarantee" fee and "distribution fees" that the Vanguard REIT Index Fund does not. Compl. ¶¶ 93, 95. But this allegation is meaningless. As several courts have observed, plaintiffs cannot state a claim by challenging the components of fees associated with investments but must instead plausibly allege that "the overall fee was unreasonable."  *See, e.g.*, *Cunningham*, 2017 WL 4358769, at *6; *Sacerdote*, 2017 WL 3701482, at *11. Plaintiffs here have not plausibly made that allegation.

fies that a contract will not be deemed "reasonable" unless it "permit[s] termination by the plan without penalty to the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous." 29 C.F.R. § 2550.408b-2(c)(3).

This regulation has no application to fees such as the 2.5% surrender charge here. The regulation governs the terms on which contracts between plans and service providers must be terminable in order to be exempted from ERISA Section 406(a). But the surrender charge does not apply when plans seek to modify or terminate their contract with TIAA; it applies when an individual plan participant wishes to cash out his investment in the Traditional Annuity as a lump sum, rather than annuitizing the investment and receiving periodic lifetime payments. Plaintiffs' argument that the regulation applies to participant surrender charges borders on the frivolous and should be rejected as a matter of law.

In any event, Plaintiffs' complaint that surrender charges are "*per se* unreasonable" (Compl. ¶ 103) is clearly wrong. When an individual invests money in a traditional annuity, the firm providing the annuity expects to have the use of the money invested for a specified period of time (determined according to actuarial assumptions). If an investor requests a lump sum distribution of his entire investment upon retirement, rather than electing to receive it in the periodic installments that the annuity contemplates, the insurance company loses liquidity, along with the time value of the money that the individual had paid as a premium. Under those circumstances, it is neither surprising nor inequitable for the insurer to impose a fee as compensation for its losses.

Plaintiffs do not deny that the surrender charges are appropriately disclosed. Nor can they. Participants who invest in the TIAA Traditional Annuity are counseled that "TIAA Traditional [Annuity] is designed primarily to help meet your long-term retirement income needs; it is

not a short-term savings vehicle."[41] TIAA explains to investors that imposing surrender charges on lump-sum withdrawals from the annuity "allow[s] the TIAA General Account, which backs the guarantees and benefits under TIAA Traditional, to invest in longer-term illiquid assets that often offer enhanced returns versus shorter-term, more liquid assets."[42] Nor do Plaintiffs allege that Georgetown's decision to offer an annuity that yielded "enhanced returns" for investors in exchange for reduced liquidity was imprudent—or that alternative annuity investments were available to the Plans that would have offered similar financial performance without surrender charges. Plaintiffs' attack on Georgetown for offering participants a traditional annuity, long the underpinning of university 403(b) plans, does not allege a plausible claim.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

---

[41]     TIAA, *TIAA Traditional questions & answers* (2017), https://www.tiaa.org/public/how-do-traditional-annuities-work.

[42]     *Id.*

Dated: April 23, 2018

Nancy G. Ross (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Respectfully submitted,

*/s/ Brian D. Netter*
Brian D. Netter (D.C. Bar No. 979362)
  bnetter@mayerbrown.com
Michelle N. Webster (D.C. Bar No. 985265)
Matthew A. Waring (D.C. Bar No. 1021690)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*