**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **DARRELL WILCOX and MICHAEL MCGUIRE, individually and as representatives of a class of participants and beneficiaries in and on behalf of the GEORGETOWN UNIVERSITY DEFINED CONTRIBUTION RETIREMENT PLAN and the GEORGETOWN UNIVERSITY VOLUNTARY CONTRIBUTION RETIREMENT PLAN,** | ) ) ) ) ) ) ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | )      **Civil Action No. 18-422 (RMC)** ) |
| **GEORGETOWN UNIVERSITY, _et al._,** | ) ) |
| **Defendants.** | ) ) |

_____ )

**MEMORANDUM OPINION**

If a cat were a dog, it could bark. If a retirement plan were not based on long-term investments in annuities, its assets would be more immediately accessed by plan participants. These two truisms can be summarized: cats don't bark and annuities don't pay out immediately.

Darrell Wilcox and Michael McGuire work for Georgetown University. Each man has an individual investment account in each of the two retirement plans offered by the University. They allege that Georgetown imprudently selected and retained certain investment options that caused excessively high administrative fees and that it failed to manage the plans' investments prudently, in violation of the University's fiduciary duties to the plans' participants. This type of lawsuit seems to have taken higher education by storm, with suits brought all over the country. Georgetown moves to dismiss, arguing that Plaintiffs have no standing to make

1

some of their claims and that others fail to state a claim on which relief can be granted. The motion to dismiss will be granted as to all claims.

## I. FACTS

Georgetown University in Washington, D.C. provides two retirement plans for its faculty and staff members: the Georgetown University Defined Contribution Retirement Plan (Defined Contribution Plan) and the Georgetown University Voluntary Contribution Retirement Plan (Voluntary Plan) (collectively "the Plans"). The Plans are defined contribution, individual account employee pension plans governed by the Employee Retirement Income Security Act (ERISA) 29 U.S.C. § 1001 *et seq*. "[A] 'defined contribution plan' or 'individual account plan' promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." *LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248, 250 n.1 (2008) (citation omitted). By contrast, "a 'defined benefit plan,' generally promises the participant a fixed level of retirement income, which is typically based on the employee's years of service and compensation." *Id*. (citation omitted).

Georgetown contributes an amount up to ten percent (10%) of an employee's annual salary into the Defined Contribution Plan and employees can contribute, as they choose, up to three percent (3%) more to the Voluntary Plan. Each participant has his own account in each Plan and decides personally how to invest its funds across a wide array of investment options, according to individual choice. Georgetown is the designated Plan Administrator for both Plans. *See* 29 U.S.C. §§ 1002(2)(A), 1002(34). It manages the Plans and their assets, including selecting, monitoring, and removing investment options.

The Plans are organized under Section 403(b) of the Internal Revenue Code, 26 U.S.C. § 1 *et seq*. Titled "Taxation of employee annuities," § 403 provides a set of rules for

certain plans sponsored by non-profit employers; it allows employer contributions and part of an employee's salary to be set aside in an individual account and then to increase in value (one hopes) without immediate taxation to the employee. *Id*. § 403. This provision predates ERISA and speaks directly to the heritage of the collegiate retirement system.

In 1905, Andrew Carnegie endowed a $10 million gift to fund pensions at thirty universities.[1] In 1906, Congress chartered the Carnegie Foundation for the Advancement of Teaching to provide a system of retirement pensions for university professors. Act to Incorporate the Carnegie Foundation for the Advancement of Teaching, ch. 636, 34 Stat. 59 (Mar. 10, 1906). When, by 1918, it became clear that Mr. Carnegie's gift would be insufficient to meet the need, the Carnegie Foundation founded the Teachers Insurance and Annuity Association, now known as TIAA. TIAA developed annuity contracts with "fundamental provisions specially designed for college retirement plans." Greenough at 14, 17. An annuity is essentially a long-term insurance contract that guarantees regular payments at retirement and for the life of the holder.[2] This collegiate retirement system of annuities predated the enactment of Internal Revenue Code § 403(b), which was adopted in 1958 to provide favorable tax treatment for "tax-sheltered annuities," such as those offered by the Plans. Technical Amendments Act of 1958, Pub. L. No. 85-866, § 1022(e), 88 Stat. 829, 1972 (1974) (codified as amended at 26 U.S.C. § 403(b)).

---

[1] Defs.' Mem. at 3 (citing William C. Greenough, College Retirement and Insurance Plans 9 (1948)).

[2] Black's Law Dictionary defines "annuity" in relevant part as "an obligation to pay a stated sum, usu. monthly or annually, to a stated recipient," and "retirement annuity" as "an annuity that begins making payments only after the annuitant's retirement." *See* Black's Law Dictionary (10th ed. 2014).

When adopting ERISA in 1974, Congress amended the Code so that § 403 plans could offer mutual funds in addition to annuities. *See* ERISA, Pub. L. No. 93-406, § 1022(e), 88 Stat. 829, 1072 (1974) (codified as amended at 26 U.S.C. § 403(b)(7)). At that time, "the defined benefit plan was the norm of American pension practice." *LaRue*, 552 U.S. at 255 (alteration and internal quotation marks omitted). Under a defined benefit plan, an eligible employee who has worked sufficient years receives a promised monthly pension benefit for life. Because of the huge legacy costs of funding such plans for growing numbers of retirees, many employers have changed to "defined contribution" plans through which an employer's contribution is specified and capped, no matter how long a retired employee might live.[3] In response to this change, Congress adopted legislation by which employees can invest in various other tax-deferred plans, such as individual § 401(k) plans. Revenue Act of 1978, Pub. L. No. 95-600, § 135(a), 92 Stat. 2763, 2785 (codified as amended at I.R.C. § 401(k) (2006)). "[D]efined benefit plans are now largely limited to the public sector, very large employers, and multi-employer plans of large national unions such as the Teamsters." David Pratt, *To (b) or Not to (b): Is That the Question? Twenty-first Century Schizoid Plans Under Section 403(b) of the Internal Revenue Code*, 73 Alb. L. Rev. 139, 144 (2009).

---

[3] *See* Janice Kay McClendon, The Death Knell of Traditional Defined Benefit Plans: Avoiding a Race to the 401(K) Bottom, 80 Temple L. Rev. 809, 813-19 (2007) ("Beginning in the early 1980s, a fundamental shift occurred in this scheme of traditional retirement plan sponsorship. The 1980s and 1990s evidence a mass exodus from defined benefit plan sponsorship. While there were once approximately 112,000 private employer-sponsored defined benefit plans, at the end of 2005, there were only about 30,000.") (citations omitted); *see also* Samuel Estreicher & Laurence Gold, The Shift from Defined Benefit Plans to Defined Contribution Plans, 11 Lewis & Clark L. Rev. 331 (2007); Alicia H. Munnell & Pamela Perun, An Update on Private Pensions, An Issue in Brief 1, 4 (Ctr. for Ret. Research at Boston C., Aug. 2006), http://crr.bc.edu/images/stories/Briefs/ib_ 50.pdf (noting dramatic rise in popularity of 401(k) plans within world of defined contributions).

Defendants Christopher Augustini and Geoff Chatas have served as Georgetown's Senior Vice President and Chief Administrative Officer, and as fiduciaries to the Plans, until May 2017 and from February 30, 2018 through to the present, respectively. They, and Georgetown, are sued for alleged breaches of their fiduciary duties to the Plans' participants.

Plaintiffs Darrell Wilcox and Michael McGuire are participants in both Plans. They filed this lawsuit on February 23, 2018 and challenge the expenses of the Plans, which they say are detrimental to the interests of the Participants, wasteful, and breach the fiduciary duties of the Plans' fiduciaries. *See* Compl. [Dkt. 1]. Specifically, Plaintiffs attack the expense of separate recordkeeping services that maintain the Plans; the expense of some of the investment options that are available; the number of investment options that are offered; and the inclusion in the Plans of certain investment options.

The University and Messrs. Augustini and Chatas (collectively, Georgetown) deny that they violated any duty to the Plans' Participants and move to dismiss the Complaint.

## A. Description of the Plans

Each of the Georgetown Plans provides individual accounts for all Participants. Georgetown contributes an amount equal to 5% of each Participant's salary into his account in the Defined Contribution Plan. Participants may, but are not required to, voluntarily contribute an additional three percent (3%) of their salaries to the Defined Contribution Plan; if a Participant does so, Georgetown matches these contributions at a little more than one-and-one-half for each dollar contributed, *i.e.*, 1.67-to-1. As a result, a Participant who voluntarily contributes the entire allowed-amount of 3% of his salary into the Defined Contribution Plan receives a 5% match of funds from the University.

In each Plan, the Participant directs how his funds are invested from a broad set of choices that includes fixed and variable annuities offered by TIAA and mutual funds offered by

TIAA, Vanguard, and Fidelity.[4]  The three investment platforms charge certain fees to Plan Participants, which are fully disclosed but which Plaintiffs assert are more expensive than need be.

### 1.  Fidelity Investment Options

Plaintiffs do not complain about investment options offered by Fidelity and they will not be further discussed.

### 2.  Vanguard Investment Options

Plaintiffs complain that Georgetown "used more expensive funds . . . than investments that were available to the Plans." Compl. ¶ 131.  Specifically, they challenge the particular share classes of Vanguard funds that were available to Participants.  Neither Plaintiff, however, invested in the Vanguard funds or alleges that he intended or intends to do so.

### 3.  TIAA Investment Options

TIAA offers a variety of investment options.  The Court describes only those options that are challenged by Plaintiffs.

#### a.  TIAA Traditional Annuity

The TIAA Traditional Annuity is a fixed annuity.  "Under a classic fixed annuity, the purchaser pays a sum certain and, in exchange, the issuer makes periodic payments throughout, but not beyond, the life of the purchaser." *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 262 (1995).  When a Georgetown Plan Participant elects to invest in the TIAA Traditional Annuity, he enters into a direct contractual relationship with

---

[4] In the past, Participants could also invest in funds provided by AXA, but those funds have stopped accepting additional contributions.  Compl. ¶ 29.

TIAA concerning its terms.  Mem. of Law in Supp. of Defs.' Mot. to Dismiss (Defs.' Mem.) [Dkt. 18-1] at 6.  The University is not a party to that contract.

The TIAA Traditional Annuity is available to Participants through either the Defined Contribution Plan or the Voluntary Plan but with important differences.  A Participant who invests his money from the Defined Contribution Plan into the TIAA Traditional Annuity will earn greater interest (typically, an additional 0.75% a year) than the same investment from the Voluntary Plan.  The difference in earning power is inversely reflected in the difference in the accessibility of the invested monies: a Participant who elects the TIAA Traditional Annuity through the Voluntary Plan may withdraw his funds at any time without penalty but a Participant who elects the TIAA Traditional Annuity through the Defined Contribution Plan may not withdraw his funds until he leaves his employment with Georgetown or, if he wishes to re-direct his investments, in ten annual installments.  Upon his departure from employment, such a Participant can leave his funds invested in the TIAA Traditional Annuity for the long term and receive a monthly pension payment whenever he qualifies, or withdraw his funds immediately. If he elects to withdraw his funds immediately from the Defined Contribution plan, he will receive a lump-sum payout but must pay a 2.5% surrender charge.

Plaintiffs complain about both limiting features of the TIAA Traditional Annuity: first, that it "prohibits participants from re-directing their investment into other investment options during their employment except in ten annual installments," and second, that it "prohibits participants from receiving a lump sum distribution after termination of employment unless the participant pays a 2.5% surrender charge," both of which "violate ERISA's prohibition on the imposition of a penalty for early termination of a contract."  Pls.' Mem. of Law in Opp'n to Defs.'s Mot. to Dismiss Pls.'s Compl. (Opp'n) [Dkt. 24] at 10 (citing Compl. ¶¶ 99, 103, 108).

Georgetown contends that Plaintiffs have shown no injury-in-fact related to the

TIAA Traditional Annuity because any claim they may present is not ripe. Neither alleges that

he has left or plans to leave Georgetown or that he wishes to re-direct his investments.

b. CREF Stock Account

The CREF Stock Account is a variable-annuity investment fund. CREF stands

for College Retirement Equities Fund, which TIAA established in 1952. Defs.' Mem. at 7 n.13.

As it advises investors through its prospectus, the CREF Stock Account seeks to achieve "[a]

favorable long-term rate of return through capital appreciation and investment income by

investing primarily in a broadly diversified portfolio of common stocks."[5] The Stock Account is

globally diversified and "seeks to maintain the weightings of its holdings as approximately 65-

75% domestic equities and 25-35% foreign equities." *Id.* at 27 (citing 2017 CREF Prospectus).

As a result, the Stock Account advises investors:

> The benchmark for the Stock Account is a composite index
> composed of two unmanaged indices: the Russell 3000® Index and
> the MSCI All Country World ex USA Investable Market Index
> ("MSCI ACWI ex USA IMI"). The weights in the composite index
> change to reflect the relative sizes of the domestic and foreign
> segments of the Account and to maintain its consistency with the
> Account's investment strategies.

*Id.* at 7 (citing 2017 CREF Prospectus).

---

[5] College Retirement Equities Fund Prospectus 27 (May 1, 2017) (2017 CREF Prospectus),
https://www.tiaa.org/public/pdf/cref_prospectus.pdf (last visited Dec. 11, 2018). As referenced
above, the Court takes judicial notice of various Plan documents in this Memorandum Opinion.
*See Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 192 (D.D.C. 2017). The Court also
takes judicial notice of publicly available definitions and information on the various funds
available through Morningstar, a well-respected investment research firm. *See* Fed. R. Evid.
201(c); *see also Washington Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) (taking judicial
notice of newspaper articles in the Washington, D.C. area); *Agee v. Muskie*, 629 F.2d 80, 81 n.1,
90 (D.C. Cir. 1980) (taking judicial notice of facts generally known because of newspaper
articles).

The Georgetown Plans assert that the global investments undertaken by the CREF Stock Account are not fully accounted for by federal regulations that control Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans.  29 C.F.R. § 2230-404a-5(d)(1)(iii); *see also* 75 Fed. Reg. 64,910, 64,916 (Oct. 20, 2010) (disallowing the use of composite benchmarks).  Because it is a composite fund but cannot use composite benchmarks in certain disclosures, the CREF Stock Account references only the domestic Russell 3000 benchmark in some materials although its prospectus advises that the influence of foreign investments is reported only by the MSCI All Country World ex USA Investable Market Index and that a true benchmark for the Stock Account is both the Russell 3000 and the MSCI All Country World ex USA Investable Market indices.  2017 CREF Prospectus at 27 n.3.  The Plans have advised investors that an independent analyst, Morningstar, "rate[d] the CREF Stock as a 5-star investment option" at year-end 2017.[6]

Plaintiffs confusingly describe the CREF Stock Account as "*a domestic equity investment* in the large cap *blend* Morningstar category."  Opp'n. at 9; Compl. ¶ 72 (emphasis added).  They assert that the CREF Stock Account represents approximately 16% of the Plans' assets but has "perennially underperformed its stated benchmark" (Russell 3000, a domestic index) in the last one-, five- and ten-year periods ending December 31, 2016.  Opp'n at 9.  "The Complaint alleges similar dismal results for the same performance periods ending Dec. 31, 2014, ¶ 79, and Dec. 31, 2009. ¶80 [sic]."  *Id*.

---

[6] *See* CREF Stock Account, Class R3 (Dec. 31, 2017),
https://www.tiaa.org/public/pdf/realestate_prosp.pdf (last visited Dec. 11, 2018).

### c. TIAA Real Estate Account

The TIAA Real Estate Account is a variable annuity account that "seeks favorable long-term returns primarily through rental income and appreciation of real estate and real estate-related investments."[7] The TIAA Real Estate Account invests primarily in commercial real estate, which it advises Participants is an asset class not widely available to retail investors in a variable annuity or mutual fund. TIAA Real Estate Account Prospectus at 37. Its prospectus distinguishes the TIAA Real Estate Account from Real Estate Investment Trusts (REITs), which "are securities and generally publicly traded" and therefore "may be exposed to market risk and potentially significant price volatility due to changing conditions in the financial markets and, in particular, changes in overall interest rates." *Id.* at 28. In contrast, the returns on the TIAA Real Estate Account are driven by the "fair value" of the real property it holds and the income those properties generate. *Id.* at 3. The TIAA Real Estate Account invests directly in real properties—unlike REITs, which invest in property management companies. *See* Defs.' Mem. at 30.

Plaintiffs also complain that the TIAA Real Estate Account has "far higher fees than are reasonable and has historically and continually underperformed comparable real estate investment alternatives." Opp'n at 9 (citing Compl. ¶ 86).

### B. The Complaint

Plaintiff Wilcox has invested in the TIAA Traditional Annuity, the CREF Bond Account, and eleven of the TIAA mutual funds. Compl. ¶ 20. Plaintiff McGuire is invested in the CREF Stock Account, the CREF Equity Index Account, the TIAA Real Estate Account, the

---

[7] *See* TIAA Real Estate Account Prospectus at 3 (May 1, 2017), https://www.tiaa.org/public/pdf/realestate_prosp.pdf (last visited Dec. 11, 2018).

CREF Inflation-Linked Bond Fund Account, the CREF Bond Market Account, and the TIAA-CREF Growth and Income Account. *Id.* ¶ 21.

Count I of the Complaint alleges that Georgetown breached its duty of prudence by selecting and retaining investment options and services without engaging in a prudent process to avoid inappropriately high administrative fees and expenses charged to the Plans. *Id.* ¶¶ 119-25. Count II alleges that Georgetown breached its duty of prudence by failing to manage prudently the Plans' investment portfolios. *Id.* ¶¶ 126-37.

Georgetown counters these general allegations and their more specific subparagraphs by summarizing Plaintiffs' complaint as alleging that it "improperly allowed TIAA-CREF, Vanguard and Fidelity separately to provide recordkeeping services for their own respective investments"; "offered investment options that were more expensive than other investment options that could have been offered"; "should have eliminated the [CREF] Stock Account . . . because of its underperformance relative to the Russell 3000 index"; "should have removed the Real Estate Account in favor of the Vanguard REIT Index (Institutional) mutual fund"; and unreasonably maintained the TIAA Traditional Annuity despite its 2.5% surrender charge. Defs.' Mem. at 8-9. Plaintiffs summarize their allegations thusly: "Defendants have retained not one, but three separate recordkeepers," *i.e.*, "bookkeepers," that "charge asset-based fees," Opp'n at 2; "Defendants ignored the abysmal historical investment performance" of the CREF Stock Account and the TIAA Real Estate Account; Defendants offered "an overwhelming 300 investment options" [8]; "Defendants failed to provide accurate reporting . . . in reports filed

---

[8] Plaintiffs allege that "[i]t is well known in the defined contribution retirement plan industry that plans with dozens of choices . . . 'fail'" because the choices are overwhelming and "studies show that when people are given too many choices of anything, they lose confidence or make no decision." Compl. ¶ 42 (citation omitted). However, Plaintiffs provide no evidence that they were confused or overwhelmed by the available investment options or that they were unable to

with the DOL"; "Defendants approved a loan program that . . . violated federal regulations"; and the TIAA Traditional Annuity violates regulations "that all contracts be terminable on reasonably short notice without penalty." *Id*. at 2-3.

## II.  LEGAL STANDARD

### A.  Jurisdiction

Federal courts, as established by Article III of the Constitution, are courts of limited jurisdiction.  U.S. Const. art. III, § 2.  As relevant here, federal courts have jurisdiction over cases involving federal statutes, 28 U.S.C. § 1331, and where, in the Constitution's words, there is a "Case[ ]" or "Controvers[y]," U.S. Const. art. III, § 2, cl. 1; *see also David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013) (noting that federal courts have "subject matter jurisdiction over ERISA claims only where the [litigants] have both statutory and constitutional standing").  No action of the litigants can confer subject matter jurisdiction on a federal court.  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).

From a statutory perspective, ERISA explicitly authorizes participants or beneficiaries of private employee benefit plans to bring suit in federal court, without respect to the amount in controversy or citizenship of the parties, over ERISA-based claims.  *See* 29 U.S.C. § 1132(e)(1) ("Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary . . ."); *id*. § 1132(f) ("The district courts of the United States shall have jurisdiction, without respect to the amount in controversy

---

make decisions regarding those options.  To the contrary, both were invested in multiple investment options and had "access to advisors who provide valuable one-on-one retirement planning services."  Defs.' Mem. at 19.

or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.").

Plaintiffs bring suit, individually and as putative representatives of a class of participants in the Plans, under 29 U.S.C. § 1132(a)(2) and (a)(3), to enforce Messrs. Wilcox and McGuire's personal liability as ERISA fiduciaries under 29 U.S.C. § 1109(a).  Section 1132(a)(2) allows participants or beneficiaries of plans to sue for "appropriate relief," under § 1109, which establishes personal liability for an ERISA fiduciary for breaches of fiduciary duties that result in losses to the plan.  *See* 29 U.S.C. § 1109(a); *id*. § 1132(a)(2).  Participants or beneficiaries may also sue under § 1132(a)(3) to enjoin violations of ERISA or of the terms of an ERISA plan, or to obtain "other appropriate equitable relief" to redress such violations or enforce fiduciary obligations.  *Id*. § 1132(a)(3).

However, statutory standing is not the end of the inquiry.  Georgetown challenges Plaintiffs' standing to sue under Article III of the Constitution.  The traditional Article III standing inquiry is well-known:

> a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  Accordingly, it is possible for a litigant to have statutory standing but not Article III standing.

When a defendant challenges a plaintiff's standing to bring a lawsuit, the defendant's motion is properly understood as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  This is because a "defect of standing is a defect in subject matter jurisdiction."  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C.

Cir. 1987). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2nd Cir. 2005). Under Rule 12(b)(1), the party claiming subject matter jurisdiction bears the burden of demonstrating that it has standing. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). The court reviews a complaint liberally, giving a plaintiff the benefit of all reasonable inferences that can be derived from the facts alleged. *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). Georgetown's motion turns on application of this framework.

### B. Venue

This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plans are administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found. *See* 29 U.S.C. §1132(e)(2) (ERISA actions of this nature "may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found").

### C. Motion to Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to be sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* A complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Id.* at 570. When a plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 678. A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *See Iqbal*, 556 U.S. at 678. The court may also consider documents in the public record of which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). In ruling on a motion to dismiss in an ERISA action, the court "is not confined to the allegations in the complaint, but may review the plan documents referred to in the complaint and relied on by the plaintiff." *Abraha*, 243 F. Supp. 3d at 192 (citation omitted).

### D. Fiduciary Duty Under ERISA

Plaintiffs rely on ERISA § 1132(a)(2) and (3) as the basis for their breach of fiduciary claim. Section 1132(a)(2) allows plan participants to sue a fiduciary on behalf of the plan for "appropriate relief" under § 1109. Section 1109 establishes personal liability for an ERISA fiduciary who breaches fiduciary duties that result in losses to the plan. *See* 29 U.S.C. § 1109(a). Section 1132(a)(3) permits plan beneficiaries or participants to sue to enjoin violations of ERISA or of the terms of an ERISA plan, or to obtain "other appropriate equitable relief" to redress or enforce such violations. 29 U.S.C. § 1132(a)(3). Thus, § 1132(a)(2) provides for recovery on behalf of the Plan for breaches of fiduciary duty that cause loss to the Plan, while § 1132(a)(3) allows for individual equitable relief to enjoin or enforce ERISA violations.

Under ERISA, a person or entity is a fiduciary, *inter alia*, when they "exercise[] any discretionary authority or discretionary control respecting management of such plan or

exercise[] any authority or control respecting management or disposition of its assets . . . or [have] any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

As relevant here, ERISA imposes a duty of prudence on fiduciaries. *Abraha*, 243 F. Supp. 3d at 184. The D.C. Circuit has held that "[p]rudence under ERISA is measured according to the objective prudent person standard developed in the common law of trusts." *Fink v. Nat'l Sav. and Trust Co.*, 772 F.2d 951, 955 (D.C. Cir. 1985) (citing S. Rep. No. 93–127, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Ad. News 4639, 4838, 4865) ("The fiduciary responsibility section, in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts."). To state a claim for breach of fiduciary duty, a plaintiff must allege: (1) the defendant(s) are plan fiduciaries; (2) the defendants breached their fiduciary duties; and (3) the breach caused harm to the plaintiff(s). *Abraha*, 243 F. Supp. at 184. "A court's task in evaluating fiduciary compliance with this standard is to inquire 'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Id.* (citing *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983), cert. denied, 464 U.S. 1040 (1984)).

### III. ANALYSIS

The Teachers Investment and Annuity Association (TIAA) was founded in 1918 with the purpose of investing in annuities to pay pensions to teachers for their lifetimes after retirement.[9] No party disputes that annuities constitute long-term investments for anticipated

---

[9] *See* TIAA, Our History, https://www.tiaa.org/public/why-tiaa/who-we-are (last visited Dec. 11, 2018).

long-term benefits. But the modern world moves quickly; the stock market has reached historically high values in recent years, which may render the intended slow and careful growth of annuities less attractive, and Plaintiffs chafe at the limitations of access to Participant monies in the TIAA Traditional Annuity.

It may be that Plaintiffs want to force Georgetown to reconsider its entire strategy behind the Plans and to have them become more like corporate plans under Internal Revenue Code § 401 (conferring "qualified trust" status on "a trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries"); *see also* § 401(k) (extending § 401 benefits to "any arrangement which is part of a profit-sharing or stock bonus plan, a pre-ERISA money purchase plan, or a rural cooperative plan"). However, it is not a breach of fiduciary duty to maintain the Plans as established tax-deferred vehicles under the particular protections of § 403(b). Therefore, the question is whether the Complaint alleges fiduciary breaches in the context of the § 403 Plans in question.

## A. Jurisdiction Over Challenges to Vanguard Mutual Funds, the TIAA Real Estate Account and the TIAA Traditional Annuity

Plaintiffs complain about the available classes of stock in the Vanguard funds, the return on the TIAA Real Estate Account, and charges from the TIAA Traditional Annuity for early withdrawal and/or for its time constraints on changing investments. Georgetown moves to dismiss, arguing that Plaintiffs have sustained no injury-in-fact from any of these funds: neither invested in the Vanguard mutual funds; the TIAA Real Estate Account, in which only Mr. McGuire invested, performed well in the relevant class period; and only Mr. Wilcox invested in the TIAA Traditional Annuity but he does not say whether he did so under the Defined Contribution Plan or the Voluntary Plan, which have different withdrawal (and interest)

provisions; nor has he attempted to withdraw funds or change his investments. Plaintiffs counter that they bring suit under 29 U.S.C. § 1132(a)(2) and (3) and since Plaintiffs sue "on behalf of the Plans," they "do not need to allege injury with respect to their individual benefit payments." Opp'n at 24.

Plaintiffs mistake the difference between a defined benefit plan and a defined contribution plan. In the former, an employer contributes to a general fund from which all promised benefits are to be paid; an injury to the value of the general fund injures the chances that all participants will receive the promised benefits. In certain circumstances, one or more Participants may sue on behalf of the plan itself. *See LaRue*, 552 U.S. at 255 ("Misconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan.") (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985)). In a defined contribution plan, however, an employer contributes a defined amount to an individual employee's individual account, and "fiduciary misconduct need not threaten the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive . . . . [A]lthough § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *Id.* at 256. Thus, for either Plaintiff to have standing to sue about their defined contribution Plan, he must show fiduciary breaches that impair his individual account's value.

Plaintiffs rely on 29 U.S.C. § 1132(a)(2) and (3) to support their rights to sue as Participants. These provisions of ERISA, among others, provide standing to beneficiaries to sue fiduciaries for imprudent actions. This statutory authority to sue, however, does not automatically satisfy constitutional standing for all claims in this case. "Article III of the

Constitution limits [federal courts'] jurisdiction to 'Cases' and 'Controversies.'" *Millennium Pipeline Co., LLC v. Seggos*, 860 F.3d 696, 699 (D.C. Cir. 2017), and Georgetown argues that without a cognizable personal injury-in-fact, Plaintiffs present no case or controversy redressable by court order. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," under Article III. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The D.C. Circuit has summarized these requirements quite clearly:

> To satisfy the case-and-controversy requirement, a [plaintiff] must allege (i) that it suffered an injury in fact; (ii) that a causal connection exists between the injury and challenged conduct; and (iii) that it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision.

*Millennium Pipeline*, 860 F.3d at 699 (citing *Lujan*, 504 U.S. at 560-61)).

In a class action, the named plaintiffs must demonstrate that they have Constitutional standing, *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974), measured at the time the complaint was filed. *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989). Measured by these standards, Plaintiffs clearly cannot allege an individual violation of ERISA as to the Vanguard funds, which is an investment option neither Plaintiff selected.

Georgetown also moves to dismiss Mr. Wilcox's complaint about the 2.5% early-withdrawal charge from the TIAA Traditional Annuity since he fails to allege that he has attempted such a withdrawal or intends to leave his job and withdraw his funds. It argues that "'[a] claim is not ripe for adjudication if its rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Pfizer, Inc. v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999) (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)). Mr. Wilcox concedes this point by not contesting it. Opp'n at 21-22. Instead, he responds that Georgetown

fails to address his second claim that a Participant in the TIAA Traditional Annuity cannot re-direct his investments into other options during his employment except in ten annual installments, which allegedly limits Mr. Wilcox in his investments. *Id*. at 21 ("Tellingly, Defendants do not take issue with Plaintiffs' standing to bring a breach of fiduciary duty claim concerning the ten annual installments . . . .").[10]

In reply, Georgetown presses its original point that no injury has been shown by either Plaintiff. It adds that the ten-year period for transferring money out of the TIAA Traditional Annuity was disclosed on the first page of Mr. Wilcox's Group Retirement Annuity Certificate, issued on July 1, 2013, which is long before the three-year statute of limitations for his claim relating to it. Reply Mem. in Supp. of Defs.' Mot. to Dismiss Pls.' Compl. (Defs.' Reply) [Dkt. 27] at 6.[11]

As to the TIAA Real Estate Account, in which only Mr. McGuire invested, Georgetown argues that Mr. McGuire suffered no harm because the TIAA Real Estate Account out-performed the Vanguard REIT Account, which Mr. McGuire would prefer, during the alleged class period. Plaintiffs complain about the "excessive expenses" of the former, Opp'n at 17, but comparing the TIAA Real Estate Account to the Vanguard REIT, net of fees, the TIAA Real Estate Account still performed better.[12] Plaintiffs themselves acknowledge that the

---

[10] Inasmuch as Mr. McGuire has not invested in the TIAA Traditional Annuity, he has no standing to complain of any of its terms, just as Mr. Wilcox cannot complain about the TIAA Real Estate Account in which he did not invest.

[11] The Court also notes that these features—charges for lump sum distribution and annual withdrawal requirements—are features "inherent in a guaranteed fixed annuity fund." *See Davis v. Washington Univ. in St. Louis*, Case No. 4:17-cv-1641, 2018 WL 4684244 at *4 (E.D. Mo. Sept. 28, 2018)

[12] *Compare* Morningstar, TIAA Real Estate Account (QREARX), http://www.morningstar.com/funds/XNAS/QREARX/quote.html, *with* Morningstar, Vanguard Real Estate Index Institutional (VGSNX),

comparison "do[es] account for management, administrative, and 12b-1 fees and other costs automatically deducted from fund assets."[13]  Nonetheless, Plaintiffs complain that the Morningstar data "are not load adjusted," that is, adjusted to reflect the sales charge(s).[14]  But, as Georgetown argues, the TIAA Real Estate Account does not charge investors any "load," and so the comparisons between returns for the TIAA Real Estate Account and the Vanguard REIT are accurate.[15]

Further, the Court finds that Plaintiffs' argument that Georgetown impermissibly relies on hindsight, Opp'n at 18, reverses the appropriate timeline by which to measure fiduciary duties.  While an unhappy participant would improperly rely on hindsight to complain that his investments underperformed others, the question regarding appropriate prudence by a fiduciary necessarily depends on "information available to the fiduciary at the time of each investment decision."  *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011)).  More importantly in this circumstance, the question is whether Mr. McGuire suffered an injury-in-fact.  During the relevant time period, his funds remained in the better-performing TIAA Real Estate Account rather than the Vanguard REIT Account.  He

---

http://www.morningstar.com/funds/xnas/vgsnx/quote.html last visited Dec. 11, 2018); *see* Fed. R. Evid. 201(c).

[13] Opp'n at 19 (quoting Morningstar Report: Mutual Fund Data Definitions, http://quicktake.morningstar.com/datadefs/fundtotalreturns.html (last visited Dec. 11, 2018)).

[14] *See* Morningstar Investing Glossary, "Load," http://www.morningstar.com/InvGlossary/load_definition_what_is.aspx (last visited Dec. 11, 2018).

[15] *See*, Morningstar, TIAA Real Estate Account, https://www.morningstar.com/funds/XNAS/QREARX/quote.html ("Load": "None") (last visited Dec. 11, 2018).

therefore experienced no loss or injury from that investment. *See, e.g.*, *Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2018) (holding that, in an ERISA case, "at a minimum, a plaintiff must allege a *net loss* in investment value that is fairly traceable to the defendants' challenged actions") (emphasis added). (Since Mr. Wilcox did not invest in the TIAA Real Estate Account, he has no standing to complain about its performance because he too has no injury to show.)

Therefore, dismissal will be granted on the Complaint allegations concerning the Vanguard funds, the 2.5% withdrawal charge from the TIAA Traditional Annuity, and the TIAA Real Estate Account. Dismissal will also be granted as to Mr. McGuire's claims concerning the requirement of the TIAA Traditional Annuity requirement that funds be re-allocated over a ten-year period because Mr. McGuire has never invested in the TIAA Traditional Annuity; he therefore also lacks standing to represent other Plan Participants who did.

### B. CREF Stock Account

Plaintiffs take issue with the "excessive fees and historical underperformance" of the CREF Stock Account, Compl. ¶ 132, in comparison to the Russell 3000 and "other, lower-cost actively and passively managed investments that were available to the Plans." *Id*. ¶ 72. Plaintiffs allege that Defendants failed to conduct an analysis of the CREF Stock Account performance and investments fees and "had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large cap retirement plan investment performance index after fees." *Id*. ¶¶ 75-76. This argument is based on a false premise and fails to state a plausible claim for relief.

Plaintiffs' allegation that "Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the CREF Stock Account's investment results," Compl. ¶ 77, oversimplifies and misstates the facts and governing law. As Georgetown notes, and as explained in the relevant prospectus, the CREF Stock Account is a blend of U.S.

and foreign assets, such that domestic indices (like the Russell 3000) are comparators to only part of its holdings. *See* Defs.' Mem at 7, 27; Defs.' Reply at 13; 2017 CREF Prospectus at 27. This particular account "seeks to maintain the weightings of its holdings as approximately 65-75% domestic equities and 25-35% foreign equities," as detailed in its Prospectus. Defs.' Mem. at 7 n.13 (citing 2017 CREF Prospectus). However, applicable Department of Labor regulations do not permit the use of a composite benchmark, so Plan Participant disclosures reference only the Russell 3000 (domestic) component of the benchmark. *See* 29 C.F.R. § 2550.404a-5(d)(1)(iii); Fiduciary Requirements for Disclosure in Participant Directed Individual Account Plans, 75 Fed. Reg. 64,910, 64,916-17 (Oct. 20, 2010)). The CREF Stock Account explains that the appropriate benchmark is a composite of the Russell 3000 and the MSCI All Country World ex USA Investible Market Index. With full advice and knowledge of these facts, Plaintiffs' argument that the CREF Stock Account underperformed the Russell 3000, and that this indicates imprudence on the part of Defendants, is without merit.

Plaintiffs' further argument that the fund underperformed "other, lower-cost actively and passively managed investments that were available to the Plans" similarly is unavailing. First, ERISA does not provide a cause of action for "underperforming funds." *See Sweda v. Univ. of Penn.*, Case No. 16-cv-43292017, WL 4179752 at *10 (E.D. Pa. Sept. 21, 2017). Second, a fiduciary is not required to select the best performing fund, *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018), but instead to "discharge their duties with care, skill, prudence, and diligence under the circumstances then prevailing" when they make decisions. 29 U.S.C. § 1104(a)(1)(B). That the CREF Stock Account, with its deliberate mix of foreign and domestic investments, may not have performed as some purely domestic accounts with different investments does not indicate imprudence on the part of Defendants. Again,

Plaintiffs ignore the facts of this case in apparently adopting allegations from other cases that are unsuited to the Plans. Notably, the independent analyst Morningstar rated the CREF Stock Account as a 5-start investment option, which also counters Plaintiffs' allegations of imprudence.

### C. Recordkeeping Fees

Much of Plaintiffs' ire is focused on their allegations that Defendants failed to monitor and control "duplicative, excessive, and unreasonable fees." Opp'n at 23. They allege that Defendants breached their fiduciary duties by allowing three recordkeepers—TIAA, Vanguard and Fidelity—and thereby "creat[ed] needless additional expense and complexity." Opp'n at 29. Plaintiffs recognize that recordkeeping services are "a necessary administrative requirement for retirement plans. A recordkeeping firm keeps track of participant accounts, and creates an online portal where participants can view their accounts." *Id.* at 22 n.14. However, they allege that such services, if performed by a single entity, could be provided across all the three investment platforms for a "reasonable amount of a fixed fee . . . in the range of $35" each year for each participant. *Id.* at 23.

Georgetown responds that there is no inference of fiduciary mismanagement from the fact that TIAA, Vanguard, and Fidelity keep separate records for their own accounts. Georgetown's arguments distinguish between different kinds of defined contribution plans, that is, "university plans like Georgetown's [and] corporate 401(k) plans that look nothing like Georgetown's." Defs.' Mem. at 27. Georgetown insists that its approach to recordkeeping is consistent with the norms of its peers' higher-education plans, for which "'[t]he traditional 403(b) plan has historically been implemented through a multi-provider recordkeeper platform,'" and that "arrangement remains '[t]he most prevalent model by far.'" *Id*. at 17 (citations omitted). Georgetown notes that ERISA requires fiduciaries to act as would a reasonable individual "in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B), and

asks the Court to find that the appropriate peer group against which to measure its conduct is fiduciaries at other private universities, not fiduciaries of corporate 401(k) plans. Plaintiffs contend that ERISA litigation against university trustees is suddenly popular ("dozens of lawsuits") because university fiduciaries "ignored what was going on in the defined contribution world" and "engaged in the same bad behavior" by ignoring recordkeeping costs. Opp'n at 28.

Nonetheless, Plaintiffs fail to identify a single one of the "any number of university plans [that] provide for a single recordkeeper with investment choices offered by multiple fund managers," Compl. ¶ 47, much less one that offers the TIAA Traditional Annuity and other investment platforms through a single recordkeeper. To the contrary, Plaintiffs only identify multiple cases in which district courts have found such allegations sufficient to proceed to discovery. *See* Opp'n at 1 n.3-4.

This Court finds that neither party is quite right. When it comes to recordkeeping, the relevant difference between Georgetown's § 403(b) plans and corporate § 401(k) plans is not the nature of their defined contributions but the nature of the retirement investment programs offered to their employees, *i.e.*, long-term annuities and short-term investments. Plaintiffs allege that recordkeeping for their TIAA annuities could and should have been consolidated with recordkeeping for the mutual funds offered by Vanguard and Fidelity, thereby reducing such costs by millions of dollars. The Complaint alleges that participants in the Georgetown Plans should pay only $35/year per participant for recordkeeping services for all three investment platforms. Compl. ¶ 53.

While a plaintiff is entitled to the reasonable inferences that may arise from the facts asserted in his complaint, Plaintiffs provide no factual support at all for their assertion that the Plans should pay only $35/year per participant in recordkeeping fees. They cite no example

of any non-TIAA entity performing recordkeeping for TIAA annuities, which, of course, are based on decades worth of investments. *See* Ex. B, Supp. Auth. Slip Op. & Order, *Sacerdote v. New York Univ.*, Case No. 16-cv-6284 (S.D.N.Y. July 31, 2018) [Dkt 28-2] at 49 (finding, after trial, that "no other vendor has ever recordkept TIAA annuities[] even if it were legally possible to have another vendor do so . . . .").

A claim that fiduciaries were imprudent by allowing excessive fees "must be supported by facts that take the particular circumstances into account." *Id.* at 13 (citing *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 Fed. App'x 31, 33 (2d Cir. 2009); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 n.7 (8th Cir. 2009) (noting that, although "a bare allegation that cheaper alternative investments exist in the marketplace" is not sufficient to state a claim for a breach of fiduciary duty under ERISA, a court ruling on a motion to dismiss must rest its conclusions "on the totality of the specific allegations in [the] case"); *see also Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982); *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989)).

Georgetown admits that it could have materially changed the Plans and thereby reduced recordkeeping costs:  (i) it could have "abandoned annuities, which are more expensive to administer, but  . . . would have caused participants to lose important and meaningful benefits"; (ii) it could have redesigned the Plans to take a "no-frills" approach, by which participants would have received only federally-mandated notices and no individual investment advice; and/or (iii) it could have dropped the TIAA annuities or the Fidelity mutual funds to attempt to reach a cost of $35/year.  Defs.' Mem. at 18-19.  Notably, Plaintiffs do not allege that the currently available investment resources would remain available at their preferred price of $35/year.

Plaintiffs' allegations challenge the fundamental structures of the Georgetown Plans, not the fiduciary attentions or prudence of its Trustees. Indeed, the Plans could be transformed from what they are to something else. But Plaintiffs provide no evidence that the three entirely different current investment platforms—TIAA, Vanguard, and Fidelity—would agree to continue the same offerings at a lesser, or combined, recordkeeping price; nor have they identified any college or university that has accomplished that feat. Plaintiffs allege that the value of Georgetown's two Plans gives it sufficient bargaining power to accomplish such a merger, but that is not the legal question presented by their Complaint. A fiduciary may carry out his duties in different ways but whether he violates his duty of prudence requires that "the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenburg*, 694 F.2d at 929. Plaintiffs' allegations fail to meet this standard.

Plaintiffs do not allege self-dealing between the Plans' trustees and the recordkeepers. *See Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*, 513 Fed. App'x. 78, 80 (2d Cir. 2013). At most, they allege that the Trustees have not altered the Plans' recordkeepers (and, perhaps, its investment strategies) to lower costs to their preferred price. The mere allegation that Georgetown could continue to offer the same Plans and the same associated services for $35/year has no factual support, is entirely speculative, contrary to caselaw and common sense, and does not warrant discovery.

## IV.  CONCLUSION

For the aforementioned reasons, Defendants' Motion to Dismiss, Dkt. 18, will be granted.  A memorializing Order accompanies this Memorandum Opinion.


Date: January 8, 2019

_____
ROSEMARY M. COLLYER
United States District Judge