IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DARRELL WILCOX and MICHAEL MCGUIRE, individually and as representatives of a class of participants and beneficiaries in and on behalf of the GEORGETOWN UNIVERSITY DEFINED CONTRIBUTION RETIREMENT PLAN, the GEORGETOWN UNIVERSITY VOLUNTARY CONTRIBUTION RETIREMENT PLAN,<br><br>        Plaintiffs,<br><br>vs.<br><br>GEORGETOWN UNIVERSITY and CHRISTOPHER AUGOSTINI, formerly Senior Vice President and Chief Administrative Officer of Georgetown University,<br><br>        Defendants. | Civil Action No. 1:18-cv-00422<br><br><br>Hon. Rosemary M. Collyer<br><br><br>**FIRST AMENDED COMPLAINT – CLASS ACTION** |

1.       Plaintiffs Darrell Wilcox and Michael McGuire, individually and as representatives of a class of participants and beneficiaries of the Georgetown University Defined Contribution Retirement Plan (the "DC Plan") and the Georgetown University Voluntary Contribution Retirement Plan (the "Voluntary Plan") (collectively, the "Plans"), bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plans against Defendants for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

2.       Defendant Georgetown University is the sponsor of and a fiduciary to the Plans. Defendant Christopher Augostini, while he served as Senior Vice President and Chief Administrative Officer of Georgetown University, was the Plan Administrator and a fiduciary.

- 1 -

3.     As fiduciaries, Defendants owed the Plans and participants the duties of undivided loyalty and prudence, duties that are among the highest known to the law and require fiduciaries to perform their obligations solely in the best interests of the participants and beneficiaries.[1]

4.     Among the principal functions of a fiduciary in participant-directed individual account retirement plans like the Plans are the selection of services providers to the Plans and the selection of designated investment alternatives into which plan participants can direct the investment of their retirement savings accounts.[2]

5.     Teachers Insurance and Annuity Association of America ("TIAA") has been selected and retained by Defendants to provide recordkeeping and administrative services to the Plans and to provide a variety of designated investment alternatives managed by TIAA or its affiliated company, College Retirement Equities Fund ("CREF"). As a service provider and fiduciary to the Plans, TIAA is a "party in interest," as that term is defined in ERISA's prohibited transaction rules,[3] and the agreement between the Plans and TIAA must satisfy the conditions set forth in ERISA § 408(b)(2) and its associated regulation, 29 C.F.R. § 255.408b-2(c) ("the "408b-2 Rules" or simply "408b-2"). In fact, every contract for services between an ERISA retirement

---

[1] ERISA § 404 provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
(A) for the exclusive purpose of:
    (i) providing benefits to participants and their beneficiaries; and
    (ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

[2] "[T]he [US] Department [of Labor] points out that the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA Section 404(c) plan is a fiduciary function [.]" Final Regulation Regarding Participant Directed Individual Account Plans (ERISA § 404(c) Plans), 57 Fed. Reg. 46906, 46924, n.27 (Oct. 13, 1992).

[3] ERISA §§ 406 – 408, 29 U.S.C. §§ 1106 – 1108.

plan and any recordkeeper or any fiduciary must meet the requirements of the 408b-2 Rules.

6.      The 408b-2 Rules require that fiduciaries of qualified retirement plans investigate and evaluate all direct and indirect compensation being received by the recordkeeper in connection with the services, and make a determination that the total compensation being received is reasonable in relation to the services being provided.[4] Plan fiduciaries are also obligated to ensure that the recordkeeper provide a complete and detailed description of all direct and indirect compensation the recordkeeper expects to receive for performing recordkeeping and other administrative services under the contract. The failure to do so is a breach of the fiduciary's duties of prudence and diligence and results in a prohibited transaction in violation of ERISA § 406(a)(1)(D).

7.      The 408b-2 Rules first became effective in February 2012, and the first detailed disclosures were required to be made in July 2012.

8.      Defendants were obligated to evaluate and analyze the 408b-2 disclosures made by TIAA and ensure they were complete and accurate. They were also required to perform their own investigation of the compensation that TIAA would be receiving, and to determine that the total compensation was reasonable in relation to the services being provided. In performing that evaluation and investigation, if the Defendants were not experienced with (i) recordkeeping contracts, (ii) the market and market rates for recordkeeping and administrative services, and (iii) the various methods available for paying for recordkeeping services, Defendants were obligated

---

[4] "When the fees for services are paid out of plan assets, fiduciaries will want to understand the fees and expenses charged and the services provided. While the law does not specify a permissible level of fees, it does require that fees charged to a plan be 'reasonable.'" *Meeting Your Fiduciary Responsibilities,* Employee Benefit Security Administration, US. Dept. of Labor, February 2012, p. 5; available at *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf;* last viewed Aug. 11, 2017.

to obtain expert advice.[5] Additionally, the fiduciary would have been required to compare the compensation TIAA was going to receive to fees that would be charged by comparable service providers.

9.      Defendants failed in every phase of this process.

10.     Defendants approved fees for TIAA that greatly exceeded a reasonable fee for comparable services. In 2012, for example, TIAA received at a minimum more than $2 million in compensation for recordkeeping and administrative services for the DC Plan, or roughly $250 per participant. By comparison, NEPC, LLC, an independent, nationally-recognized, full-service investment consulting firm, reported that *median* fees in 2012 for administrative services for individual account defined contribution plans were $92 per participant. With more than $1.2 billion in assets in the DC Plan, Defendants should have been able to negotiate a fee much lower than the median fee.

11.     Because Defendants accepted an asset-based fee for recordkeeping and administrative services, fees grew to more than $2.3 million in 2014 (approximately $280 per participant) for roughly the same number of participants and the same level of services as in 2012, even though NEPC reported a significant reduction in median administrative fees in 2014 to $70 per participant. NEPC has reported that median recordkeeping fees in 2016 for individual account plans with $1 billion in assets was $37 per participant.

12.     It does not take an expert to understand that an asset-based fee for plan administration will cause fees to increase as plan assets grow, even though there is no change in the services being provided. Any expert who examined this fee arrangement, would have drawn

---

[5] The investing fiduciary will be held to the standard not of a prudent layman, but of a prudent investment professional.  *Whitfield v. Cohen*, 682 F. Supp. 188, 194 (S.D.N.Y. 1988).

attention to its inherent flaw.

13.     Additionally, Defendants failed to benchmark the fees being charged by TIAA, even against fees being charged by other recordkeepers providing services to the same Plans. During the period covered by this Complaint, the Plans engaged three recordkeepers simultaneously: TIAA, Vanguard and Fidelity. In 2014, while TIAA was collecting a minimum[6] of $280 per participant, Vanguard was charging a maximum of $114 per participant for recordkeeping services, despite the fact that Vanguard offered more than twice as many investment choices as did TIAA. Likewise, in 2012, Vanguard's compensation for recordkeeping was $97 per participant while TIAA was receiving at least $250 per participant for the same services.

14.     Finally, Defendants failed to obtain the necessary disclosures required by 408b-2.

a.     The disclosures received from TIAA and reviewed by Defendants failed to include a significant amount of compensation received by TIAA in the form of "distribution fees" that TIAA charged with respect to nearly all of the TIAA investment options in the Plans.[7] Those distribution fees were between 11.5 and 25 basis points until mid- to late-2015 and 5.5 to 25 basis points thereafter. The undisclosed compensation that TIAA received from the Plans in the form of distribution fees was in excess of $800,000 in 2014. A simple review of the prospectuses for the funds would have disclosed the distribution fees being received by TIAA. There's no basis to ignore that source of compensation, since the source of recordkeeping

---

[6] The calculation of TIAA's compensation for this purpose does not include actual compensation earned from the TIAA Traditional Annuity, by far the largest single investment fund in the Plans, which was the spread between TIAA's investment return on its general account and the amount of interest credited to participants' accounts. *See infra* at ¶ 13.b.

[7] A distribution fee or "12b-1 fee" is an annual marketing/distribution fee or on a mutual fund.

fees from both Vanguard and Fidelity consisted entirely of revenue sharing payments from the investment choices made available from the two recordkeepers.

b.   Furthermore, disclosures provided by TIAA reported that TIAA's compensation from the Traditional Annuity, one of the Plans' investment options and the one that held the most assets, was only 15 basis points. The Traditional Annuity, however, is an insurance company general account product, and the compensation being received by TIAA is measured by the spread between the earnings on TIAA's general account and the interest credited to investors in the Traditional Annuity, less expenses of investment.[8] The 15 basis points disclosed by TIAA is nothing more than a misleading number used by TIAA for internal accounting purposes. On information and belief, the compensation measured by the spread between general account earnings and the interest rate credited to participants was multiples of the reported 15 basis points. Defendants failed to make any inquiry regarding TIAA's actual compensation from the Traditional Annuity, and TIAA failed to provide such information.

15.   Defendants agreed to pay TIAA  an additional fee of 0.5 basis points as a mortality and expense charge for each of the eight TIAA variable annuities included as investment choices in the Plans, even though a simple review of the prospectus for the variable annuities would have revealed that these "annuities" do not bear any mortality risk. First, the prospectus for the variable annuities makes it clear that annuity payments are not made from the variable annuities. Instead, participants must use the value of their account invested in the variable annuities to purchase a

---

[8] *See John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993).

separate annuity from TIAA: "CREF also deducts a mortality and expense risk charge that is paid to TIAA to guarantee that CREF *participants transferring funds to TIAA for the immediate purchase of lifetime payout annuities* will not be charged more than the rate stipulated in the CREF contract." (Emphasis added.)

**16.**     Moreover, the so-called variable annuities actually transfer mortality risk to the participants.  As stated in the prospectus: "if the people receiving income from an Account's annually revalued annuity fund live longer, as a group, than expected*, the amount payable to each will be less than if they as a group die sooner than expected. So the 'mortality risk' of each Account's annuity fund falls on those who receive income from it and is not guaranteed by either CREF or TIAA.*"[9] (Emphasis added.)

17.     Like the DC Plan, the Voluntary Plan, with roughly 3,000 participants invested through TIAA, paid TIAA excessive compensation. The per-participant charge for administrative expense in 2014 was approximately $175; less than the DC Plan but still extraordinarily high for recordkeeping and administrative services for any individual account plan, including other comparably sized university 403(b) plans.[10] For example, the fiduciaries of the University of Chicago retirement plans, with aggregate assets of approximately $2.4 billion, have recently cut recordkeeping fees to $21-$44 per participant.

---

[9] College Retirement Equities Fund Prospectus, May 1, 2018, at 92 (emphasis added); available at http://connect.rightprospectus.com/TIAA/TADF/194408803/P?site=VA, last viewed Jan. 31, 2019.

[10] For this purpose, the assets of both Plans are being considered.  Recordkeepers and fund managers routinely aggregate the assets of all plans of a plan sponsor when negotiating the terms of agreements.

18. Defendants failed to leverage the Plans' substantial bargaining power to benefit participants and beneficiaries. Defendants failed adequately to evaluate and monitor the Plans' expenses and caused the Plans to pay unreasonable and excessive fees for recordkeeping and administrative services.

19. Defendants further breached their duty of prudence by failing to exercise sufficient diligence to understand the investment options they were offering Plan participants and, as a result of this failure, misrepresenting to Plan participants the nature and characteristics of those offerings.

20. By their breaches of duty as described above, Defendants have caused Plaintiffs and the other DC Plan participants to pay excessive recordkeeping fees in the range of $300 per participant, and participants in the Voluntary Plan to pay roughly $175 per participant. Fiduciaries of other individual account plans cause their participants to pay far less.

21. Fees for administrative services have been charged and paid to TIAA as a percentage of the overall expenses paid for investing in the various investment options offered within the Plans (including expensive choices and/or share classes). As a result, Plaintiffs have paid asset-based fees for administrative services, which continued to increase as the value of their accounts increased through additional contributions and investment returns even though no additional services were being provided to Plaintiffs as their fees went up. (The greater assets of the DC Plan account for the dramatic difference in the fees paid by participants in the DC Plan compared to the fees paid by participants in the Voluntary Plan.)

22. The folly of an asset-based fee for administrative services is demonstrated dramatically when viewed from the perspective of individual participants. A participant with an account balance of $500,000 invested entirely in the CREF Stock Account in 2014 would have paid $1,600 for administrative services, while a participant with a $100,000 account invested

entirely in the CREF Stock Account would have paid only $320 for exactly the same services.

23.     Defendants' failure to properly evaluate and assess the reasonableness of TIAA's charges for recordkeeping and administrative expense, and their failure to evaluate and understand the terms and nature of the TIAA investment products, are indicative of a flawed process and breaches of Defendants' duties of prudence and diligence that has resulted in the payment by participants of millions of dollars in excessive and unreasonable fees. To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to restore to the Plans all losses resulting from each breach of fiduciary duty.

## I.   JURISDICTION AND VENUE

24.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

25.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plans are  administered, where at least one of the alleged breaches took place and where the Defendants reside.

## II.   THE GEORGETOWN UNIVERSITY DEFINED CONTRIBUTION AND VOLUNTARY CONTRIBUTION RETIREMENT PLANS

26.     The Plans are defined contribution, individual account, employee pension benefit plans as defined under 29 U.S.C. §1002(2)(A) and §1002(34).

27.     The Plans are established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

28.     Eligible faculty and staff members of Georgetown University are able to participate

in the Plans. The Plans provide a primary source of retirement income for many employees of Georgetown University. Contributions to the Plans are based upon deferrals of employee compensation and employer matching contributions. The ultimate retirement benefit provided to investors in the Plans – who in retirement plan-speak also are known as "plan participants" or just "participants" and are referenced as such in this complaint – depends on the performance of investment options chosen for the Plans by the University net of fees and expenses. Participants like Plaintiffs have a right to direct the investment of their accounts among the available investment choices

29.    Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion). With an aggregate value of nearly $2 billion in assets as of December 31, 2015, the Plans, taken together, qualify as a "Mega" plan.

## III.   THE PARTIES

### A.    Plaintiffs

30.    Plaintiff Darrell Wilcox, a resident of Washington, D.C., is a participant in both Plans as defined under 29 U.S.C. §1002(7) because he has a vested account balance in both of the Plans, and his beneficiaries are or may become eligible to receive benefits under the Plans. Through the Plans he has been invested in the TIAA Traditional Annuity, the CREF Bond Account (one of the variable annuities), and eleven of the TIAA mutual funds.

31.    Plaintiff Michael McGuire, a resident of Stafford, Virginia, is a participant in both Plans as defined under 29 U.S.C. §1002(7) because he has a vested account balance in the both Plans, and his beneficiaries are or may become eligible to receive benefits under the Plans.

Through the Plans he has been invested in the CREF Stock Account, the CREF Equity Index Account, the TIAA Real Estate Account, the CREF Inflation-Linked Bond Fund Account, the CREF Bond Market Account and the TIAA-CREF Growth and Income Account.

**B.    Defendants**

32.    Defendant Georgetown University is a private university with its principal place of business in Washington, D.C. It is governed by a Board of Trustees.

33.    The University is designated as the Plan Administrator under 29 U.S.C. §1002(16)(A)(i) and the "named fiduciary," and is responsible for the management of the Plans and the Plans' assets, with complete discretionary authority to control the operation, management and administration of the Plans, and with all powers necessary to enable it properly to carry out such responsibilities. These include the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

34.    The University is an ERISA fiduciary to the Plans because it has exercised and continues to exercise discretionary authority or discretionary control respecting the management of the Plans and the management and disposition of their assets, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii). The University has acknowledged that it is the Plan Administrator in the Plans' 5500 filings.

35.    Defendant Christopher Augostini (together with the University, "Defendants") was formerly the Senior Vice President and Chief Administrative Officer of the University until May, 2017, and was given discretionary authority and powers necessary to administer the Plan and, therefore, was a fiduciary to the Plans.

## IV.   FACTS APPLICABLE TO ALL COUNTS

### A.   Plan investments

36.     Defendants exercised and continue to exercise discretionary authority over the investment options that are included in the Plans. The Plans' investments are designated by Defendants as available investment alternatives offered under the Plans.

37.     The Plans offer TIAA retirement investment funds, including fixed and variable annuities, registered investment companies (mutual funds), and a pooled separate account. In addition, at various times since 2010 the Plans have also offered eighty-six investment choices managed by Vanguard, which are all mutual funds. It also has offered approximately one hundred and ninety Fidelity funds and eight AXA investment funds. (The AXA funds are frozen to new contributions.)

38.     The TIAA Traditional Annuity offered in the Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of TIAA.

39.     The Plans' CREF Stock Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Account and CREF Bond Market Account are characterized as variable annuities that invest in underlying securities for a given investment style. The value of the Plans' investments in these variable annuities changes over time based on investment performance and expenses of the accounts.

40.     Multiple layers of expense charges comprise the expense ratio of the CREF variable annuity accounts. For the R1 share class, which was the only share class offered by TIAA prior to 2015, those expenses consisted of the following:

    a. "administrative expense" charge (24 bps); [11]

    b. "distribution expense" charge (11.5 bps);

    c. "mortality and expense risk" charge (0.5 bps); and

    d. "investment management expense" charge (ranging from 4 to 15 bps).

41.    The TIAA Real Estate Account is an insurance company separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2016, these charges consisted of the following:

    a. "administrative expense" charge (26.5 bps);

    b. "distribution expense" charge (12.5 bps);

    c. "mortality and expense risk" charge (0.5 bps);

    d. "liquidity guarantee "(17 bps); and

    e. "investment management expense" charge (32 bps).

42.    The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, which commonly are known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing and other expenses, depending on the type of investment and share class. During the period covered by this Complaint, many of the TIAA mutual funds charged 25 basis points as a distribution fee.

---

[11] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

43.     There is nothing special or unique about the TIAA annuity products that make them more difficult or more complicated to recordkeep than collective investment trusts that are routinely offered in 401(k) and 403(b) plans. They are merely pools of assets – equities, fixed-income securities, and cash or cash-equivalents – that offer participants a vehicle for collective investment. A participant can move all or a portion of her account into and out of the variable annuities on a daily basis, just as she could with respect to the available TIAA mutual funds and just as a participant could in any other 401(k) or 403(b) plan that offers mutual funds and collective investment trusts.

44.     The eight so-called variable annuities issued by TIAA are not really annuities at all. It is clear from the prospectus for the variable annuities that upon a participant's sale of her interest in the variable annuities, or on her death, she or her estate receives nothing except the balance in the account. Certainly, the participant who invested in these variable annuities can arrange for a payout over time of her account balance. But whether the amount is paid out in a lump sum upon selling the investment or exiting the Plan, or instead the amount is paid out over time, the result is the same: the Plan participant who invests in the variable annuities receives the same principal amount no matter what.

45.     In fact, every 401(k) plan and 403(b) plan effectively offers a "lifetime income option" by virtue of the "required minimum distribution rules" set forth in Section 401(a)(9) of the Internal Revenue Code. These rules require that, once a participant reaches age 70 ½, the plan must begin distributing to the participant annual benefits based on IRS life expectancy tables. (Of course, the participant could direct the plan to distribute more than this minimum annual amount, so long as her account continues to hold assets.) If, for example, an individual's life expectancy at age 70 ½ is 15 years, the first annual installment is 1/15th of her account balance. The following

- 14 -

year, when her life expectancy has decreased to 14.3 years, she will receive 1/14.3[th] of her account

balance, and so on.  By the recalculation of life expectancy every year, the individual is guaranteed

to receive some payout for the rest of her life.

46.     On top of that, a Plan participant who invests in the TIAA variable annuities pays

hefty expenses for services or features that provide value to no one except TIAA. TIAA charges a

"distribution expense", but in fact TIAA itself incurs no such expense, so forcing the Plan

participant to pay it represents paying something – in fact, a great deal – for nothing. When

individual retail investors purchase shares in a mutual fund, the fund pays distribution costs, or so-

called 12b-1 fees, to its network of brokers for their efforts to lead individuals to invest in the

mutual fund. But such circumstances do not exist here. There are no retail brokers, and no need to

sign up individual investors, because TIAA's variable annuities have been designated by

Defendants as Plan investment menu options. Instead, the "distribution expense" is money that

TIAA pays to itself from Plan assets in exchange for nothing. By comparison, any 12b-1

distribution fees that are charged by any of the Fidelity mutual funds available in the Plans are

used to offset Fidelity's recordkeeping charges.[12]

47.     TIAA also reaps material profits by Defendants' inclusion of the Traditional

Annuity among Plan investment menu options. The Traditional Annuity pays a guaranteed return

to Plan participants. But all amounts earned on the Traditional Annuity's investments that are over

and above that guaranteed amount go into TIAA's pocket. In addition, the Traditional Annuity

imposes an illegal 2.5% surrender charge on lump sum withdrawals.[13] This 2.5% surrender charge

---

[12] The expense ratios of Vanguard funds do not include 12b-1 distribution fees.

[13] "No contract or arrangement is reasonable within the meaning of section 408(b)(2) of the Act and paragraph (a)(2) of this section if it does not permit termination by the plan without penalty to

and the 10-year lock-up make the Traditional Annuity less valuable for all Plan participants who invest in the Traditional Annuity, regardless of whether they have yet to pay the surrender charge or suffer the loss of opportunity due to the 10-year lock-up.

48.     All these amounts – mortality cost, distribution fees, and excess profits on the Traditional Annuity – represent monies that flow to TIAA that are well in excess of a reasonable recordkeeping fee. Indeed, all fees paid TIAA in connection with its services and products on behalf of the Plans – apart from investment management fees paid on a fund by fund basis – constitute recordkeeping fees. Taken altogether, and considering the many different sources of those fees, the recordkeeping fees are grossly excessive, and it is in breach of their fiduciary duties that Defendants cause Plan participants to pay such excessive fees. Alternatively, if such excessive amounts – apart from investment management fees – are not considered recordkeeping fees, then those amounts are gifts from Plan assets paid by Defendants, in breach of their fiduciary duties, to TIAA. Such amounts, whether they be excessive recordkeeping fees or gifts, are, again, something for nothing.

> **B.     Defendants' actions caused participants in the Plans to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

49.     Recordkeeping is a necessary service for every defined contribution retirement plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace capable of providing a high level of service to large defined contribution plans like the Plans. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

---

the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous." 29 C.F.R. § 2550.408b-2(c)(3).

50.     To ensure that retirement plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution retirement plans solicit competitive bids for recordkeeping and administrative services at regular intervals of approximately five years.

51.     The cost of recordkeeping and administrative services depends on the number of retirement plan participants, the number of investment choices, the complexity of plan features and similar factors that generally do not vary greatly over time. The actual cost of those services does not turn on the asset balance of a retirement plan or the amount of savings held in a particular plan participant's account. Thus, the cost of providing recordkeeping services to a retirement plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same features and the same number of participants and a $5,000 average account balance. For this reason, prudent ERISA fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the fees paid to a recordkeeper will increase without any change in the services provided.

52.     "Mega" defined contribution plans like the Plans generate tremendous economies of scale for recordkeeping and administrative services. As the number of participants in a retirement plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for retirement plans with a greater number of participants.

53.     A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing

arrangements provide asset-based compensation for the retirement plan recordkeeper (that is, recordkeeping fees calculated as a percentage of total plan assets), prudent ERISA fiduciaries monitor the total amount of revenue sharing a retirement plan recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided. A prudent fiduciary will see that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation. In fact, it is best practice among retirement plan fiduciaries to acquire the share class for a particular investment choice that charges the lowest expense ratio and pays no revenue sharing, and the fiduciary then negotiates a fixed (not asset-based) fee for recordkeeping. That practice insures that the fiduciaries actually know how much their retirement plan is paying for recordkeeping and ensures that participants in the plan are paying the least expense for investments and recordkeeping.

54. Based on information currently available to Plaintiffs regarding the Plans' features, the nature of the administrative services provided by the Plans' platform providers, the Plans' participant levels, and the recordkeeping market, benchmarking data indicates that a reasonable recordkeeping fee for the Voluntary Plan would have been a fixed amount between $500,000 and $650,000 and for the Defined Contribution Plan an amount between $350,000 and $500,000 (approximately $35 per participant with an account balance). Strong, recent precedent exists. Last year, following extensive review and negotiation, and in connection with eliminating one of two plan recordkeepers, the University of Chicago plan fiduciaries reduced annual recordkeeping fees on their two 403(b) plans to $21-$44 per participant.

55. An examination of the prospectuses for the TIAA funds available as investment

choices and the Plans' financial data shows that the Plans have paid at least hundreds of dollars per participant per year from 2010 to 2015 for recordkeeping – much more than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year and millions of dollars in damage to Plaintiffs and the proposed class every year.

56.     Based on calculations derived from examination of the Plans' U.S. Department of Labor ("DOL") Form 5500's, TIAA received excessive indirect compensation for recordkeeping and administrative services of more than $8.4 million during the relevant period from just the CREF variable annuities, the TIAA CREF Real Estate Account and the TIAA Traditional Annuity without regard to any other indirect compensation received from, for example, plan loans, revenue sharing from the TIAA mutual funds, and TIAA's earnings on the investments of the TIAA Traditional Annuity over and above the amounts paid to Plan participants. None of this indirect compensation was reported on any of the Plans' Annual Returns filed with the DOL Employee Benefit Security Administration ("EBSA") on Form 5500, in violation of the explicit obligation to do so under federal law.

57.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The EBSA has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[14]

58.     Defendants also failed to control recordkeeping costs as assets in the Plans grew. From December 31, 2009 to December 31, 2014, the Plans' assets increased by 60% from $1.26 billion to $2.02 billion. Because revenue sharing payments are asset-based, the already excessive

---

[14] 11 Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

compensation paid to the Plans' platform providers became even more excessive as the Plans' assets grew (even though the administrative services provided to the Plans remained the same). Defendants could have capped the amount of revenue sharing retained by TIAA at an amount that would have been a reasonable charge for recordkeeping and administration, to ensure that all excessive amounts were returned to the Plans but failed to require the return of all excessive compensation.

59.     Defendants failed to monitor and control prudently the compensation paid by the Plans for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plans' platform providers. Had Defendants monitored the compensation paid to the Plans' platform providers and ensured that participants like Plaintiffs were charged only reasonable fees for administrative and recordkeeping services, Plan participants including Plaintiffs would not have lost millions of dollars in their retirement savings in the last six years alone.

## C.     Defendants imprudently retained historically underperforming Plan investments.

60.     Given Defendants' failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plans.

### i.     CREF Stock Account

61.     Investments in the CREF Stock Account as of December 31, 2016 represent roughly 16 percent of the Plans' assets, and the CREF Stock Account has been included as an investment option in the Plans from at least 2009 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has for years historically underperformed

and continues to underperform its benchmark and other, lower-cost actively and passively managed investments that were available to the Plans.

62.     On information and belief, TIAA-CREF imposed restrictive provisions on the specific annuities that must be provided in the Plans. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity, the CREF Money Market Account and six other CREF variable annuities. Defendants provided these mandatory offerings in the Plans without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. Prior to creation of three separate share classes for the CREF Stock Account in mid-2015, the CREF Stock Account annually paid 56 basis points in fees for revenue sharing as administrative expense and "distribution fees," which exceeded other TIAA-CREF investments by over 50%.

63.     Prudent ERISA fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed retirement funds, particularly "large cap" ones like the CREF Stock Account, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the best interests of plan participants like Plaintiffs and the proposed Class to offer an actively managed large cap option for the particular investment style and asset class.

64.     In providing the Stock Account as a fund option, Defendants failed to conduct such a prudent analysis, despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market and that active managers do not outperform passive managers net of fees in this investment style.

65.     Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large cap retirement plan investment performance index after fees. That is in fact what occurred.

66.     Rather than performing poorly in a single year or two, the CREF Stock Account has registered poor performance persistently for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the CREF Stock Account's investment results.

67.     To the extent that Defendants may claim that DOL regulations required them to use an "appropriate broad-based" benchmark in participant communications concerning the CREF Stock Account,, 29 CFR 2550.404a-5(d)(1)(iii), they overlook that those regulations further provide that nothing precludes "a plan administrator from including additional information that the plan administrator determines appropriate for such comparisons . . . ." 29 CFR 2550.404a-5(d)(2)(ii). In other words, Defendants cannot now be heard to assert that the Russell 3000 is not the correct benchmark, when throughout the class period they told Plan participants that it was. Moreover, if they knew at the time that it was misleading to use the Russell 3000 as a benchmark, they should have supplemented the disclosures to participants with the additional information. The more reasonable inference, however, is that they were not aware of the discrepancy, and understood the CRAF Stock account to be exactly what TIAA represented it to be—a large blend fund (meaning a blend of large cap growth and value stocks) that was appropriately measured against the Russell 3000.

68.     The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same

investment style for the one-, five-, and ten-year periods ending December 31, 2014. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Pl) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.



69.     The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2016, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

70.     Apart from underperforming passively managed index funds, the fund also

significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the Vanguard Capital Opp. (Adm) (VHCAX).



71.    The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[15]

---

[15] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was



excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.





72.     Despite the consistent underperformance, the CREF Stock Account, with an

expense ratio of 70 bps during most of the relevant period, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (36 bps), the Vanguard PRIMECAP (Adm) (32 bps), and the Vanguard Capital Opp. (Adm) (37 bps).

73.     Given the foregoing, the CREF Stock Account was recognized as an imprudent investment in the industry. In March 2012, a prominent independent investment consultant, Aon Hewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plans. Aon Hewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[16] This recommendation was due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers and the fund's over 60 separate underlying investment strategies, which taken together greatly reduced the fund's ability to generate excess returns over any substantial length of time. *Id*. at 4–5. Some prudent retirement plan fiduciaries took heed. As noted, in 2018 the fiduciaries of the University of Chicago retirement plans removed the Stock Account from the menu of plan investment options.

74.     The Supreme Court recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its continuing underperformance compared to lower-cost investment alternatives readily available to the Plans (and the opinion of one of the foremost authorities in the retirement investment industry that *no* retirement plan should own this fund).

---

[16]     Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

75.     Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans.

**76.**     Had the Defendants removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives or the passively managed lower-cost alternatives, as set forth in paragraphs 68 and 70, participants in the Plans like Plaintiffs would not have suffered millions of dollars' of diminished investment returns on their retirement savings.

**D.      There is ample evidence of multiple flaws in Defendants' fiduciary decision-making process**

**1.      Far too many investment choices.**

77.     It is well known in the defined contribution retirement plan industry that plans with hundreds of choices and multiple recordkeepers "fail" based on two primary flaws:

1. **The choices are overwhelming**. Studies show that when people are given too many choices of anything, they lose confidence or make no decision.

2. **The multi-recordkeeper platform is inefficient**. It does not allow plan sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009) (emphasis in original).[17]

78.     The sheer volume of three hundred total investment choices for retirement investors like Plaintiffs indicates that Defendants failed properly to monitor and evaluate the historical

---

[17] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

performance and expense of each of these funds, compare that historical performance and expense to a peer group of funds and/or even compare the three segments against one another. Defendants have done what the DOL and at least one federal appellate court have warned against: they have stuffed the Plans' investment menus with hundreds of possible investments and then shifted to the participants the responsibility for choosing among this vast array. This strategy chosen by Defendants results in the inclusion of many investment alternatives that a responsible fiduciary should exclude and that unreasonably burdens plan participants who do not have the resources to pre-screen investment alternatives in the way Defendants do.[18] The designation of three hundred investment alternatives made available under the Plans reflects an attempt by Defendants as ERISA plan fiduciaries to insulate themselves from ERISA liability at the expense of participants in the Plans, including Plaintiffs. Plan participants are not likely to have the investment expertise and sophistication to build an appropriate asset allocation from the hundreds of available investment choices.

79.     No participant should be expected to read the prospectuses for three hundred investment funds in order to determine which of those three hundred she should invest in.  That would make choosing investments in a retirement plan a fulltime job.[19] In that regard, it is highly doubtful that the Georgetown University employees charged with performing Georgetown's fiduciary responsibilities, such as Mr. Augostini, read the prospectuses for those three hundred funds, much less the six hundred or nine hundred other prospectuses for competing funds of the ones selected in order to choose the final three hundred. One can reasonably conclude the

---

[18] *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009).

[19] Such a strategy is clearly not a smart choice for any employer who expects employees to be fully focused on performing her job responsibilities.

Defendants have stuffed the Plans' investment menus with hundreds of possible investments and then shifted to the participants the responsibility for choosing among this vast array.

80.     Defendants finally acknowledged the problems created by their failure to select a reasonable number of investment choices after the filing of Plaintiffs' original complaint, and dramatically reduced the number of Fidelity and Vanguard funds in 2018.

**2. Continued retention of multiple recordkeepers.**

81.     The benefits of using a single recordkeeper are clear:

By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[20]

82.     In a study titled "How 403(b) Plan Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", Aon Hewitt similarly recognized:

403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

– Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate competitive pricing.

Aon Hewitt, *How 403(b) Plan are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[21]

---

[21] 6Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1

83.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[22]

84.     Others in the industry agree. *See, e.g.*, Kristen Heinzinger, Paring Down Providers: A 403(b) Sponsor's Experience, PLANSPONSOR (Dec. 6, 2012) ("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers."); Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010) (identifying, among other things, the key disadvantages of maintaining a multi-provider retirement plan recordkeeping platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors"). Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the retirement plans. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following

---

1685d2a64078/How_403(b)_Plan_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").

85.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants contracted with *three* platform providers (TIAA-CREF, Fidelity and Vanguard) for the (ostensible) benefit of Plaintiffs and the Plans. This inefficient and costly structure maintained by Defendants has caused Plans' participants, including Plaintiffs, to pay and continue to pay duplicative, excessive and unreasonable fees for recordkeeping and administrative services. There is no loyal, prudent or practical reason for Defendants' failure to engage in a process to reduce duplicative services and the fees charged to the Plans or to continue with multiple platform providers to the present. In fact, any number of university plans provide for a single recordkeeper with investment choices offered by multiple fund managers.

86.     Over recent years, 403(b) plan fiduciaries for various university plans have begun recognizing that they must make major changes in order to ensure that they advance the participants' interests. Just last year, with litigation pending against them that alleged many of the claims asserted in the present case against Defendants, the fiduciaries of the University of Chicago retirement plans dropped one of the plans' two recordkeepers and removed from the investment menu options an historically underperforming investment fund that is discussed at length below, the CREF Stock Account. In taking these steps, the University of Chicago reflected a trend, as indicated by the following examples:

### Loyola Marymount University

87.     In its 403(b) Retirement Plan Review Project Overview, the fiduciaries of the Loyola Marymount University ("LMU") 403(b) defined contribution plan recognized that, "Recordkeeping must be consolidated and/or managed by a single party," and that "Keeping two on-going record keepers . . . would mean that faculty/staff would pay higher fees and receive reduced services."

88.     To assist LMU in assessing the plan's investment options and recordkeeping services, beginning in 2008, LMU hired an independent third party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TIAA.

89.     LMU consolidated from two recordkeepers to one, effective January 1, 2009. Moreover, LMU selected Diversified as the new recordkeeper in part because Diversified did not require bundling investment products and did not require that particular investment funds be included among the menu options made available to plan participants. LMU was therefore able to offer "best in class" funds in each fund category.

90.     LMU cited a number of additional reasons for why it did not select TIAA (and instead selected Diversified) as the recordkeeper, including but not limited to because:

- The annuity products offered by TIAA have not performed as well as the mutual funds offered by other service providers;

- Over the long run, selection of TIAA would result in higher fees paid by faculty and staff;

- TIAA offered less reliable administrative services; and

- TIAA received an unfavorable audit review.

91.     LMU also recognized that the TIAA Traditional Annuity has a favorable historical return rate, but – as discussed below in this Complaint – "the higher returns associated with TIAA traditional fixed annuity come at the expense of a severe lock-up period during which an investor who wants to transfer assets out of the account is currently required to move assets out gradually over a period of 10 years."

## Pepperdine University

92.     Pepperdine University retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, effective 2009, Pepperdine selected Diversified, a recordkeeper that does not offer proprietary investments, to administer the plan, consolidating from four recordkeepers (Fidelity, TIAA, Vanguard and Prudential) to a single recordkeeper.

93.     Pepperdine found that the benefits of consolidation include lower costs and more robust services, as well as a streamlined compliance process and simplified data coordination. As identified by Paul Lasiter in his National Association of College and University Business Officers (NACUBO) publication entitled *Single Provider, Multiple Choices*, Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option." Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs are "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider is allowed to "realize true economies of scale."

94.     Pepperdine also recognized that the bundled model (discussed above in this Complaint) demanded by certain providers is not in participants' interest. Using providers who insisted on bundling investment products "meant being obligated to offer some or all of that

provider's proprietary funds on the plan's investment menu—whether or not those investments offered participants the best range of choice, value, and relative performance."

95.      Acting in participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser—could identify as being the 'best options in their respective asset classes.'" After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants."

**Purdue University**

96.      In the fall of 2008, Purdue University began a comprehensive review of its defined contribution retirement program. Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. Purdue decided to transition from five providers (TIAA, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity), which caused recordkeeping expenses to decline significantly. Purdue thus "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu

of pre-screened, broadly diversified investment options." Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated $3–4 million per year which is then compounded over time."

### California Institute of Technology

97.     Likewise, as reported in an Institutional Investor article called *Caltech Names TIAA-CREF Recordkeeper*, the California Institute of Technology TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA and Fidelity) to a single recordkeeper (TIAA), effective January 1, 2010, with the assistance of an independent third-party consultant, Mercer Investment Consulting.

98.     In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the DOL, between 2013 and 2015, CalTech negotiated over $15 million in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

### University of Notre Dame

99.     In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper", which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations. Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market."

100.    Hewitt noted several areas of plan improvements. First, recordkeeper consolidation provided "many benefits to participants," including cost savings, and Hewitt identified that

"[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants."

101.    Second, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup.

102.    Unfortunately, Defendants have not effected the types of changes described above with respect to other university retirement plans. As noted, Defendants have failed to move to a single recordkeeper model. Defendants have also failed to follow the example of Pepperdine, for example, in rejecting a recordkeeper's attempt to "bundle" proprietary investment products. TIAA insists, and Defendants have agreed, that particular TIAA products must be included among the investment menu options, including certain variable annuities, effectively abdicating their duty to ensure that all of the Plans' investment choices are appropriate for the Plans and performing to expectations.

103.    Moreover, Defendants apparently have failed even to evaluate the differences in compensation paid to each of the three recordkeepers in the form of revenue sharing or additional fees supposedly charged for administrative services. And, if they did perform such an evaluation, they failed to take the appropriate corrective action that any reasonable fiduciary would have

undertaken, given the unmistakable results of such an evaluation: that participants investing through the TIAA and Fidelity segments were paying far more for administrative services than were those investing through the Vanguard segment.

104.    Each of the Plans' platform providers received or currently receives compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plans and their investments for providing these duplicative services.

105.    Upon information and belief and according to industry experts and the prospectus for the CREF Retirement Equities Fund, which includes the eight CREF variable annuities, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF investments prior to 2015 were:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 36 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 39 bps |
| TIAA Traditional Annuity | 15  bps |

106.    In addition, the Plans' recordkeepers receive additional indirect compensation, including revenue sharing for "float," securities lending revenue, distribution fees, surrender charges, spread and redemption fees and, in the case of the annuities in the TIAA segment, mortality and expense charges.

### 3. Significant reporting and disclosure errors present further evidence of Defendants' flawed process

107.    Annual Returns on the relevant Form 5500's provide substantial evidence of Defendants' failures. The Plans' 5500's are essentially the Plans' annual tax returns. DOL rules expressly require that plan service providers report all direct and indirect compensation received

for the year in connection with the services they provide. None of the Plans' 5500's filed since 2009 disclose any amount of indirect compensation being received by TIAA. Whether these egregious reporting errors were caused by TIAA's reporting deficiencies or by the University's misrepresentation of TIAA's accurate reporting, the implication is the same: Defendants failed in their obligations to the Plans and their participants to adequately evaluate and report the Plans' expenses.

108.     Further evidence of the carelessness of Defendants in the exercise of their fiduciary obligations appears in the participant fee disclosure required by 29 CFR 2550.404(a)(5) to be delivered annually to each participant, a disclosure provided by TIAA. Among other information, the disclosure must provide an historical record of the investment return for the fund as well as the "expense ratio," which is the aggregate expense investors pay for investing in the fund, stated in "basis points" as a percentage of the amount invested. An expense ratio of 50 basis points, for example, charges 0.5% as a fee for investing.

109.     As previously alleged, participants can choose to invest in the TIAA products or in a variety of funds offered by Vanguard or Fidelity. The participant fee disclosure includes investment return and expense information for the Vanguard funds, the Fidelity funds and the TIAA funds. The reporting for the Vanguard funds, however, does not appear to be accurate. The following table provides a significant sample of the available Vanguard funds with their corresponding expense ratios as reported in the respective funds' prospectuses and as reported in a recent participant fee disclosure. As seen below, differences in the reporting of the expense ratios amount to as much as twelve basis points:

| Georgetown U. Defined Contribution Retirement Plan— Vanguard Fund Reported Expense Ratios |
|---|

| Fund (Investor shares) | Expense from Prospectus | Expense Reported by TIAA | Differential |
|---|---|---|---|
| Emerging Markets Stock Index Fund | 32 | 33 | 1 |
| Equity Income Fund I | 26 | 29 | 3 |
| Explorer Fund | 46 | 53 | 7 |
| Growth Index Fund | 22 | 23 | 1 |
| International Explorer | 41 | 40 | 1 |
| International Growth Fund | 46 | 47 | 1 |
| Mid-Cap Index Fund | 20 | 23 | 3 |
| Mid-Cap Growth Index | 20 | 23 | 3 |
| Mid-Cap Value Index | 20 | 23 | 3 |
| Mid-Cap Growth | 36 | 46 | 10 |
| Morgan Growth Fund | 38 | 40 | 2 |
| REIT Index Fund | 26 | 26 | 0 |
| PRIMECAP | 32 | 44 | 12 |
| Selected Value Fund | 35 | 44 | 9 |
| Small-Cap Index Fund | 20 | 23 | 3 |
| Intermediate Term Bond Index | 16 | 20 | 4 |
| Long-Term Bond Index | 16 | 20 | 4 |

| Short-Term Bond Index | 16 | 20 | 4 |
|---|---|---|---|
| Total Bond Market Index Fund | 16 | 20 | 4 |
| Total International Stock Index Fund | 18 | 22 | 4 |
| U.S. Growth Fund | 46 | 47 | 1 |
| Wellesley Income Fund | 22 | 23 | 1 |
| Windsor II Fund | 33 | 36 | 3 |

110.    Likewise, a sampling of the fee reporting for the Fidelity funds demonstrates even more glaring errors than in connection with the reporting of Vanguard fees. The table below presents a sample of 15 Fidelity funds whose *actual* fees, as reported by the funds' prospectuses, were between 2 and 31 basis points *less than* the fees reported as being charged by the participant fee disclosure required by ERISA §404(a)(5):

| Georgetown U. Defined Contribution Retirement Plan— Fidelity Fund Reported Expense Ratios | | | | |
|---|---|---|---|---|
| Fund | Expense | | Delta | Notes |
| | from Prospectus | From 404(a)(5) | | |
| Fidelity Blue Chip Growth K | 59 | 70 | 11 | |
| Fidelity Capital Appreciation K | 41 | 72 | 31 | |
| Fidelity Contrafund K | 58 | 61 | 3 | |
| Fidelity Diversified International Fund K | 82 | 87 | 5 | |
| Fidelity Europe | 100 | 1.03 | 3 | |

| | | | | |
|---|---|---|---|---|
| Fidelity Freedom 2030 | 61 | 65 | 4 | |
| Fidelity Freedom 2040 | 64 | 67 | 3 | |
| Fidelity Large Cap Value Enhanced Index | 39 | 45 | 6 | Premium/Inst class available for 5 bps |
| Fidelity Large Cap Growth Enhanced Index | 39 | 45 | 6 | Premium/Inst class available for 5 bps |
| Fidelity Low-Priced Stock | 58 | 78 | 20 | |
| Fidelity Mid Cap Value | 73 | 86 | 13 | |
| Fidelity Mid Cap Index Fund - Premium Class | 5 | 7 | 2 | |
| Fidelity Mid Cap Stock | 46 | 61 | 15 | |
| Fidelity New Millennium | 54 | 74 | 20 | |
| Fidelity Select Retailing | 78 | 81 | 3 | |

111.    These rather extensive reporting errors demonstrate the lackadaisical attitude with which Defendants regarded their ERISA duties to give retirement investors such as Plaintiffs accurate information about their retirement investments in the Plans. These errors should have been uncovered and corrected.

112.    But, even worse, the problem may not lie with the reporting. If in fact the participant fee disclosure is correct, and someone has been padding the bill, overcharging participants who chose the Vanguard funds, Defendants failed to uncover and correct the overcharge.

113.    As of December 31, 2017, Defendants continued to include approximately 82 Vanguard mutual funds as investment options. That menu of funds included asset classes such as bond funds, balanced funds (stocks and bonds), domestic stock funds, international stock funds,

and specialty stock funds like real estate.

114.     The Plans' Vanguard fund offerings include both retail "investor" share classes and "institutional" (or Admiral, depending on the fund) share classes of mutual funds. The retail share classes of mutual funds are designed for small individual investors, not large defined contribution retirement plans like the Plans, and are identical in every respect to institutional share class funds, except for much higher fees.

115.     For virtually all of the 82 Vanguard funds available to Plans' investors, Defendants have designated only the retail "investor" share class as available investment alternatives offered under the Plans. Of the other 40 available Vanguard funds offered by the Plans, either Admiral (institutional) shares are offered with substantially lower fees, or the funds offer only one share class.

116.     As shown by the sampling of those funds in the table below, Defendants could have designated the Admiral or institutional share class for the designated investment options, as opposed to investor share classes, at substantially lower cost to participants in the Plans. Such Admiral or institutional class funds are available to large investors like the Plans.

117.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. For example, Vanguard discloses in the prospectuses for the Vanguard Target Retirement Funds, "Certain Vanguard clients may meet the minimum investment amount by aggregating separate accounts within the same Fund or across the lineup of Vanguard Institutional Target Retirement Funds and/or Vanguard Target Retirement Funds." Thus, it is commonly understood by investment managers of large pools of assets that, for a retirement plan of the Plans' sizes, if requested, the investment provider would make available

- 43 -

lower-cost share classes for the Plans, if there were any fund that did not individually reach the threshold.

### 4. Imprudent Investment Options

#### a.  TIAA Non-Benefit Responsive Traditional Annuity

118.    The TIAA Non-Benefit Responsive Traditional Annuity prohibits participants from re-directing their investment in that Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives change. The Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they paid a 2.5% surrender charge that bore no relationship to any reasonable risk or expense to which the fund was subject.

119.    The TIAA Traditional Annuity is an insurance company general account product, meaning that all of the assets supporting the annuity contract are held in TIAA's general account, and invested along with all the other assets in TIAA's general account.  All of the assets of the TIAA general account are available to support the obligations of the Traditional Annuity.

120.    Under ERISA, a contract or agreement between a retirement plan like the Plans and an investment manager like TIAA is deemed not to be reasonable within the meaning of section 408(b)(2) of ERISA if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous.

121.    As expressly noted in 29 CFR 2550.408b-2(c)(3), a provision in a contract or other arrangement which reasonably compensates the service provider for loss upon early termination of the contract, arrangement, or lease is not a penalty. For example, a minimal fee in a service

contract which is charged to allow recoupment of reasonable start-up costs is not a penalty. Similarly, a provision in a lease for a termination fee that covers reasonably foreseeable expenses related to the vacancy and re-letting of the office space upon early termination of the lease is not a penalty. Such a provision does not reasonably compensate for loss if it provides for payment in excess of actual loss or if it fails to require mitigation of damages.

122.     The 2.5% surrender charge imposed by the TIAA Traditional Annuity on lump sum withdrawals here is a clear and patent violation of the prohibition on a penalty for early withdrawal from the contract. Suppose, for example, that in connection with the investment of participant accounts in the Traditional Annuity in the Plans, TIAA acquired long-term bonds paying an interest rate of 4%. Suppose further that Plaintiff Darrell Wilcox has invested in the Traditional Annuity for twenty years before his retirement. If, at his retirement, those bonds have increased in value by 10% due to changes in prevailing interest rates, and he requests a lump sum distribution, TIAA could easily sell those bonds at a profit and pay Darrell his lump sum distribution.  Instead, getting a lump sum distribution will cost Darrell a 2.5% surrender charge, ostensibly to protect TIAA from a loss it would not incur. A surrender charge that is always imposed for the life of a contract, regardless of the term of a participant's investment in the contract and regardless of the financial condition of TIAA's general account at the time of withdrawal is *per se* unreasonable because it will invariably result in charges that are wholly unrelated to any actual loss.

123.     To have accepted these conditions for the investment of plan assets indicates that either (i) Defendants failed in its obligation to thoroughly understand the terms of the contract or (ii) failed to act in the best interest of plan participants in accepting such unreasonable terms.

124.     Even if the Defendant was blissfully and excusably unaware of the nature of the surrender change at the time of the initial investment in the contract, the DOL's release of its final

regulation under ERISA § 408(b)(2), *Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure* (the "408b-2 Disclosure Rule"), on February 2, 2012 should have alerted it to issue.

125.    Release of the 408b-2 Disclosure Rule was a big deal. No reasonable responsible ERISA plan fiduciary could have missed it, since it required affirmative compliance of virtually every plan service provider and fiduciary by July 2012.

126.    As noted above, the 408b-2 Disclosure Rule contains an express provision in 29 CFR 2550.408b-2(c)(3) addressing the requirement for contacts to be terminable on reasonably short notice without penalty. In fact, insurance companies discussed the issue of surrender charges with the DOL prior to the issuance of the final rule. As noted in the Preamble to the Interim Final Rule:

> *Other commenters raised questions as to whether certain fees and market value adjustments, generally associated with insurance or insurance-type services and investments, constitute "penalties" for purposes of this paragraph of the regulation*. The regulation provides specifically that "a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty." *The Department believes that questions as to whether, for any particular contract, the charges for contract termination are in fact "penalties," rather than a service provider's recoupment of reasonable start-up costs, are inherently factual questions; accordingly, the Department did not amend the rule in response to these comments.* After consideration of all of the comments on paragraph (c )(2) of the proposal, the Department has determined to adopt that paragraph, without change, in the interim final rule, except that this provision has been moved to a new paragraph (c )(3) of the interim final rule.

(Emphasis added.)

127.    Accordingly, the very existence of a 2.5% surrender charge that never varies regardless of the financial consequence of the withdrawal is unreasonable, and the acceptance of such terms, a breach of fiduciary duty under ERISA, and presents additional evidence of Defendant's flawed process and lack of prudence and diligence in protecting the interests of

participants.

## ERISA'S FIDUCIARY STANDARDS

128.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants

as fiduciary of the Plans. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the
> participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances
> then prevailing that a prudent man acting in a like capacity and
> familiar with such matters would use in the conduct of an enterprise
> of like character and with like aims.

2.    Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the
> exclusive purposes of providing benefits to participants in the plan and their beneficiaries
> and defraying reasonable expenses of administering the plan.

129.    Under ERISA, fiduciaries that exercise any authority or control over plan assets,

including the selection of plan investments and service providers, must act prudently and solely in

the interest of participants in the Plans.

130.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C.

§1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by

another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant

part, that:

> In addition to any liability which he may have under any other provisions of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:

- 47 -

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

131.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

132.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. §1109(a).

133.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

All participants and beneficiaries of the Plans whose account was invested through the

- 48 -

TIAA segment of the Plans at any time from March 1, 2012, through the date of judgment, excluding the Defendants or any participant who is a fiduciary to the Plans.

134.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class includes over 24,000 members and is so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plans-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the time period at issue in this action, and all participants in the Plans were harmed by Defendants' misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plans during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or

varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of its fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

135.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

136.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g).

## COUNT I

### Breach of Duty of Prudence—Unreasonable Administrative Fees

137.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

138.    The scope of the fiduciary duties and responsibilities of the Defendants includes

discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries in the Plans, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.  Defendants are directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

139.    Defendants selected and retained as the Plans' investment options investment funds and insurance company annuities that caused the Plans to incur far higher administrative fees and expenses relative to the size and complexity of the Plans.

140.    For years Defendant failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plans to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided.

141.    Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.

142.    Defendants' failure to properly evaluate the reasonableness of amounts being charged to the Plans have caused Plaintiffs and the Class millions of dollars in direct economic loss.  The Plans' total losses will be determined after complete discovery in this case and are continuing.

143.     Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT II

### Breach of Duty of Prudence—Unreasonable Investment Management Fees and Performance Losses

144.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

145.     The scope of the fiduciary duties and responsibilities of the Defendants include managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

146.     As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

147.     Defendants selected and retained as the Plans' investment options investment funds and insurance company annuities with far higher expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

148.     Defendants failed to engage in a prudent process for the selection and retention of the Plans' investment options. Rather, Defendants used more expensive funds with inferior historical performance than investments that were available to the Plans.

3.      CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments ***and actively managed investments with similar underlying asset allocations***.

149.    Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

150.    Total losses to the Plans will be determined after complete discovery in this case and are continuing.

151.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated participants and beneficiaries, respectfully request that the Court:

• Find and declare that Defendants have breached their fiduciary duties as described above;

• Find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duties, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

• Determine the method by which the Plans' losses under 29 U.S.C. §1109(a) should be calculated;

• Order Defendants to provide all accountings necessary to determine the amounts

Defendants must make good to the Plans under §1109(a);

• Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

• Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

• Reform the Plans to include only prudent investments;

• Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

• Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schneider Wallace Cottrell Konecky Wotkyns LLP and Berger Montague PC as Class Counsel;

• Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

• Order the payment of interest to the extent it is allowed by law; and

• Grant other equitable or remedial relief as the Court deems appropriate.


Dated: February 7, 2019          By:     */s/ Garrett W. Wotkyns*
                                         Garrett W. Wotkyns
                                         John J. Nestico*
                                         SCHNEIDER WALLACE COTTRELL
                                         KONECKY WOTKYNS LLP
                                         8501 N. Scottsdale Road, Suite 270
                                         Scottsdale, Arizona  85253
                                         Telephone: (480) 428-0145
                                         Facsimile: (866) 505-8036
                                         gwotkyns@schneiderwallace.com
                                         jnestico@schneiderwallace.com

Todd Schneider*
James A. Bloom*
Kyle G. Bates*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California  94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com

Todd S. Collins*
Eric Lechtzin*
Ellen T. Noteware*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
tcollins@bm.net
elechtzin@bm.net
enoteware@bm.net

*Attorneys for Plaintiffs*

*(Admitted *Pro Hac Vice*)