**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DARRELL WILCOX et al., | |
| *Plaintiffs*, | No. 1:18-cv-00422-ABJ |
| v. | Hon. Amy Berman Jackson |
| GEORGETOWN UNIVERSITY et al., | |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT**

Nancy G. Ross (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Brantley E. Webb (D.C. Bar No. 726509)
  bwebb@mayerbrown.com
Michelle N. Webster (D.C. Bar No. 985265)
Colleen M. Campbell (D.C. Bar No. CA00062)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

    A.     Tax-Deferred Annuity Plans Under I.R.C. § 403(b) ............................................. 3

    B.     Georgetown's Plans ............................................................................................. 5

    C.     Plaintiffs' Original Complaint ............................................................................. 6

    D.     Dismissal of the Original Complaint .................................................................. 8

    E.     Original Motion for Leave to File Amended Complaint ..................................... 9

    F.     Appeal to the D.C. Circuit ................................................................................ 10

    G.     New Motion for Leave to File Amended Complaint ......................................... 10

ARGUMENT ..................................................................................................................... 13

I.      LEAVE TO AMEND SHOULD BE DENIED BECAUSE PLAINTIFFS'
       EFFORTS TO RESUSCITATE THEIR CLAIMS ARE FUTILE. ............................... 13

    A.     Plaintiffs Do Not State a Claim Based on Their Already-Dismissed
            Vanguard Allegations ....................................................................................... 13

    B.     The Court Already Rejected Plaintiffs' TIAA Traditional Annuity Claim ......... 14

    C.     Plaintiffs Cannot Save Their Recordkeeping Fees Claim .................................. 18

           1.     Other University Plans ........................................................................... 18

           2.     Asset-Based Fees ................................................................................... 21

           3.     Investment Options Menu ....................................................................... 23

           4.     408b-2 Disclosures ................................................................................ 24

    D.     Plaintiffs Wholly Misunderstand Variable Annuities ....................................... 27

    E.     Plaintiffs' Recycled Allegations Do Not State a Claim for Breach of the
            Duty of Candor ................................................................................................ 29

II.     LEAVE TO AMEND SHOULD BE DENIED BECAUSE PLAINTIFFS'
       AMENDMENT IS UNDULY DELAYED ................................................................. 32

CONCLUSION ................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraha v. Colonial Parking, Inc.*,
  243 F. Supp. 3d 179 (D.D.C. 2017) ......................................................................26

*Ackerman v. Warnaco, Inc.*,
  55 F.3d 117 (3d Cir. 1995) ..................................................................................30

*Alas v. AT&T Services, Inc.*,
  2021 WL 4893372 (C.D. Cal. Sept. 28, 2021) ....................................................29

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Group, Inc.*,
  99 F. Supp. 3d 1110 (C.D. Cal. 2015) ................................................................25

*Anoka Orthopaedic Assocs., P.A. v. Lechner*,
  910 F.2d 514 (8th Cir. 1990) ..............................................................................31

*Appalachian Voices v. Chu*,
  262 F.R.D. 24 (D.D.C. 2009) ........................................................................12, 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................13, 27

*Bloch v. Powell*,
  348 F.3d 1060 (D.C. Cir. 2003) ..........................................................................28

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ..............................................................................13

*Chao v. Merino*,
  452 F.3d 174 (2d Cir. 2006) ................................................................................13

*Cunningham v. Cornell Univ.*,
  2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ......................................................2

*Davis v. Washington Univ. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) ................................................................................2

*Davis v. Washington Univ. in St. Louis*,
  2018 WL 4684244 (E.D. Mo. Sept. 28, 2018) ...............................................16, 33

*Dawson-Murdock v. Nat'l Counseling Grp., Inc.*,
  931 F.3d 269 (4th Cir. 2019) ...........................................................................30

*Divane v. Nw. Univ.*,
  2018 WL 2388118 (N.D. Ill. May 25, 2018) ......................................................2

*Divane v. Nw. Univ.*,
  953 F.3d 980 (7th Cir. 2020) ...........................................................................19

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) .........................................................................25

*G&E Real Est., Inc. v. Avison Young-Wash., D.C., LLC*,
  2018 WL 4680199 (D.D.C. Sept. 28, 2018) ......................................................12

*Godfrey v. Greatbanc Tr. Co.*,
  2019 WL 4735422 (N.D. Ill. Sept. 26, 2019) ....................................................31

*Harris v. Koenig*,
  815 F. Supp. 2d 26 (D.D.C. 2011) ...................................................................13

*Henderson v. Emory Univ.*,
  252 F. Supp. 3d 1344 (N.D. Ga. 2017) ............................................................23

*Henry v. Champlain Enters., Inc.*,
  445 F.3d 610 (2d Cir. 2006)............................................................................27

*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012) .........................................................................12

*Hinton v. Corr. Corp. of Am.*,
  624 F. Supp. 2d 45 (D.D.C. 2009) ...................................................................25

*Hudson v. Am. Fed'n of Gov't Emps.*,
  2019 WL 3533602 (D.D.C. Aug. 2, 2019) ........................................................12

*In re Interbank Funding Corp. Sec. Litig.*,
  629 F.3d 213 (D.C. Cir. 2010) .........................................................................12

*Jacobs v. Verizon Commc'ns, Inc.*,
  2017 WL 8809714 (S.D.N.Y. Sept. 28, 2017).............................................30, 31

*In re JDS Uniphase Corp. ERISA Litig.*,
  2005 WL 1662131 (N.D. Cal. July 14, 2005).....................................................31

*Kong v. Trader Joe's Co.*,
  2020 WL 7062395 (C.D. Cal. Nov. 30, 2020).............................................19, 20

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)...................................................................................25

*LaPrade v. Abramson*,
    2006 WL 3469532 (D.D.C. Nov. 29, 2006) ..................................................12, 32

*Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*,
    2007 WL 710119 (N.D. Ind. Mar. 6, 2007)...................................................27, 28

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985).................................................................................................30

*McGee v. D.C.*,
    646 F. Supp. 2d 115 (D.D.C. 2009) ........................................................................32

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
    513 U.S. 251 (1995)..............................................................................................6, 27

*Oliver v. Black Knight Asset Mgmt., LLC*,
    812 F. Supp. 2d 2 (D.D.C. 2011) ............................................................................30

*Pegram v. Herdrich*,
    530 U.S. 211 (2000).................................................................................................30

*Pfizer, Inc. v. Shalala*,
    182 F.3d 975 (D.C. Cir. 1999) ..................................................................................8

*Reed v. Queens Vill. Comm. for Mental Health for J-CAP, Inc.*,
    2019 WL 4452386 (E.D.N.Y. Sept. 17, 2019) ......................................................31

*Sacerdote v. N.Y. Univ.*,
    328 F. Supp. 3d 273 (S.D.N.Y. July 31, 2018)..................................................2, 18

*Sacerdote v. New York Univ.*,
    2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017).....................................................23, 33

*Schmidt v. United States*,
    749 F.3d 1064 (D.C. Cir. 2014) ..............................................................................12

*United States ex rel. Scott v. Pac. Architects & Eng'rs (PAE), Inc.*,
    327 F.R.D. 17 (D.D.C. 2018)............................................................................12, 32

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.
Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)....................................................................................13

*Stanley v. George Washington Univ.*,
    394 F. Supp. 3d 97 (D.D.C. 2019) ............................................................................2

*Taveras v. UBS AG*,
    513 F. App'x 19 (2d Cir. 2013) ................................................................................31

*Vellali v. Yale Univ.*,
    308 F. Supp. 3d 673 (D. Conn. 2018) .......................................................................23

*Wilcox v. Georgetown Univ.*,
    987 F.3d 143 (D.C. Cir. 2021) ..................................................................................10

*Wilcox v. Georgetown Univ.*,
    No. 19-7065 (D.C. Cir. Feb. 9, 2021) .......................................................................10

**Statutes, Rules and Regulations**

17 C.F.R. § 270.12b-1 ....................................................................................................10, 24

29 C.F.R. § 2509.75-8 ...........................................................................................................31

29 C.F.R. § 2550.404a-5(c) ...................................................................................................30

29 C.F.R. § 2550.404a-5(d)(1)(iv)(A) ...................................................................................26

29 C.F.R. § 2550.408b-2 ..................................................................................................24, 26

29 C.F.R. § 2550.408b-2(a) ...................................................................................................17

29 C.F.R. § 2550.408b-2(c)(1)(i) ..........................................................................................26

29 C.F.R. § 2550.408b-2(c)(1)(iii)(B) ...................................................................................24

29 C.F.R. § 2550.408b-2(c)(1)(iv)(E)(2) ..............................................................................26

29 C.F.R. § 2550.408b-2(c)(3) .........................................................................................17, 18

29 C.F.R. § 2550.408b-2(c)(iv)(E)(1)-(3) .............................................................................24

29 C.F.R. § 2550.408b-2(c)(iv)(F) ........................................................................................24

26 U.S.C. § 403(b) ..........................................................................................................3, 4, 16

26 U.S.C. § 403(b)(7) ..............................................................................................................4

29 U.S.C. § 1021(b)(1) ...........................................................................................................30

29 U.S.C. § 1023(c) ................................................................................................................30

29 U.S.C. § 1024(a) ................................................................................................................30

29 U.S.C. § 1104(a)(1) ...........................................................................................................13

29 U.S.C. § 1104(a)(1)(B) ...................................................................................1

29 U.S.C. § 1104(e) .............................................................................................5

29 U.S.C. § 1108(b)(2) .......................................................................................24

29 U.S.C. § 1113 ................................................................................................16

ERISA § 406(a)............................................................................................17, 18

ERISA § 408(b)(2)........................................................................................17, 24

Fed. R. Civ. P. 15(a)...............................................................................10, 11, 32

Fed. R. Civ. P. 15(a)(1) ......................................................................................12

Fed. R. Civ. P. 15(a)(2) ................................................................................10, 12

Fed. R. Civ. P. 59(e) ..........................................................................................10

## Other Authorities

Caltech, *2018 Summary Plan Description* (2018),
     http://web.gps.caltech.edu/~clay/Benefits2018.pdf ........................................20

Caltech, *Your Full List of Investments* (last updated 2019),
     https://www.tiaa.org/public/tcm/caltech/view-all-investments ........................20

Fed. R. Civ. P. 59(e) ..........................................................................................10

Fed. R. Civ. P. 60(b) ..........................................................................................10

TIAA, *Quarterly Investment Update, Georgetown University Defined
     Contribution Retirement Plan* (last updated Dec. 31, 2019),
     https://www.tiaa.org/public/tcm/georgetown/investment-performance ...........25

Transamerica, *Loyola Marymount Fund Performance and Fees* (updated 2020),
     https://bit.ly/2QMTiic ..................................................................................20

U.S. Sec. & Exchange Comm'n, *Variable Annuities: What You Should Know*
     (Sept. 2007), https://www.sec.gov/investor/pubs/sec-guide-to-variable-
     annuities.pdf ..................................................................................................29

## INTRODUCTION

In this Employee Retirement Income Security Act ("ERISA") action, Plaintiffs seek to revive their once-dismissed challenge to various aspects of two Georgetown University retirement plans: the Georgetown University Defined Contribution Retirement Plan ("Defined Contribution Plan") and the Georgetown University Voluntary Contribution Retirement Plan ("Voluntary Plan") (collectively, "the Plans"). The Court previously dismissed the original complaint in its entirety concluding that Plaintiffs lack standing to press certain claims and that their remaining claims have "no factual support, [are] entirely speculative, contrary to caselaw and common sense, and do[] not warrant discovery." Op. at 27. The Court of Appeals did not question those findings, but remanded on procedural grounds to determine the issue presently before this Court, that is, whether Plaintiffs should be granted leave to amend their complaint. For the reasons below, because the same fatal flaws remain in Plaintiffs' new proposed amended complaint, this Court should deny Plaintiffs' request.

The Plans at issue here are part of the generous package of benefits that Georgetown provides its employees. Georgetown contributes money to the Plans on behalf of each eligible participant, and participants are incentivized to make voluntary contributions to the Plans as well. Participants decide how to invest those funds across a wide array of investment options designed to meet the individual participant's own circumstance and preferences.

The Plans challenged are governed by ERISA. Pursuant to ERISA, the Plans are administered by fiduciaries, who owe duties to Plan participants to act as would reasonable individuals "in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). ERISA thus imposes a relative standard of care that obligates fiduciaries to heed the practices of their peers.

1

The allegations in the original complaint mimicked those brought against other large, private universities in the preceding years. The only other such case in this Circuit was dismissed for lack of subject matter jurisdiction. *See Stanley v. George Washington Univ.*, 394 F. Supp. 3d 97 (D.D.C. 2019), *aff'd*, 801 F. App'x 792 (D.C. Cir. Mar. 24, 2020). Courts around the country have rejected similar claims, at various stages, against other universities[1]—and in no case have any plaintiffs ultimately prevailed on the merits after trial.

Plaintiffs challenge various aspects of the Plans' administration—but in particular, the cost of the Plans' recordkeeping arrangement and the desirability of including long-term annuity options in the Plans. The fundamental theory of their case is that Georgetown breached its fiduciary duties by failing to administer the Plans in a way that Plaintiffs—viewing the matter in retrospect—contend would have been best for Plan participants. But to prove a claim for fiduciary breach, Plaintiffs must establish both that Georgetown employed a defective process and that its decisions were out of step with those of comparable institutions.

Plaintiffs' complaint plausibly alleges neither. At most, Plaintiffs allege that, if Georgetown were starting its plan over from scratch, it could have adopted a different paradigm

---

[1]     *See, e.g.*, *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020) (affirming dismissal of ERISA breach of fiduciary duty of prudence claims based on retention of investment options, including the TIAA Traditional Annuity, but reversing dismissal of ERISA prudence claim based on administrative fees); *Cunningham v. Cornell Univ.*, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) (granting summary judgment against ERISA breach of fiduciary duty claims premised on recordkeeping fees and retention of allegedly underperforming funds, with exception of claim regarding TIAA-CREF Lifecycle target date funds), *appeal docketed*, No. 21-88 (2d Cir. Jan. 13, 2021); *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273 (S.D.N.Y. July 31, 2018) (holding, following a bench trial, that university did not breach ERISA fiduciary duty of prudence for excessive recordkeeping fees, selection and monitoring of vendors, or retention of two TIAA variable annuities), *aff'd in part*, 9 F.4th 95 (2d Cir. 2021) (affirming the district court's ruling, except with respect to the plaintiffs' share class claims and motion to add individual defendants), *petition for cert. docketed*, No. 21-724 (Nov. 16, 2021); *see also Divane v. Nw. Univ.*, 2018 WL 2388118 (N.D. Ill. May 25, 2018) (dismissing case with prejudice and denying motion for leave to amend because plaintiffs failed to plead claims alleging breach of ERISA fiduciary duty of prudence for imprudent retention of allegedly underperforming funds and excessive recordkeeping fees, breach of fiduciary duty based on a prohibited transaction, and failure to monitor), *aff'd*, 953 F.3d 980 (7th Cir. 2020), *cert. granted sub nom. Hughes v. Nw. Univ.*, 141 S. Ct. 2882 (2021).

that favored short-term mutual fund investing over the long-term annuity options embraced by Georgetown's peers and all of higher education. Indeed, the Court already recognized that while there is more than one way to design a retirement plan, Plaintiffs allegations only support that Georgetown's "Plans could be transformed from what they are to something else"— not that there was a defect in "the fiduciary attentions or prudence of its Trustees." Op. at 27.

Because Plaintiffs in essence seek to dress up their once-dismissed claims with cosmetic changes, leave to amend should be denied. Mostly, Plaintiffs double-down on legal theories already rejected by the Court. For example, they argue that recordkeeping fees could have been reduced to $35 per participant—but then fail to account for the services and investment features that would have been sacrificed to attain lower fees. Their allegations thus establish only that Georgetown "could have materially changed the Plans"—not that Georgetown breached any fiduciary duty. Op. at 26. Plaintiffs do purport to add one or two new theories, but, as explained below (*infra* at pp. 32-34) those theories certainly could have been alleged earlier. Indeed, many were alleged earlier by this same Plaintiffs' counsel—but in other cases, in which they were rejected. *See infra*, p. 30 n.26, p. 33-34 n.28. In this case, Plaintiffs' counsel deliberately chose not to assert those purportedly "new" claims in either their initial complaint or their prior efforts to amend, which alone casts suspicion on their plausibility. They should not now be permitted to rethink their strategic choice and bring these claims after undue delay. Ultimately, Plaintiffs' inability to cure the complaint's fundamental defects renders the proposed amendment futile.

## BACKGROUND

### A.    Tax-Deferred Annuity Plans Under I.R.C. § 403(b)

The Plans at issue are governed by section 403(b) of the Internal Revenue Code. That provision, entitled "*Taxation of employee annuities*," provides a set of rules for retirement plans

sponsored by nonprofit employers, such as Georgetown. Section 403(b) reflects the century-long heritage of the collegiate retirement system. The unique elements of this system bear strongly on the issues in this case, and demonstrate that Plaintiffs' hostility to annuities and contention that there is a single, cohesive market for "defined contribution plans"—lumping together both nonprofit 403(b) plans and corporate 401(k) plans—are entirely unwarranted.

As the Court explained in its Opinion dismissing Plaintiffs' original complaint, the annuities that are the subject of Plaintiffs' claims have formed the backbone of the collegiate retirement system for more than a hundred years. In 1905, Andrew Carnegie endowed an initial gift to fund pensions at thirty universities. Op. at 3 (citing William C. Greenough, College Retirement and Insurance Plans 9 (1948)). The following year, Congress chartered the Carnegie Foundation for the Advancement of Teaching to provide a pension system for university professors. *Id.* By 1918, however, the aspirations of the Carnegie Foundation had outgrown its means. So the Carnegie Foundation founded the Teachers Insurance and Annuity Association, which is now known as TIAA. *Id.* TIAA created annuity contracts with "fundamental provisions specially designed for college retirement plans." *Id.* (citing Greenough at 14, 17).

The launch of the collegiate retirement system of annuities predates by decades the enactment of I.R.C. § 403(b), which was enacted in 1958 to provide favorable treatment to so-called "tax-sheltered annuities." Op. at 3 (citing 26 U.S.C. § 403(b)). Later, "[w]hen adopting ERISA in 1974, Congress amended the Code so that § 403 plans could offer mutual funds in addition to annuities." *Id.* at 4 (citing 26 U.S.C. § 403(b)(7)). Nevertheless, even today, annuities remain the hallmark of 403(b) plans.[2] The U.S. Government Accountability Office has endorsed

---

[2]    The American Association of University Professors and the Association of American Colleges (now known as the Association of American Colleges and Universities) jointly endorse a Statement of Principles on Academic Retirement and Insurance Plans. *See* https://www.aaup.org/file/retirement-and-insurance-plans.pdf. The Statement encourages member-institutions to "provide for a plan of retirement annuities" that will generate, for a typical

this emphasis on lifetime income; a 2016 GAO report recommended that the Secretary of Labor "help encourage plan sponsors to offer lifetime income options" as part of their retirement plans.[3] And, more recently, Congress amended ERISA Section 404(e) to provide a fiduciary safe harbor for the prudent selection of annuities in retirement plans. 29 U.S.C. § 1104(e).

Plaintiffs' reliance on 401(k) plan administration as the benchmark for their claims is their first mistake. Unlike 403(b) plans, corporate 401(k) plans were not designed around annuities—they were designed to supplement the traditional pension benefits that were long the mainstay of employee compensation in the private sector. Op. at 4. And unlike university 403(b) plans, corporate 401(k) plans generally do not offer annuities as an investment choice: Whereas **68%** of 403(b) retirement plans (which includes plans sponsored by educational institutions and nonprofit organizations) offer annuities, only **6%** of 401(k) plans do.[4]

### B.    Georgetown's Plans

Participants in Georgetown's Plans have individual accounts. For each Plan, the participant directs how the money is to be invested from a broad menu of investment options that includes fixed and variable annuities offered by TIAA and mutual funds offered by TIAA, Vanguard, and Fidelity. Original Compl. ¶¶ 28-29.  In addition, these "three investment platforms charge certain fees to Plan Participants, which are fully disclosed." Op. at 6. These disclosures include periodic statements to participants and the investment fund prospectuses disclosing the various fees

---

individual retiring at a normal age, "two-thirds of the yearly disposable salary (after taxes and other mandatory deductions) during the last few years of full-time employment." *Id.*

[3]        GAO, 401(k) Plans: DOL Could Take Steps to Improve Retirement Income Options for Plan Participants 55, GAO-16-433 (2016), https://www.gao.gov/assets/680/678924.pdf.

[4]        *Compare* Plan Sponsor Council of Am. 2017 403(b) Plan Survey tbl.58, *Sacerdote v. N.Y. Univ.*, No. 1:16-cv-06284-AT (S.D.N.Y. Jan. 10, 2018), Doc. 134-5, *with* Deloitte, Defined Contribution Benchmarking Survey 20 (2017), https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-hc-defined-contributions-benchmarking-survey-report.pdf.

associated with each investment option.

Among the wide variety of investment options included in the Plans, Plaintiffs challenge only the TIAA Traditional Annuity, a fixed annuity product. Dkt. 58-2 (Am. Compl.) ¶¶ 117-126.

An annuity is effectively an insurance policy. "Under a classic fixed annuity, the purchaser pays a sum certain and, in exchange, the issuer makes periodic payments throughout, but not beyond, the life of the purchaser." *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 262 (1995). When a participant "elects to invest in the TIAA Traditional Annuity, he enters into a direct contractual relationship with TIAA concerning its terms" and Georgetown "is not a party to that contract." Op. at 6-7.

The terms of the Traditional Annuity are different for the Defined Contribution Plan and the Voluntary Plan. A participant who invests Voluntary Plan contributions in the Traditional Annuity may withdraw the funds at any time with no penalty; a participant who invests funds from the Defined Contribution Plan in the Traditional Annuity may not withdraw those assets until the termination of employment; upon termination, a participant who elects not to annuitize the funds must pay a 2.5% surrender charge to receive a lump-sum payout of the funds. Op. at 7. Further, a participant may only re-direct those assets during employment into other options in ten annual installments. *Id.* Because of the difference in the liquidity terms, contributions to the Defined Contribution Plan Traditional Annuity yield greater interest than contributions to the Voluntary Plan Traditional Annuity—typically 0.75% per year more. *Id.*

### C.      Plaintiffs' Original Complaint

Plaintiffs Darrell Wilcox and Michael McGuire filed this action against Georgetown and its current and former Senior Vice President and Chief Administrative Officers on February 23,

2018.[5] Plaintiffs alleged that defendants breached their fiduciary duties to participants of the Plans in several respects:

*First*, Plaintiffs alleged that Georgetown failed to adequately monitor the Plans' expenses and caused the Plans to pay excessive recordkeeping fees for Plan administration by entering into agreements with each of the Plans' three investment providers—TIAA, Vanguard, and Fidelity—in order for them to maintain records for participant accounts. Plaintiffs claimed that, had Georgetown consolidated all accounts with a single recordkeeper, it would have attained an administrative fee of "approximately *$35* per participant with an account balance"—as early as 2012. Original Compl. ¶¶ 6-7, 39-53 (emphasis added).

*Second*, Plaintiffs alleged that Georgetown breached its duty to offer the least expensive investment options that could be offered. *Id*. ¶ 129.

*Third*, Plaintiffs alleged that Georgetown offered too many investment options. *Id*. ¶¶ 10, 130.

*Fourth*, Plaintiffs challenged three particular annuities in the Plans' investment lineup: the CREF Stock Account, the TIAA Real Estate Account, and the TIAA Traditional Annuity, asserting that better, alternative funds were available. With respect to the Traditional Annuity, Plaintiffs alleged that its inclusion was unreasonable because the applicable contracts impose a 2.5% surrender charge under some circumstances and place restrictions on participants' ability to withdraw from the fund.[6] *Id*. ¶¶ 99-108, 134.

---

[5]     The proposed amended complaint does not distinguish actions taken by the University from those supposedly taken by the Chief Administrative Officers Augostini and Chatas, or by the new proposed defendant, the "University's Finance Subcommittee of the President's Executive Committee." Accordingly, all references to Georgetown should be construed to encompass all defendants.

[6]     In the original complaint, Plaintiffs complained generally about Georgetown's reporting on its Form 5550s, but did not state a unique cause of action as to that grievance. Original Compl. ¶¶ 55, 59.

**D.      Dismissal of the Original Complaint**

The Court granted Georgetown's motion to dismiss on all claims. Op. at 2. With respect to Plaintiffs' recordkeeping-fee claim, the Court found, as a general matter, that it was inappropriate to compare plans offering "long-term annuities" with those offering only "short-term investments." *Id.* at 25. Like many other courts addressing such claims, the Court observed that Plaintiffs had "cite[d] no example of any non-TIAA entity performing recordkeeping for TIAA annuities," "provide[d] no factual support at all for their assertion that the Plans should pay only $35/year per participant in recordkeeping fees," and had not "allege[d] that the currently available investment resources would remain available at their preferred price of $35/year." *Id.* at 25-26. Thus, the Court concluded, Plaintiffs' allegations suggested only that "the Plans could be transformed from what they are to something else," not that the defendants breached any fiduciary duty under ERSIA. *Id.* at 27. The Court likewise rejected Plaintiffs' claim that the Plans offered too many investment options: "Plaintiffs provide[d] no evidence that they were confused or overwhelmed by the available investment options or that they were unable to make decisions regarding those options." *Id.* at 11-12 n.8.

The Court also dismissed all of Plaintiffs' allegations concerning the TIAA Traditional Annuity. Op. at 20-22. First, it held that, because Mr. McGuire "has never invested in the TIAA Traditional Annuity," he "lacks standing to represent other Plan Participants who did." *Id*. at 22. Additionally, while Mr. Wilcox did invest in the Traditional Annuity, the Court also dismissed his claim. The Court noted, with respect to the 2.5% surrender charge claim, that the Plaintiff had not alleged that he had attempted—or intended—to withdraw his funds. *Id.* at 19 (quoting *Pfizer, Inc. v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999) ("'[a] claim is not ripe for adjudication if its rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'")).

With respect to the timed withdrawal claim, the Court noted that "charges for lump sum distribution and annual withdrawal requirements—are features inherent in a guaranteed fixed annuity fund" and, moreover, "the ten-year period for transferring money out of the TIAA Traditional Annuity was disclosed on the first page of Mr. Wilcox's Group Retirement Annuity Certificate, issued on July 1, 2013 … long before the three-year statute of limitations for his claim relating to it." *Id.* at 20 & n.11. The Court thus dismissed Mr. Wilcox's Traditional Annuity claims as well.[7]

The Court also dismissed several claims that the Plaintiffs do not raise again in their proposed amended complaint. The Court found that Plaintiffs lacked Article III standing to challenge the supposedly excessive fees associated with Vanguard mutual fund share classes, reasoning that "[n]either Plaintiff … invested in the Vanguard funds or alleges that he intended or intends to do so." *Id.* at 6, 19. Likewise, the Court rejected Plaintiffs' challenge to the TIAA Real Estate Account because during the relevant time period, the Real Estate Account outperformed the fund the Plaintiffs alleged they would prefer. *Id.* at 20. Finally, the Court concluded that Plaintiffs had not plausibly alleged a fiduciary breach with their "apples to oranges" comparison between the CREF Stock Account—a "deliberate mix of foreign and domestic investments"—and "some purely domestic accounts with different investments." *Id.* at 23.

### E.       Original Motion for Leave to File Amended Complaint

After the Court dismissed the Complaint in its entirety, Plaintiffs filed a motion for leave to amend the complaint, accompanied by a proposed First Amended Complaint. Dkt. 37; Dkt. 37-

---

[7]       In Section III.A of its opinion, the Court stated, "dismissal will be granted on the Complaint allegations concerning the Vanguard funds, the 2.5% withdrawal charge from the TIAA Traditional Annuity, and the TIAA Real Estate Account." Op. at 22. While the Court did not mention the timed withdrawal requirement by name, it disposed of that claim by granting Georgetown's Motion to Dismiss in its entirety and dismissing Plaintiffs' original complaint in full. *See* Op. at 28; Dkt. 36 (Order).

1. Georgetown opposed the motion, arguing that amendment was untimely, given the procedural posture, as well as futile. Dkt. 39 at 6-19. On May 29, 2019, the Court denied Plaintiffs' motion, determining that Plaintiffs were required to move for post-judgment relief under Federal Rule of Civil Procedure 59(e) or 60(b) in order to seek leave to amend the complaint, that the deadline to do so under Rule 59(e) had passed, and that Plaintiffs did not satisfy the extraordinary circumstances requirement of Rule 60(b). Dkt. 42 at 7-10. Because it determined that Plaintiffs were not entitled to amend the complaint on procedural and timeliness grounds, the Court did not reach the question of whether Plaintiffs' amendment is futile or unduly delayed under Rule 15(a). However, the Court did conclude, in connection with its Rule 60(b) analysis, that "Plaintiffs have not stated that any of the facts in the proposed Amended Complaint were newly discovered or otherwise not known to them previously." *Id.* at 8. Plaintiffs appealed dismissal of their original complaint as well as the denial of their motion for leave to amend. Dkt. 45.

### F.     Appeal to the D.C. Circuit

On appeal, the D.C. Circuit determined that the Rule 15(a)(2) standard governed Plaintiffs' motion for leave to amend, rather than the more restrictive Rule 59(e) and 60(b) standards. Thus, the D.C. Circuit determined, "it is appropriate to remand for the district court to decide, in the exercise of its discretion, whether to grant appellant's motion [to amend the complaint]." *Wilcox v. Georgetown Univ.*, 987 F.3d 143, 152 (D.C. Cir. 2021). The D.C. Circuit did not consider whether Plaintiffs' amendments are futile, leaving that determination for this Court to make now in the first instance. *Id.*; *see also* Judgment, *Wilcox v. Georgetown Univ.*, No. 19-7065 (D.C. Cir. Feb. 9, 2021) (per curiam).

### G.     New Motion for Leave to File Amended Complaint

On December 10, 2021, Plaintiffs filed a new motion for leave to amend the complaint.

Confusingly, in their new motion for leave to amend, Plaintiffs cite to the complaint paragraph numbers in their first proposed amended complaint (Dkt. 37-2) rather than their newest proposed amended complaint (Dkt. 58-2).[8] Plaintiffs' new version includes several changes. Plaintiffs propose to add Georgetown's "Finance Subcommittee of the President's Executive Committee" as a defendant, alleging that, as of February 1, 2018—several weeks before they filed their original complaint—the subcommittee "was delegated all discretionary authority and powers to control and manage the assets of the Plans." Dkt. 58-2 ¶ 3. Plaintiffs drop several claims, including their challenges to the CREF Stock Account and the TIAA Real Estate Account. They also appear to drop their challenge to the TIAA Traditional Annuity's 2.5% surrender charge, but continue to press their challenge to its timed withdrawal requirements. *Id.* ¶ 146.

Plaintiffs continue to allege that Georgetown failed to monitor the Plans' recordkeeping fees and allowed participants to be charged excessive recordkeeping fees. New to the complaint, however, are examples of universities that consolidated recordkeepers thereby purportedly reducing fees. Plaintiffs continue to challenge the disclosure of "distribution fees," and they add an entirely new claim alleging that Georgetown breached its "duty of candor" because it "failed to report any of the indirect compensation received by either TIAA or Vanguard for recordkeeping services and erroneously and misleadingly reported that all of Fidelity's indirect compensation was 'eligible indirect compensation'" on its Form 5500s. *Id.* ¶ 151. Plaintiffs' motion for leave is now ripe for this Court's review.

## LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) permits a party to amend a complaint only "once as

---

[8]   For simplicity's sake, Georgetown compares the original complaint to Plaintiffs' latest proposed amended complaint.

a matter of course," within a timeframe that indisputably has passed here. *See* Fed. R. Civ. P. 15(a)(1). Once the time for amendment as a matter of right has expired, a party may amend its complaint "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2); *see Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014). Although leave shall be granted "when justice so requires," Fed. R. Civ. P. 15(a)(2), district courts have discretion to determine when that standard is satisfied. *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010).

Courts will deny leave to amend if the amendment would be futile or reflects undue delay. *G&E Real Est., Inc. v. Avison Young-Wash., D.C., LLC*, 2018 WL 4680199, at *2 (D.D.C. Sept. 28, 2018). "An amended complaint is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory or could not withstand a motion to dismiss." *Appalachian Voices v. Chu*, 262 F.R.D. 24, 27 (D.D.C. 2009); *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) ("A district court may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss."). And, a party's undue delay "presents an independently sufficient reason to deny his attempt to amend a complaint." *Hudson v. Am. Fed'n of Gov't Emps.*, 2019 WL 3533602, at *3 (D.D.C. Aug. 2, 2019). Plaintiffs are guilty of undue delay when they "fail[] to promptly allege a claim for which they already possessed evidence." *United States ex rel. Scott v. Pac. Architects & Eng'rs (PAE), Inc.*, 327 F.R.D. 17, 20 (D.D.C. 2018) (internal quotation marks omitted). "A motion to amend may be denied as dilatory or unduly delayed where a plaintiff was aware of the facts giving rise to the cause of action before filing the complaint that she now wishes to amend." *LaPrade v. Abramson*, 2006 WL 3469532, at *4 (D.D.C. Nov. 29, 2006).

Leave to amend should be denied here because Plaintiffs' efforts to resuscitate their claims

are both futile and unduly delayed. Plaintiffs' new allegations fail to cure the serious flaws previously identified by the Court and thus fail to state a claim that would survive a motion to dismiss. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible only when the pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Ordinarily, a claim for breach of fiduciary duty must allege shortcomings in the *processes* by which the fiduciary deviated from industry customs. A complaint that lacks "allegations relating directly to the methods employed by the ERISA fiduciary" may survive a motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the *process* was flawed.'" *PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718, 727 (2d Cir. 2013) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009) (emphasis added)). Importantly, "ERISA does not impose a duty to take any particular course of action if another approach seems preferable." *Harris v. Koenig*, 815 F. Supp. 2d 26, 32 (D.D.C. 2011) (quoting *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006)). And whether a fiduciary acted reasonably must be judged "under the circumstances then prevailing." *Id.* at 31-32 (quoting 29 U.S.C. § 1104(a)(1)).

## ARGUMENT

## I.   LEAVE TO AMEND SHOULD BE DENIED BECAUSE PLAINTIFFS' EFFORTS TO RESUSCITATE THEIR CLAIMS ARE FUTILE.

### A.   Plaintiffs Do Not State a Claim Based on Their Already-Dismissed Vanguard Allegations

As an initial matter, Plaintiffs reassert allegations regarding the particular share classes of

Vanguard funds that were available to Plan participants, and re-allege other purported errors in recordkeeping for Vanguard's mutual funds. *Compare* Original Compl. ¶¶ 63-65 *with* Am. Compl., Dkt. 58-2 ¶¶ 112-16. The Court already dismissed Plaintiffs' challenge to the Vanguard funds for lack of standing. In their brief, Plaintiffs claim that they do "not seek to revive claims that the Court dismissed on Article III standing grounds"—including "allegations on behalf of Plan participants who invested in Vanguard or Fidelity funds instead of TIAA products." Dkt. 58-1 (Mem.) at 2. Plaintiffs say they retain the Vanguard allegations only as "relevant and material to Plaintiffs' claims that Defendants failed to adequately evaluate the amount participants paid for recordkeeping and administrative services." *Id.* But Plaintiffs' nowhere explain how or why the Vanguard allegations are relevant to any of their other claims. To the extent Plaintiffs are attempting to revive their Vanguard claims, the Court should again dismiss those claims. "Plaintiffs clearly cannot allege an individual violation of ERISA as to the Vanguard funds, which is an investment option neither Plaintiff selected." Op. at 19.

### B.  The Court Already Rejected Plaintiffs' TIAA Traditional Annuity Claim

Although Plaintiffs say they do "not seek to revive claims that the Court dismissed on Article III standing grounds" (Mem. at 2), they revive one such claim: the TIAA Traditional Annuity timed withdrawal claim. In their original complaint, Plaintiffs claimed that Georgetown was imprudent to offer the TIAA Traditional Annuity for two reasons: (1) the annuity imposes a "2.5% surrender charge … on lump sum withdrawals" (Original Compl. ¶ 103), and (2) it "prohibits participants from re-directing their investment … during employment except in ten annual installments" (*id.* ¶ 99). Plaintiffs have dropped the first theory, but resurrected the second, in their proposed amended complaint.

The Court rejected both theories when it dismissed the original complaint. The Court

rejected Plaintiffs' 2.5% surrender charge claim because neither Plaintiff had standing—Mr. McGuire because he did not allege investing in the Traditional Annuity at all, and Mr. Wilson because he did not allege plans or even the desire to leave his job and withdraw his funds—rendering any injury entirely speculative. Op. at 19.

As to the timed withdrawal claim, Plaintiffs contend, at one point in their brief, that "the Court "failed … to address Mr. Wilcox's claim regarding the 10-year restrictions on withdrawals from the Traditional Annuity" (Mem. at 3), but that is inaccurate even by Plaintiffs' own account. Plaintiffs concede elsewhere in their brief that "The Court dismissed on Article III standing grounds Plaintiffs' claims concerning … charges from the TIAA Traditional Annuity for early withdrawal *and/or time constraints on exiting* the TIAA Traditional Annuity." Mem. at 3 (emphasis added). Georgetown agrees. The Court dismissed on standing grounds Plaintiffs' timed withdrawal claim for the exact same reason it dismissed the 2.5% surrender charge: Mr. McGuire did not invest in the TIAA Traditional Annuity and Mr. Wilson has not alleged that he wishes to change his investments. Op. at 18.[9]

In the proposed amended complaint, Plaintiffs allege that Mr. Wilcox was invested in the Traditional Annuity "at various times during the Class period." Dkt. 58-2 ¶ 39. This new allegation is not enough to overcome the Court's conclusion that neither Plaintiff has shown any impairment to "his individual account's value." Op. at 18 ("[F]or either Plaintiff to have standing to sue about their defined contribution Plan, he must show fiduciary breaches that impair his individual

---

[9]      Although in dismissing the TIAA Traditional Annuity claims, the Court did not mention Mr. Wilcox's timed withdrawal claim by name (Op. at 22), the Court discussed that claim at length (*see, e.g.*, Op. at 17-20) and disposed of it by granting Georgetown's motion to dismiss in its entirety. *See* Op. at 28; Dkt. 36 (Order). The Court's opinion stated, "dismissal will be granted on the Complaint's allegations concerning the Vanguard funds, the 2.5% withdrawal charge from the TIAA Traditional Annuity, and the TIAA Real Estate Account. Dismissal will also be granted as to Mr. McGuire's claims concerning the requirement of the TIAA Traditional Annuity requirement that funds be re-allocated over a ten-year period because Mr. McGuire has never invested in the TIAA Traditional Annuity; he therefore also lacks standing to represent other Plan Participants who did." *See* Op. at 22; Dkt. 36 (Order).

account's value.").

Furthermore, the Court already recognized another reason why Plaintiffs' timed withdrawal claim fails: "the ten-year period for transferring money out of the TIAA Traditional Annuity was disclosed on the first page of Mr. Wilcox's Group Retirement Annuity Certificate, issued on July 1, 2013, which is long before the three year statute of limitations for his claim relating to it." Op. at 20. A claim for breach of fiduciary duty under ERISA must be filed no later than three years after a plaintiff acquires *actual knowledge* of his claim. 29 U.S.C. § 1113. Mr. Wilcox had actual knowledge of the 10-year period when he opened his annuity contract in 2013. If Mr. Wilcox believed that the 10-year period somehow violated ERISA—despite being approved by state insurance regulators—he was required to file suit no later than July 1, 2016. Neither the proposed amended complaint nor Plaintiffs' brief has any response to the Court's finding.

Plaintiffs also claim that the timed withdrawal "den[ies] participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives change" and that the "harm to participants of such a restriction could not have been made more clear than over the past decade when the equity markets were experiencing double-digit annual gains." Dkt. 58-2 at ¶¶ 117, 146. But the Court already considered and rejected this point, too. As the Court explained, "the stock market has reached historically high values in recent years, which may render the intended slow and careful growth of annuities less attractive, and Plaintiffs chafe at the limitations of access to Participant monies in the TIAA Traditional Annuity." Op. at 17. But, as the Court found, "it is not a breach of fiduciary duty to maintain the Plans as established tax-deferred vehicles [i.e., annuities] under the particular protections of § 403(b)." *Id.* As the Court explained, the "charges for lump sum distribution and annual withdrawal requirements—are features 'inherent in a guaranteed fixed annuity fund'" (Op. at 20 n.11 (quoting *Davis v.*

16

*Washington Univ. in St. Louis,* Case No. 4:17-cv-1641, 2018 WL 4684244 at \*4 (E.D. Mo. Sept. 28, 2018))). In other words, people buy annuities to generate a lifelong stream of income that will last throughout their retirement years.

In fact, the limitations on liquidity *benefit* plan participants who keep their annuities as annuities, because liquidity restrictions facilitate higher yields. As explained by the disclosure to Plan participants:

> TIAA Traditional is designed primarily to help meet your longterm retirement income needs; it is not a short-term savings vehicle. Therefore, some contracts require that benefits are paid in installments over time and/or may impose surrender charges on certain withdrawals. TIAA has rewarded participants who save in contracts where benefits are paid in installments over time instead of in an immediate lump-sum by crediting higher interest rates, typically 0.50% to 0.75% higher. Higher rates will lead to higher account balances and more retirement income for you.

Required Disclosure Information, Georgetown University Voluntary Contribution Retirement Plan, Dkt. 18-3, at 112.

Finally, in the proposed amended complaint, Plaintiffs contend that the timed withdrawal requirement "violates the very clear requirements of 29 CFR 2550.408b-2(c)(3) that any ERISA plan contract be terminable on reasonably short notice without penalty to prevent the plan from becoming locked into an arrangement that has become disadvantageous." Dkt. 58-2 ¶ 146. But the regulation Plaintiffs cite pertains to contracts between ERISA plans and parties in interest "for office space or any service" that is "necessary for the establishment or operation of the plan." 29 C.F.R. § 2550.408b-2(a). Its purpose is to clarify when certain contracts between plans and landlords or service providers are exempted, under ERISA Section 408(b)(2), from ERISA Section 406(a)'s prohibition on transactions with parties in interest. Section 408(b)(2) requires that any contract so exempted be "reasonable," and the DOL regulation clarifies that a contract will not be

deemed "reasonable" unless it "permit[s] termination by the plan without penalty to the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous." 29 C.F.R. § 2550.408b-2(c)(3).

This regulation has no application to the TIAA Traditional Annuity restrictions on re-directing investments. The regulation governs the terms on which contracts between *plans and service providers* must be terminable in order to be exempted from ERISA Section 406(a). But the TIAA Traditional Annuity restriction about which Plaintiffs complain applies only when an individual plan *participant* wishes to redirect his or her investments. Thus, Plaintiffs' argument that the regulation applies to timing restrictions on participants' redirecting their funds should be rejected as a matter of law.

### C.    Plaintiffs Cannot Save Their Recordkeeping Fees Claim

#### 1.    *Other University Plans*

Plaintiffs allege in Count I of the original and proposed amended complaints that Georgetown breached its fiduciary duty of prudence by overpaying for recordkeeping services. They argue that Georgetown should not have permitted TIAA, Vanguard, and Fidelity to maintain separate records for their own accounts, and that the overall cost of recordkeeping was excessive. Original Compl. ¶¶ 6-7; Dkt. 58-2 ¶ 84. Plaintiffs allege that had Georgetown consolidated recordkeepers, a single firm could have recordkept all three investment platforms for "approximately $35 per participant with an account balance" per year. Dkt. 58-2 ¶ 67. But as the Court previously concluded, Plaintiffs "cite no example of any non-TIAA entity performing recordkeeping for TIAA annuities." Op. at 25-26 (citing *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018) ("[N]o other vendor has ever recordkept TIAA annuities[] even if it were legally possible to have another vendor do so.")). The Court further concluded, applying reasoning

adopted by other courts,[10] that Plaintiffs "provide no factual support at all for their assertion that the Plans should pay only $35/year per participant in recordkeeping fees" and do not even "allege that the currently available investment resources would remain available at their preferred price of $35/year." *Id.*

Plaintiffs attempt to get around the Court's prior holding by identifying five examples of "private university 403(b) plans" they contend support the claim that Georgetown could have saved money on recordkeeping costs without sacrificing its investment lineup. Mem. at 14. But Plaintiffs' examples actually reinforce the fatal flaw in their legal challenge: although there may be different ways to structure a retirement plan, that does not mean that one structure reflects sound fiduciary practice while another represents fiduciary misconduct. Op. at 27. The universities Plaintiffs identify operate entirely different, pared-down plans compared to Georgetown's and, even so, *do not come close* to realizing the cost savings that Plaintiffs claim Georgetown was required to obtain.

Take, for instance, Pepperdine University. Plaintiffs say that Pepperdine reaped the benefits of consolidating recordkeepers. Dkt. 58-2 ¶¶ 91-94. But when Pepperdine consolidated recordkeeping in 2009 with Diversified (now known as Transamerica), it lost the ability to offer TIAA annuities, which were . . . frozen to new investment."[11] By 2013, Pepperdine was paying

---

[10]        *See, e.g.*, *Divane v. Nw. Univ.*, 953 F.3d 980, 990–91 (7th Cir. 2020), *cert. granted sub nom. Hughes v. Nw. Univ.*, 141 S. Ct. 2882 (2021) ("Northwestern was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked. '[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems).' Plaintiffs have identified no alternative recordkeeper that would have accepted such a low fee or any fee lower than what was paid to Fidelity and TIAA. And plaintiffs have failed to explain how a hypothetical lower-cost recordkeeper would perform at the level necessary to serve the best interests of the plans' participants") (internal citations and parentheses omitted); *Kong v. Trader Joe's Co.*, 2020 WL 7062395, at *5 (C.D. Cal. Nov. 30, 2020) ("The Court finds Plaintiffs have not offered any facts to suggest that a $48 per participant recordkeeping fee is 'unreasonable.' 'Courts regularly dismiss imprudence claims such as these for failing to allege an adequate market comparison.'") (internal citations omitted).

[11]        Minutes of the Pepperdine University Retirement Plan Committee, at 1 (Sept. 27, 2013), https://bit.ly/2RRnGGf.

$157 per participant to Transamerica to keep records on a new, stripped-down investment lineup,[12] *plus* an additional $97 per participant to TIAA to keep records on the "frozen" assets.[13] What is more, Pepperdine had been forced to replace the favorable terms of TIAA's fixed annuities (which had a 10-year historical yield of 4.07% per year and provided the insurance benefit of lifetime income)[14] with a guaranteed-interest fund (which had a 10-year historical yield of just 0.75% per year without any insurance benefit).[15] The Pepperdine example shows that it was *possible* for a university to abandon annuities in favor of a different kind of retirement plan (which was never in doubt). But it hardly makes a case for why a fiduciary was required to take the mutual-fund route—much less a case for how a fiduciary could have followed the mutual-fund route for $35 per participant.

Plaintiffs' other examples reflect similar tradeoffs. Loyola Marymount, like Pepperdine, opted for a mutual-fund-based plan from Transamerica and lost access to TIAA annuities.[16] Purdue—incidentally, a public university not governed by ERISA—and Notre Dame chose Fidelity and lost access to TIAA annuities.[17] Caltech chose TIAA and lost access to Fidelity mutual funds.[18]

---

[12]    Pepperdine University Retirement Savings Plan, Retirement Plan Quarterly Investment Review, at 70 (Sept. 30, 2015), https://bit.ly/2DG3BzH ("Pepperdine Quarterly Investment Review").

[13]    Minutes of the Pepperdine University Retirement Plan Committee, at 1 (Sept. 27, 2013) (19.5 bps fee to TIAA on $150 million in assets = $292,500); Pepperdine University Retirement Savings Plan, 2013 Form 5500, at Dkt. 39-1 at 2 (Dkt. 39-1) (3035 participants with account balances).

[14]    Pepperdine Quarterly Investment Review, at 141.

[15]    *Id.* at 40.

[16]    Transamerica, *Loyola Marymount Fund Performance and Fees* (updated 2020), https://bit.ly/2QMTiic.

[17]    Purdue                University,                Enrollment                Guide, https://nb.fidelity.com/public/nb/purdue/planoptions/plandetails?planId=84808 (showing that Purdue's current investment lineup lacks TIAA annuities); University of Notre Dame 403(b) Retirement Plan, Plan & Investments, https://nbpreview.fidelity.com/public/nb/nd/planoptions/plandetails?planId=60300&option=planBasics.

[18]    Caltech, *2018 Summary Plan Description*, at 71 (2018), http://web.gps.caltech.edu/~clay/Bennefits2018.pdf (noting that Fidelity accounts are closed); Caltech, *Your Full List of Investments* (last updated 2019), https://www.tiaa.org/public/tcm/caltech/view-all-investments (showing that Caltech's current investment lineup lacks

Plaintiffs' addition of these examples does nothing to change the underlying defect in its claims. The Court's prior observation remains true: Plaintiffs' "allegation that Georgetown could continue to offer the same Plans and the same associated services for $35/year has no factual support, is entirely speculative, contrary to caselaw and common sense, and does not warrant discovery." Op. at 27. Plaintiffs still lack any allegations that *any* plan with legacy TIAA annuities was paying anything close to $35 per year in the relevant timeframe. While Plaintiffs trumpet the University of Chicago's 2020 fee reduction, recordkeeping fees from *2020* do not support Plaintiffs' allegations during the earlier period. Moreover, Plaintiffs fail to include any information about what services the University of Chicago dropped or retained after 2020 to obtain its new fees. And they still "cite no example of any non-TIAA entity performing recordkeeping for TIAA annuities." *Id.* at 25-26. Thus, while it remains true that Georgetown "could have materially changed the Plans," that does not mean that fiduciaries unwilling to accept the tradeoffs can be said plausibly to have breached their fiduciary duties. *Id.* at 26.

## 2.   *Asset-Based Fees*

Plaintiffs also continue to contend that Plan recordkeeping fees were unreasonable because Georgetown employed an asset-based structure rather than a fixed, per-participant fee, which allegedly led to fees higher than those reported as a median for "defined contribution plans." Mem. at 14-15; Dkt. 58-2 ¶¶ 13, 17. But Plaintiffs already put these same allegations, including multiple purported fee estimations, before the Court—and the Court dismissed them. Original Compl. ¶¶ 7, 37, 39-40, 57, 58, 122, 123 (allegations regarding asset-based recordkeeping fees). "An amended complaint is futile if it merely restates the same facts as the original complaint in different terms." *Appalachian Voices*, 262 F.R.D. at 27.

---

Fidelity mutual funds).

The proposed amended complaint adds additional allegations of fees purportedly paid by Plan participants for recordkeeping and administrative expenses. Dkt. 58-2 ¶¶ 12-15. But Plaintiffs cite nothing in support of their allegations and their numbers are inconsistent. *Compare, e.g.*, Dkt. 58-2 ¶ 12 ("[I]n 2012, for example, TIAA received at a minimum more than $1,720,000 in compensation for recordkeeping and administrative services for the DC Plan; a staggering $267 per participant.") *with* Mem. at 15 ("[I]n 2012, TIAA received more than $2 million in compensation for recordkeeping, or roughly $250 per participant.").

In any event, Plaintiffs' fee allegations rest upon a more serious flaw. Plaintiffs' core claim is "that a reasonable ***recordkeeping fee***" for the Defined Contribution Plan would have been "approximately $35 per participant." Dkt. 58-2 ¶ 67 (emphasis added). But Plaintiffs' allegations concerning the Plans' supposed fees relate to more than just recordkeeping expenses. For example, Plaintiffs allege that, "[u]ntil CREF created three different share classes for the Variable Annuities, participants were paying 35 basis points for *recordkeeping and administrative expense.*" Dkt. 58-2 ¶ 14 (emphasis added). But a few paragraphs later, they explain that, before "CREF created three separate share classes for the eight Variable Annuities," the "total *administrative expenses and distribution fees* were 35 basis points." Dkt. 58-2 ¶ 23(a). Later still, they explain that before CREF created three different share classes for the Variable Annuities, there were "[m]ultiple layers of expense charges" for those annuities including (1) "administrative expense" charge (24 - 26 bps); (2) "12b-1 distribution expense" charge (7.5 - 11.5 bps); (3) "mortality and expense risk" charge (0.5 bps); and (4) "investment management expense" charge (ranging from 4 to 15 bps). *Id.* ¶ 51. Thus, Plaintiffs' allegations make clear that the "***35 basis point fee***" Plaintiffs allege Plan participants were paying includes multiple different types of fees, not only recordkeeping fees. Plaintiffs' fee allegations thus compare apples to oranges and cannot support their contention that

22

Georgetown should have secured a $35 ***recordkeeping fee***.

### 3.   *Investment Options Menu*

Plaintiffs also bulk up their allegations that Georgetown offered too many investment options to participants. Dkt. 58-2 at ¶¶ 73-78. But still missing are allegations that Plaintiffs "were confused or overwhelmed by the available investment options or that they were unable to make decisions regarding those options." Op. at 11 n.8. To the contrary, both Plaintiffs "were invested in multiple investment options and had 'access to advisors who provide valuable one-on-one retirement planning services.'" *Id.* Thus, Plaintiffs' proposed amended complaint fails to cure the defect already identified by the Court in rejecting Plaintiffs' allegations that Georgetown's menu of investment options was deficient.

Courts, moreover, have repeatedly rejected the argument that a fiduciary violates the duty of prudence by offering too many investment options to participants. *See, e.g.*, *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 686 (D. Conn. 2018) ("[T]he possibility of lower fees resulting from the concentration of assets" does not "defeat the general presumption in favor of a broader range of options."); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1350 (N.D. Ga. 2017) ("The plaintiffs allege that the Plans should have offered fewer options and used more bargaining leverage with those investment options to obtain lower fees. The court does not agree with the plaintiffs' theory. Having too many options does not hurt the Plans' participants, but instead provides them opportunities to choose the investments that they prefer."); *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017) ("Plaintiffs simply have not alleged any facts to suggest that the Plans' beneficiaries were harmed in an actionable way by NYU's failure to consolidate the Plans' investment Options."), *reversed in part on other grounds*, *Sacerdote v. New York University*, 9 F.4th 95 (2d Cir. 2021).

4.      *408b-2 Disclosures*

Plaintiffs next seek to add allegations that "Defendants failed to obtain the necessary disclosures from TIAA required by Rule 408b-2," specifically as pertains to "administrative expense" and "distribution fees." Mem. at 6-7; Dkt. 37-2 ¶ 14. As an initial matter, Plaintiffs themselves allege that "TIAA provided" Georgetown with "the [408b-2] disclosures." Dkt. 58-2 at ¶ 23. To the extent Plaintiffs are alleging that those disclosures were somehow inaccurate, the underlying flaw in their legal theory remains.

By way of background, section 408(b)(2) of ERISA provides that a transaction with a party-in-interest that is otherwise prohibited by ERISA will be permitted if the services are "necessary for the establishment or operation of the plan" and "no more than reasonable compensation is paid thereof." 29 U.S.C. § 1108(b)(2). The regulation implementing the prohibited-transaction exemption—29 C.F.R. § 2550.408b-2—creates a disclosure regime, so that fiduciaries understand what compensation is being paid to their plans' service providers.

If a vendor provides a designated investment alternative in connection with recordkeeping services (as described in 29 C.F.R. § 2550.408b-2(c)(1)(iii)(B)), the vendor must provide disclosures of the one-time expenses associated with each investment product and the annual expense ratio, so that a plan's fiduciaries can disclose those attributes to the plan's participants. *Id.* § 2550.408b-2(c)(iv)(F) (incorporating *id.* § 2550.408b-2(c)(iv)(E)(1)-(3)). One type of expense associated with investment options is a distribution fee, sometimes known as a 12b-1 fee. Rule 12b-1 under the Investment Company Act of 1940 provides that a registered, open-ended investment company cannot distribute its own shares except pursuant to a written plan that specifies, among other facts, the method for financing the distribution effort. *See* 17 C.F.R. § 270.12b-1.

24

Georgetown provides disclosures on its Plan website that identify each fund's expense ratio.[19] For instance, Georgetown's 2014 annual disclosure to Plan participants indicated that the CREF Stock Account had "Total Annual Operating Expenses" of 0.49%. Ex. A, at 80. The 2014 prospectus for the CREF Stock Account estimated that the fund's "Total annual expense deductions" would be 0.455%, consisting of investment management expenses of 0.115%, administrative expenses of 0.24%, distribution expenses of 0.095%, and mortality and expense risk charges of 0.005%.[20]

Plaintiffs say that their new allegation is that "Defendants failed to properly investigate the amount of compensation paid to TIAA." Mem. at 14. But that claim is impossible to reconcile with Georgetown's disclosure, on the Plan website, of the total expense ratio, and Georgetown's publication of the prospectuses, which disclose the various layers of fees (*see also, e.g.*, Dkt. 58-2 ¶¶ 23.a, 51).[21] Plaintiffs do not dispute either of these facts.

Plaintiffs also have a separate challenge to the TIAA Traditional Annuity. Unlike all of the other investment options in the Plans, which are open-ended registered investment companies within the meaning of federal securities laws, the TIAA Traditional Annuity is an insurance

---

[19]   *See, e.g.*, TIAA, *Quarterly Investment Update, Georgetown University Defined Contribution Retirement Plan* (last updated Dec. 31, 2019), https://www.tiaa.org/public/tcm/georgetown/investment-performance (click on "Quarterly Performance" hyperlink).

[20]   SEC, College Retirement Equities Fund Form N-3, at 7 (2014), https://www.sec.gov/Archives/edgar/data/777535/000093041314002154/c76422_485bpos.htm ("2014 Prospectus"). At the motion to dismiss stage, a court may consider "facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *See, e.g.*, *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). If the complaint "necessarily relies" on particular documents, they are considered to be incorporated in the complaint "even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009). Consistent with these standards, courts routinely rely upon formal plan documents and disclosures required by statute when resolving motions to dismiss ERISA cases. *See, e.g.*, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991) (prospectuses subject to judicial notice); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Group, Inc.*, 99 F. Supp. 3d 1110, 1126 (C.D. Cal. 2015) (Form 5500 subject to judicial notice).

[21]   Georgetown University, *Your Full List of Investments* (last updated 2019), https://www.tiaa.org/public/tcm/georgetown/view-all-investments; *see, e.g.*, TIAA, CREF Growth Account (R3) Prospectus (May 1, 2019), http://connect.rightprospectus.com/TIAA/TADF/194408803/P?site=VA.

product. The difference is meaningful. In a mutual fund, a participant has a stake in a pooled portfolio of assets. The investor is entitled to a share of those assets; so, his stake depends on the value of the portfolio—and also on any circumstances in which assets are removed from the portfolio to pay expenses. By contrast, for the Traditional Annuity, TIAA declares an interest rate for a specified term and guarantees that it will pay that rate—even if market conditions change during the period of the guarantee. TIAA then invests its general account in a manner that, it hopes, will outperform the rate it has promised to its clients. Plaintiffs' theory is that TIAA was required to disclose "the spread between the earnings on TIAA's general account and the interest credited to investors in the Traditional Annuity, less expenses of investment." Mem. at 7; Dkt. 58-2 ¶ 24(b). But the Traditional Annuity is not an "investment" under the regulations and the "spread" is not an "expense" that TIAA was required to disclose or that Georgetown was required to review. The obligation to disclose a fund's annual operating expenses applies only "if the return is not fixed." 29 C.F.R. § 2550.408b-2(c)(1)(iv)(E)(2); *accord id.* § 2550.404a-5(d)(1)(iv)(A) (requiring fee disclosures "[f]or designated investment alternatives with respect to which the return is not fixed.").

Furthermore, Rule 408b-2 is "independent of fiduciary obligations under [ERISA] section 404." 29 C.F.R. § 2550.408b-2(c)(1)(i). That is, Plaintiffs would need to show that any errors in TIAA's disclosures constitute a breach of *Georgetown's* fiduciary duties. On that score, Plaintiffs do not even attempt to allege that a prudent fiduciary must comb through third party disclosures to detect potential errors. In addition, Plaintiffs would need to show that Georgetown's alleged failure to obtain 408b-2 disclosures harmed them. *See Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 185 (D.D.C. 2017). But Plaintiffs offer no facts or law to support their bare conclusion that Georgetown breached its fiduciary duty, nor do they allege that the purported

breach caused them to suffer any harm. *See, e.g.*, *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 620 (2d Cir. 2006) (explaining that the test is whether a fiduciary "employed the appropriate methods to investigate") (internal quotation marks omitted); *cf. Twombly*, 550 U.S. at 555 (explaining that the facts alleged "must be enough to raise a right to relief above the speculative level").

### D.      Plaintiffs Wholly Misunderstand Variable Annuities

Plaintiffs newly contend that Georgetown breached its fiduciary duty of prudence by "failing to use sufficient diligence to understand that the eight variable annuities they offered as the investment options in the Plans were not actually annuities." Mem. at 15-16; Dkt. 58-2 ¶ 25. In particular, they take aim at the 0.005% mortality and expense risk charge that applies to all CREF variable annuities. Plaintiffs' theory is fatally flawed.

As an initial matter, Plaintiffs misunderstand the nature of an annuity. An annuity is a "contract[] under which the purchaser makes one or more premium payments to the issuer in exchange for a series of payments, which continue either for a fixed period or for the life of the purchaser or a designated beneficiary." *NationsBank of N.C.*, 513 U.S. at 254. Annuities "generally fall into two categories: immediate and deferred annuities." *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, 2007 WL 710119, at *1 (N.D. Ind. Mar. 6, 2007).

For immediate annuities, "the insured pays a lump sum of money to the insurer who then instantly begins periodic payments to the insured according to the terms of the contract." *Lincoln Nat'l Life Ins.*, 2007 WL 710119, at *1. Deferred annuities, by contrast, traditionally "have two distinct phases: accumulation and distribution." *Id.* In the first phase, "the policy owner amasses assets (in the form of premiums) over a period of time to be sustained during retirement years":

> The accumulated money is said to have an account value and can be
> withdrawn at any time by the owner. During the distribution phase,

> also known as the payout or post-annuitization phase, the insured receives regular payments under the terms of the contract but no longer has access to the accumulated money as the account value ceases to exist. The point of time where the accumulated value of the deferred annuity is exchanged for a promise by the insurer of a series of future retirement income benefits payments is termed "annuitization."

*Id.* (citations and internal quotation marks omitted); *see also Bloch v. Powell*, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (discussing the distinction between immediate and deferred annuities).

The prospectus for the CREF variable annuities explains how they are deferred annuities that precisely track the above definition. There is an "[a]ccumulation [p]eriod"[22] that ends at the "annuity starting date,"[23] after which the accumulated credits are translated into a one-life or two-life annuity or an annuity with a fixed or guaranteed term.[24] So Plaintiffs are incorrect in claiming that these products are "merely pools of equity" and not annuities.

Moreover, Georgetown knew very well the nature of these products. Indeed, the annual disclosures provided by Georgetown to Plan participants explain that, whereas "lump-sum withdrawals are available from the TIAA Traditional Account only within 120 days after termination of employment," Dkt. 18-3, at 112, variable annuities permit certain withdrawals, at least until an annuity has been elected, whereupon the "election is irrevocable," *id.* at 115-16.

And, even if the CREF Accounts were "not actually annuities" and Georgetown had failed to realize that, Plaintiffs still would lack a case that a reasonable fiduciary would have behaved differently. Plaintiffs have not shown that any other retirement plan fiduciary treats the TIAA variable annuities as anything but. Plaintiffs do not allege that any other fiduciary was able to

---

[22]     2014 Prospectus, at 3 (defining "[a]ccumulation [p]eriod" as "The period during which investment account accumulations are held under a contract prior to their being annuitized or otherwise paid out").

[23]     *Id.* at 73.

[24]     *Id.* at 74.

negotiate that charge and they cannot credibly assert that the 0.005% charge imposed by TIAA CREF is excessive. In fact, the SEC's investor guide on variable annuities advises investors that the mortality and expense risk charge is "typically in the range of 1.25% per year"[25]—that is, 250 times TIAA CREF's assessment.

### E.    Plaintiffs' Recycled Allegations Do Not State a Claim for Breach of the Duty of Candor

Although they make no mention of it in their brief, Plaintiffs' proposed amended complaint adds a new count for breach of the "duty of candor," claiming that Georgetown "failed to report any of the indirect compensation received by either TIAA or Vanguard for recordkeeping services and erroneously and misleadingly reported that all of Fidelity's indirect compensation was 'eligible indirect compensation.'" Dkt. 58-3, ¶ 151. Not only did Plaintiffs' counsel recently lose this same claim in another case,[26] the claim is based on recycled allegations from the original complaint (*see* Original Compl. ¶ 55 (alleging TIAA failed to report indirect compensation on its Form 5500 "in violation of the explicit obligation to do so under federal law); *id.* ¶ 58 (similar)), which the Court already considered and rejected. Op. at 11-12. And, while this "new" claim dresses the theory up in new garb, it remains just as flawed.

***First***, Plaintiffs cannot show any ERISA violation. Their fleeting reference to a "duty of candor" is entirely unsupported. ERISA mentions no such duty and there appears to be no case law on the existence or content of an ERISA duty of candor in this Circuit. Because ERISA is a

---

[25]     U.S. Sec. & Exchange Comm'n, *Variable Annuities: What You Should Know*, at 11 (Sept. 2007), https://www.sec.gov/investor/pubs/sec-guide-to-variable-annuities.pdf.

[26]     Defendants are aware of only one out-of-circuit case specifically considering whether a "duty of candor" applies to the filing of Form 5500s. In *Alas v. AT&T Services, Inc.*, this same Plaintiffs' counsel raised the same argument in a third amended complaint and the court rejected it. 2021 WL 4893372, at *15 (C.D. Cal. Sept. 28, 2021). The court granted the defendant's motion for summary judgment in all respects in that case and so did not conduct "[a] detailed analysis of the duty of candor under ERISA." *Id.*

"comprehensive and reticulated statute," courts should be "reluctant" to read in additional duties or remedies not specified in the text of the law. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146-47 (1985) (internal quotation marks omitted).

**Second**, even if a "duty of candor" applied to some disclosures under ERISA, it would not apply here—to Form 5500s. Unlike ERISA disclosures that must be sent to participants, *e.g.*, 29 C.F.R. § 2550.404a-5(c), Form 5500s are filed with the Department of Labor. *See* 29 U.S.C. § 1024(a). Even as to disclosures that are sent directly to participants, "under ordinary circumstances defects in fulfilling the reporting and disclosure requirements of ERISA do not give rise to a substantive remedy other than that provided for in section 502(a)(1)(A) of that Act," which is not available to participants. *Ackerman v. Warnaco, Inc*., 55 F.3d 117, 124 (3d Cir. 1995). "Where, as here, ERISA does not expressly provide a private remedy for a violation of a disclosure requirement, courts have consistently declined to read a cause of action into the statute." *Jacobs v. Verizon Commc'ns, Inc*., 2017 WL 8809714, at *13 (S.D.N.Y. Sept. 28, 2017).

**Third**, submitting Form 5500s to the Department of Labor is not a fiduciary function. Form 5500 disclosures are made by the plan administrator, 29 U.S.C. §§ 1021(b)(1), 1023(c), but ERISA "defines an administrator as a fiduciary 'only to the extent' that he acts in such a capacity in relation to a plan," *Oliver v. Black Knight Asset Mgmt., LLC*, 812 F. Supp. 2d 2, 11-12 (D.D.C. 2011) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000)). Put another way, "there is no liability for breach of fiduciary duty if the challenged conduct of the plan administrator . . . is not fiduciary in nature." *Dawson-Murdock v. Nat'l Counseling Grp., Inc*., 931 F.3d 269, 278 n.13 (4th Cir. 2019). Courts have recognized that "ministerial functions like preparing and submitting regulatory filings are not discretionary acts and therefore do not support an inference of fiduciary status." *Godfrey v. Greatbanc Tr. Co*., 2019 WL 4735422, at *3 (N.D. Ill. Sept. 26, 2019); *see also, e.g.*,

*Anoka Orthopaedic Assocs., P.A. v. Lechner*, 910 F.2d 514, 517 (8th Cir. 1990) ("the preparation of reports required by government agencies[] does not entail discretionary authority or responsibility"); *In re JDS Uniphase Corp. ERISA Litig.*, 2005 WL 1662131, at *3 (N.D. Cal. July 14, 2005) ("The preparation of government reports required by government agencies is a ministerial function, and those performing such functions are not fiduciaries"). Likewise, an interpretive bulletin from the Department of Labor advises that "[p]reparation of reports required by government agencies" is a ministerial function that does not establish ERISA fiduciary status. 29 C.F.R. § 2509.75-8.

Under these principles, Georgetown's preparation and submission of the Form 5500s is not a fiduciary function and cannot give rise to fiduciary liability. *Cf. Taveras v. UBS AG*, 513 F. App'x 19, 24 (2d Cir. 2013) (dismissing candor claim based on alleged misstatements in SEC filings because such statements were not made in the defendants' "ERISA fiduciary capacities"). Indeed, as one district court recently observed, "plaintiffs have not cited any cases in which a court held that a defendant who filled out a Form 5500 . . . improperly violated a fiduciary duty." *Reed v. Queens Vill. Comm. for Mental Health for J-CAP, Inc.*, 2019 WL 4452386, at *11 (E.D.N.Y. Sept. 17, 2019).

**Fourth**, Plaintiffs' "duty of candor" claim is akin to a misrepresentation claim. Yet Plaintiffs do not allege that they relied on the purported errors in the Form 5500s or that they were harmed by any such errors. This failure to allege reliance or any harm is fatal to their claim. *See, e.g.*, *Reed,* 2019 WL 4452386, at *11 (dismissing claim where plaintiffs "have not demonstrated how they relied on any [allegedly] material misrepresentation" in the Form 5500); *Jacobs,* 2017 WL 8809714, at *15 (same where plaintiffs "ha[ve] not asserted that [they] relied on the allegedly inaccurate Form 5500 in any way").

## II.    LEAVE TO AMEND SHOULD BE DENIED BECAUSE PLAINTIFFS' AMENDMENT IS UNDULY DELAYED

Plaintiffs are not entitled to use Rule 15(a) to add theories that Plaintiffs could have asserted earlier, but chose not to incorporate into their original complaint. Courts find undue delay when "movants failed to promptly allege a claim for which they already possessed evidence." *PAE*, 327 F.R.D. at 20 (internal quotation marks omitted); *see also LaPrade v. Abramson*, 2006 WL 3469532, at *5 (D.D.C. Nov. 29, 2006) (denying leave to amend where Plaintiff "knew sufficient facts before the amendment deadline to make the claims she now seeks to add").

Plaintiffs nowhere contend that the theories in their proposed amended complaint were unavailable when they brought suit. Indeed, their "new" duty of candor claim relies on recycled facts. Plaintiffs alleged in the original complaint that failure to report TIAA's indirect compensation in the Form 5500s violated an "explicit obligation . . . under federal law" (Original Compl. ¶ 55; *id.* ¶ 59 ("None of the Plans' 5500's filed since 2009 disclose any amount of indirect compensation being received by TIAA"). Thus, Plaintiffs had all of the facts they needed to bring this claim much earlier—they just chose not to do so. This is a classic case of undue delay. *See, e.g.*, *LaPrade*, 2006 WL 3469532, at *5 (holding motion for leave to amend unduly delayed where plaintiff "knew sufficient facts before the amendment deadline to make the claims she now seeks to add"); *McGee v. D.C.*, 646 F. Supp. 2d 115, 121-22 (D.D.C. 2009) (stating "[t]he fact that claims [added] in an amended complaint are based on the same legal duties or facts asserted in the original complaint is grounds for denying leave to amend").

On top of that, many of the "new" allegations appear to be lifted from lawsuits against other universities that predated the filing of this case. For example, five of the universities that Plaintiffs seek to discuss in their amended complaint—Loyola Marymount, Pepperdine, Purdue, Caltech, and Notre Dame—are the same five schools identified in a 2016 complaint alleging very

similar claims against NYU that resulted in judgment for the university on all counts.[27] *Compare* Dkt. 58-2 ¶¶ 86-100, *with* Am. Compl. ¶¶ 88-94, *Sacerdote v. New York Univ.*, No. 1:16-cv-06284 (S.D.N.Y. filed Nov. 9, 2016), E.C.F. No. 39. Plaintiffs do not (and cannot) allege that they have discovered new facts, so their request to introduce new allegations is unduly delayed.

Plaintiffs also had at their fingertips all of the information they needed to assert a claim against the new Defendant they seek to tack on—Georgetown's Finance Subcommittee of the President's Executive Committee. Years after filing this lawsuit on February 23, 2018, Plaintiffs only now seek to name the Subcommittee as a Defendant, stating that "[a]s of February 1, 2018, the Subcommittee "was delegated all discretionary authority and powers to control and manage the assets of the Plans." Dkt. 58-3 ¶ 3. Thus, by their own allegations, the information that led Plaintiffs to seek to add the subcommittee as a Defendant was already available to Plaintiffs, and they could have added this Defendant back in February 2018.

## CONCLUSION

For these reasons, Plaintiffs' motion for leave to amend should again be denied.

Dated: January 3, 2021

Respectfully submitted,

*/s/ Nancy G. Ross*
Nancy G. Ross (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
Telephone: (312) 782-0600

E. Brantley Webb (D.C. Bar No. 726509)
  bwebb@mayerbrown.com

---

[27]     In fact, this same Plaintiffs' counsel included almost identical allegations in their consolidated complaint against Washington University that was filed more than *six months* prior to the filing of this case. *Compare* Dkt. 1 (filed Feb. 23, 2018), *with* Original Compl. ¶¶ 149-66, *Davis v. Washington Univ.*, No. 4:17-cv-01641 (E.D. Mo. filed Aug. 21, 2017), Dkt. 24.

Michelle N. Webster (D.C. Bar No. 985265)
Colleen M. Campbell (D.C. Bar No. CA00062)
MAYER BROWN LLP 1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*