**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

——————————————————————
                                                    )
DARRELL WILCOX and MICHAEL,                         )
MCGUIRE, *individually and as*                      )
*Representatives of a class of participants*        )
*and beneficiaries in and on behalf of the*         )
*GEORGETOWN UNIVERSITY*                             )
*DEFINED CONTRIBUTION*                              )
*RETIREMENT PLAN, the*                              )
*GEORGETOWN UNIVERSITY*                             )
*VOLUNTARY CONTRIBUTION*                            )
*RETIREMENT PLAN*, et al.,                          )
                                                    )
                         Plaintiffs,                )
                                                    )
            v.                                       )          Civil Action No. 18-0422 (ABJ)
                                                    )
GEORGETOWN UNIVERSITY, *et al.*,                    )
                                                    )
                         Defendants.                )
——————————————————————)

**<u>MEMORANDUM OPINION</u>**

On February 23, 2018, plaintiffs Darrell Wilcox and Michael McGuire, individually and

as representatives of a class of participants and beneficiaries of the Georgetown University Defined

Contribution Retirement Plan ("DC Plan") and the Georgetown University Voluntary Contribution

Retirement Plan ("Voluntary Plan") (collectively, "Plans"), filed a complaint against Georgetown

University, and the Senior Vice President and Chief Administrative Officer of the University

(collectively, "Georgetown") alleging a breach of their fiduciary duties under the Employee

Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA").  Compl. [Dkt. # 1] ¶¶ 1,

25–26.[1]  Plaintiffs, who are employees of the University, claimed that defendants failed "to evaluate and monitor the Plans' expenses" adequately and "caused the Plans to pay unreasonable and excessive fees for investment and administrative services."  Compl. ¶ 4.

The case had a complicated procedural history, and approximately four years after they originally brought suit, plaintiffs moved for leave to file an amended complaint.  Pls.' Mot. Seeking Leave to File Pls.' First Am. Compl. [Dkt. # 58], Mem. of Law in Supp. of Pls.' Mot. Seeking Leave to File Pls.' First Am. Compl. [Dkt. # 58-1] ("Pls.' Mot.").  Plaintiffs' motion includes their proposed amended complaint.  Proposed First Am. Compl., Ex. A to Pls.' Mot. [Dkt. # 58-2] ("Proposed Am. Compl.").  The motion is fully briefed.[2]

For the reasons to be set forth in more detail below, plaintiffs' motion for leave to file an amended complaint will be **DENIED**.  The case appears to be a lawsuit in search of a theory, and notwithstanding its length, the proposed amended complaint does not add much to the original pleading that was dismissed.  Plaintiffs identify ways in which plan management could be different, or even improved, but they have not alleged facts to support a plausible inference that the defendants have failed as fiduciaries.

---

1      Christopher Augostini is the former Senior Vice President and Chief Administrative Officer of Georgetown University; Geoff Chatas assumed Augostini's duties in 2018. Compl. ¶¶ 25–26.

2      *See* Defs.' Mem. of P. & A. in Opp. to Pls.' Mot. [Dkt. # 59] ("Defs.' Opp."); Pls.' Reply Mem. in Supp. of Pls.' Mot. [Dkt. # 62] ("Pls.' Reply"); Defs.' Notice of Suppl. Authority Regarding Pls.' Mot. [Dkt. # 63]; Pls.' Resp. to Defs.' Notice of Suppl. Authority and Pls.' Notice of Suppl. Authority in Supp. of Pls.' Mot. [Dkt. # 64]; Defs.' Resp. Regarding Suppl. Authorities and Defs.' Notice of Suppl. Authority [Dkt. # 65]; Pls.' Notice of Suppl. Authority Regarding Pls.' Mot. [Dkt. # 71]; Defs.' Resp. to Pls.' Second Notice of Suppl. Authority and Defs.' Notice of Suppl. Authority [Dkt. # 72].

## BACKGROUND

Georgetown offers its eligible employees the opportunity to participate in the Georgetown University Defined Contribution Retirement Plan and the Georgetown University Voluntary Contribution Retirement Plan, both of which are "defined contribution, individual account, employee pension benefit plans" governed by ERISA.[3]  Proposed Am. Compl. ¶¶ 35, 37; Compl. ¶¶ 16, 18.

 In a defined contribution plan, the participant's retirement benefit is determined based on the performance of the assets they choose, less any fees and expenses.  Proposed Am. Compl. ¶ 37; Compl. ¶ 18; *see also LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248, 250 n.1 (2008) (explaining difference between defined *contribution* plans, where the retirement benefit is based on investment performance, and defined *benefit* plans, where a participant's retirement benefit is fixed based on factors like tenure and compensation).  The individual accounts here are funded by the employees' deferred compensation and matching contributions from Georgetown.  Proposed Am. Compl. ¶ 37; Compl. ¶ 18.

The Plans offer participants a range of investments options to choose from, and participants make individual decisions as to how their funds are invested.  Proposed Am. Compl. ¶ 37;

---

3      An "individual account plan," also known as a "defined contribution plan," is defined in 29 U.S.C. § 1002(34) as "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."

       An "employee pension benefit plan" is defined in 29 U.S.C. § 1002(2)(A) as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . ."

3

Compl. ¶ 18.  Georgetown employees could choose to invest in fixed and variable annuities[4] through the Teachers Insurance and Annuity Association ("TIAA"), and mutual fund investment options managed by TIAA, Vanguard, and Fidelity.  Proposed Am. Compl. ¶ 47; Compl. ¶¶ 28–29.[5]

Plaintiffs' original complaint consisted of two counts.  Count I alleged that Georgetown breached its duty of prudence[6] by offering investment options in a manner that resulted in unreasonable administrative and recordkeeping fees.  Compl. ¶¶ 119–25.  Plaintiffs took the position that defendants' selection of three recordkeepers – TIAA, Vanguard, and Fidelity – created needless additional expense and complexity.  Compl. ¶ 6.  Each of the recordkeepers, plaintiffs alleged,

> supplied the Plans with a separate menu of investment choices including mutual fund share classes that charged higher fees than (i) other less expensive investment alternatives that offered the same investment strategies or (ii) less expensive share classes of the exact same investment fund, or (iii) both.

Compl. ¶ 6.  Moreover, "[f]ees for administrative services were charged and paid to these three companies as a percentage of the overall expenses paid for investing in the various investment options offered within the Plans (including expensive choices and/or share classes)," resulting in,

---

4     An "annuity" is "an obligation to pay a stated sum . . . to a stated recipient," and a "retirement annuity" is "an annuity that begins making payments only after the annuitant's retirement."  Black's Law Dictionary (11th ed. 2019).

5     The Plans at one point offered AXA mutual funds, but those are now allegedly "frozen to new contributions."  Proposed Am. Compl. ¶ 47; Compl. ¶ 29.

The Plans are described in detail in the court's prior Memorandum Opinion.  *See* Mem. Op. [Dkt. # 35] ("Dismissal Op.") at 5–10.

6     "ERISA fiduciaries have 'a continuing duty to monitor investments and remove imprudent ones.'"  Compl. ¶ 83, quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).  Plaintiffs detailed the fiduciary standards required under ERISA in the complaint.  *See* Compl. ¶¶ 109–13.

according to plaintiffs, their having to pay "asset-based fees for administrative services, which continued to increase as the value of their accounts increased through additional contributions and investment returns even though no additional services were being provided."   Compl. ¶ 7. Plaintiffs alleged that if recordkeeping services were performed by a single entity, as opposed to three, they could have been provided across all three investment platforms for "the reasonable amount of a fixed fee . . . in the range of $35."   Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss [Dkt. # 24] at 23, citing Compl. ¶¶ 53–54.   Plaintiffs also posited that "[t]he sheer volume of three hundred total investment choices for retirement investors," which were offered among the three recordkeepers, "indicate[d] that [d]efendants failed properly to monitor and evaluate the historical performance and expense of each of these funds, compare that historical performance and expense to a peer group of funds and/or even compare the three segments against one another." Compl. ¶¶ 9–10.

Count II alleged that Georgetown breached its duty of prudence in the way it managed the selection and retention of the Plans' investment options.  Compl. ¶¶ 125–37.  Plaintiffs found fault with a number of specific investment options:

- *Vanguard investment options*:

  Plaintiffs alleged that Georgetown "used more expensive funds . . . than investments that were available to the Plans," Compl. ¶ 131; *see* Dismissal Op. at 6, and they challenged "the particular share classes of Vanguard funds that were available to [p]articipants."  Dismissal Op. at 6.

- *TIAA investment options*:

  <u>TIAA Traditional Annuity</u>: The TIAA Traditional Annuity was available to participants through either the Defined Contribution Plan or the Voluntary Plan.  If a participant invested through the Defined Contribution Plan, that investment would typically earn greater interest than the same investment in the Voluntary Plan.   But the Defined Contribution Plan prohibited participants from withdrawing funds until the end of their employment with Georgetown, or alternatively allowed them to re-direct their funds in ten

annual installments.  Upon departure from employment, a participant could leave the funds invested in the TIAA Traditional Annuity and receive a monthly pension payment whenever that person qualified for it, or withdraw the funds immediately and pay a 2.5% surrender charge.  The Voluntary Plan allowed participants to withdraw funds at any time without penalty. Plaintiffs alleged that the TIAA Traditional Annuity's restrictions on re-directing investment funds into other investment options – except in ten annual installments – and the imposition of the 2.5% surrender charge "violate[d] ERISA's prohibition on the imposition of a penalty for early termination of a contract."  Dismissal Op. at 7; *see* Compl. ¶ 134.

College Retirement Equities Fund ("CREF") Stock Account:  Plaintiffs alleged that defendants "selected and retained the CREF Stock Account" – a variable-annuity investment fund, Dismissal Op. at 8 – "despite its excessive cost and historical underperformance compared to both passively managed investments ***and actively managed investments with similar underlying asset allocations*.**"  Compl. ¶ 132 (emphasis in original).

TIAA Real Estate Account:  "The TIAA Real Estate Account is a variable annuity account that seeks favorable long-term returns primarily through rental income and appreciation of real estate and real estate-related investments."  Dismissal Op. at 10 (internal quotation marks omitted) (referencing and linking to TIAA Real Estate Account Prospectus). Plaintiffs alleged that "[d]efendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plans despite its excessive fees and historical underperformance compared to lower-cost real estate investments."  Compl. ¶ 133.

Plaintiff Wilcox was alleged to have "invested in the TIAA Traditional Annuity, the CREF Bond Account . . . , and eleven of the TIAA mutual funds."  Compl. ¶ 20.  Plaintiff McGuire was alleged to have "invested in the CREF Stock Account, the CREF Equity Index Account, the TIAA Real Estate Account, the CREF Inflation-Linked Bond Fund Account, the CREF Bond Market Account[,] and the TIAA-CREF Growth and Income Account."  Compl. ¶ 21.

## Motion to Dismiss

On April 23, 2018, defendants moved to dismiss plaintiffs' complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  Defs.' Mot. to Dismiss [Dkt. # 18], Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Compl. [Dkt. # 18-1] ("Defs.'

Mot. to Dismiss"); *see* Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss [Dkt. # 24]; Defs.'

Reply Mem. in Supp. of Defs.' Mot. to Dismiss [Dkt. # 27].

On January 8, 2019, the court then assigned to the matter granted the motion to dismiss

without prejudice.  Order [Dkt. # 36] ("Dismissal Order"); Dismissal Op.  As to plaintiffs' claim

that defendants breached their fiduciary duties by allowing three recordkeepers, the court reasoned

that "[p]laintiffs fail[ed] to identify a single one of the any number of university plans that provide

for a single recordkeeper with investment choices offered by multiple fund managers, much less

one that offers the TIAA Traditional Annuity and other investment platforms through a single

recordkeeper."  Dismissal Op. at 25 (internal alteration, citation, and quotation marks omitted).  It

added that "[p]laintiffs provide no factual support at all for their assertion that the Plans should

pay only $35/year per participant in recordkeeping fees" for all three investment platforms, *id.*,

and that "[p]laintiffs do not allege that the currently available investment resources would remain

available at their preferred price of $35/year."  *Id.* at 26.

As to plaintiffs' claims "concerning the Vanguard funds," the court found that plaintiffs

lacked standing to bring them as it was "an investment option neither [p]laintiff selected."

Dismissal Op. at 19, 22; *see* Compl. ¶¶ 20–21.

With respect to the TIAA options, the court found that plaintiffs also lacked standing to

bring a claim contesting "the 2.5% withdrawal charge from the TIAA Traditional Annuity,"

because plaintiff Wilcox "fail[ed] to allege that he ha[d] attempted such a withdrawal or intend[ed]

to leave his job and withdraw his funds."  Dismissal Op. at 19, 22.  Further, the court explained

that plaintiff "McGuire ha[d] never invested in the TIAA Traditional Annuity; he therefore also

lack[ed] standing to represent other Plan [p]articipants who did."  *Id.* at 22.  As for the claims

concerning the CREF Stock Account, the court found that plaintiffs failed to state a plausible claim

for relief as to their claim concerning the "'excessive fees and historical underperformance'" of the Account. *Id.* at 22, citing Compl. ¶ 132. It explained that plaintiffs' comparison of the CREF Stock Account with the Russell 3000 and "other, lower-cost actively and passively managed investments that were available to the Plans" was improper because "ERISA does not provide a cause of action for 'underperforming funds[;]'" "a fiduciary is not required to select the best performing fund," and just because the CREF Stock Account "may not have performed as some purely domestic accounts with different investments does not indicate imprudence on the part of [d]efendants." *Id.* at 22–23. Finally, the court concluded that plaintiffs had not demonstrated they had standing as to the claims concerning the TIAA Real Estate Account in which McGuire had invested, because he had "experienced no loss or injury from that investment." Dismissal Op. at 20–22.

### First Motion to Amend the Complaint and Appeal to D.C. Circuit

On February 7, 2019, after the complaint had been dismissed, plaintiffs sought leave to amend. Pls.' Mot. Seeking Leave to File Pls.' First Am. Compl. [Dkt. # 37]. The court denied the motion, explaining that it had entered a final judgment when it dismissed the complaint and that plaintiffs' motion did not survive analysis under Federal Rule of Civil Procedure 59(e) or 60(b). Mem. Op. [Dkt. # 42] ("Denial Op.") at 1; *see also* Order [Dkt. # 43].

On June 27, 2019, plaintiffs appealed the denial of their motion to amend the complaint. Notice of Appeal [Dkt. # 45]. The D.C. Circuit found that the district court had not, in fact, entered a "final, appealable judgment" when it granted the motion to dismiss. *Wilcox v. Georgetown Univ.*, 987 F.3d 143, 152 (D.C. Cir. 2021). Therefore, the appellate court found it appropriate to remand the motion for leave to amend the complaint pursuant to Rule 15(a)(2) for the district court to decide "whether to grant leave for appellants to file their proposed amended complaint" and

whether "the proposed amendments would be futile."  *Id.*  The parties then stipulated, "subject to approval of the [c]ourt, that this case shall be, and is, reinstated."  Stipulation for Reinstatement [Dkt. # 55] at 2.

The case was reinstated on October 27, 2021, it was randomly reassigned to this Court on the same date, *see* Docket Entry (Oct. 27, 2021), and plaintiffs were ordered to file their motion for leave to file an amended complaint by December 11, 2021.  Order [Dkt. # 56] ("Reinstatement Order").

## Pending Motion to Amend the Complaint

On December 10, 2021, plaintiffs again moved for leave to file an amended complaint, Pls.' Mot., and they included an updated version of their proposed First Amended Complaint.  *See* Proposed Am. Compl.  Defendants oppose plaintiffs' motion, contending that plaintiffs' amendment is unduly delayed and also futile.  Defs.' Opp. at 3.

The proposed amended complaint includes three counts.  Count I concerns "unreasonable administrative fees," and it alleges that defendants breached the duty of prudence when they "selected and retained as the Plans' investment options investment funds and insurance company annuities that caused the Plans to incur fair higher administrative fees and expenses relative to the[ir] size and complexity."  Proposed Am. Compl. ¶ 138; Proposed Am. Compl. at 46.  Plaintiffs specify in this count that the asset-based fees contributed to the unnecessary expenses.  Proposed Am. Compl. ¶ 139.  Count II concerns "unreasonable investment management fees and imprudent investment option[s]" that allegedly breached the duty of prudence.  Proposed Am. Compl. at 47.  In particular, plaintiffs allege that defendants' selection of the Traditional Annuity investment option, "which restricted participant withdrawals from that investment except in 10 annual installments," was imprudent.  Proposed Am. Compl. ¶ 146.  Count III is about the "failure to

report compensation received by plan recordkeepers" in violation of the duty of candor contained in ERISA § 404(a).  Proposed Am. Compl. at 48; *see* Proposed Am. Compl. ¶¶ 151–53.  Plaintiffs allege that "[d]efendants were obligated to report on [the] Form 5500 [Annual Return/Report of Employee Benefit Plan, *see* 29 C.F.R. § 2520.103-1(b)(1),] all direct and indirect compensation received by the Plans' recordkeepers . . . but failed to do so."  Proposed Am. Compl. ¶ 151.

In the memorandum supporting their motion to amend the complaint, plaintiffs explain that the new allegations in the proposed amended complaint "cure the deficiencies asserted in the Opinion" dismissing the original complaint.  Pls.' Mot. at 5.[7]  "Importantly," they proffer, the proposed amended complaint "narrows the scope of [p]laintiffs' claims and focuses primarily on excessive service and administrative charges by TIAA, although allegations regarding fees paid to Vanguard and Fidelity in addition to TIAA's excessive fees are relevant indicators of a flawed fiduciary process."  *Id.*  The proposed changes to the "narrowed" 50-page, 153-paragraph pleading include:

- ▪ *Allegations concerning TIAA's excessive costs*:

  > Plaintiffs have eliminated their claims that Georgetown breached its duty of prudence in its management of two of the TIAA investment options: the CREF Stock Account and the TIAA Real Estate Account.

  > *Compare* Compl. ¶¶ 72–85 (alleging that if defendants had removed CREF Stock Account, participants would not have lost retirement savings), *with* Proposed Am. Compl. (removing detailed allegations about CREF Stock Account); *see also* Defs.' Opp. at 11 ("Plaintiffs drop several claims, including their challenges to the CREF Stock Account and the TIAA Real Estate Account.").

---

7       As defendants point out, plaintiffs' paragraph citations to the proposed amended complaint are largely incorrect; many of their citations point to the paragraphs in the prior version of the complaint that was the subject of the unsuccessful motion for leave to amend.  *See* Defs.' Opp. at 11; Pls.' Mot. at 14 (incorrectly citing to paragraph 5 for new allegation that TIAA is a "party in interest" with respect to ERISA's prohibited transaction rules); *compare* Proposed First Am. Compl., Ex. A to Pls.' Mot. Seeking Leave to File Pls.' First Am. Compl. [Dkt. # 37-2] ¶ 5 (containing "party in interest" allegation), *with* Proposed Am. Compl. ¶ 6 (same).

Plaintiffs assert in their motion that they have dropped their challenge to the TIAA Traditional Annuity's 2.5% surrender charge. Pls.' Mot. at 3. But the proposed amended complaint retains the allegations about the 2.5% surrender charge as "additional evidence of [d]efendant[s'] flawed process and lack of prudence and diligence in protecting the interests of participants." Proposed Am. Compl. ¶ 126; *see* Proposed Am. Compl. ¶¶ 60, 121.

Plaintiffs continue to allege that it was imprudent to prohibit participants from re-directing their investment in the Traditional Annuity into other investment choices during employment, except in ten annual installments. *See* Proposed Am. Compl. ¶¶ 60, 117, 146.

Plaintiffs have also added new allegations concerning asset-based fees, claiming that defendants should have been able to negotiate a much lower fee. Proposed Am. Compl. ¶ 12; *see* Proposed Am. Compl. ¶ 140.

Plaintiffs' proposed amended complaint also adds allegations concerning the number of investment choices. *See* Proposed Am. Compl. ¶¶ 73–78.

Plaintiffs now allege that TIAA is a "party in interest" because of its role "[a]s a service provider to the Plans," and so, "the agreement between the Plans and TIAA must satisfy the conditions set forth in ERISA § 408(b)(2) and its associated regulation, 29 C.F.R. § 2550.408b-2(c)." Proposed Am. Compl. ¶¶ 5–7. Plaintiffs allege that "[d]efendants failed to obtain the necessary disclosures from TIAA required by 408b-2." Proposed Am. Compl. ¶ 23.

- *Allegations that numerous university retirement plans have consolidated recordkeeping with a single provider*:

     To support their claim that defendants "failed to control the overall expense of administering the Plans" "by retaining three separate recordkeepers for the Plans," Proposed Am. Compl. ¶ 10, plaintiffs now specifically allege that other universities have captured savings by consolidating recordkeeping services. Proposed Am. Compl. ¶¶ 85–101 (Loyola Marymount University, Pepperdine University, Purdue University, California Institute of Technology, and University of Notre Dame); *see* Pls.' Mot. at 8–10; *see also* Pls.' Reply at 6 ("The five other plans . . . demonstrate that Georgetown, by retaining multiple recordkeepers, maintained a costly and ineffective recordkeeping structure . . . . By identifying several similarly situated university 403(b) plans that reduced fees through consolidation and competitive bidding, [p]laintiffs state a plausible claim that [d]efendants breached their duty.").

- *Allegations describing Plan investments*:

    Plaintiffs now allege that the "eight so-called Variable Annuities issued by CREF are not really annuities at all,"[8] and "[t]here is nothing special or unique about the CREF variable annuity products that makes them more difficult or more complicated to recordkeep than collective investment trusts and mutual funds that are routinely offered in 401(k) and 403(b) plans." Proposed Am. Compl. ¶¶ 53–54; *see also* Proposed Am. Compl. ¶¶ 25–26.

- *Allegations amending the definition of the proposed class*:

    Plaintiffs' new complaint alleges that "[t]he Class includes over 12,000 members," as opposed to over "24,000." *Compare* Proposed Am. Compl. ¶ 133, *with* Compl. ¶ 116.

- *Allegations against the Finance Subcommittee of the President's Executive Committee*:

    Plaintiffs have added another defendant to the action, the Finance Subcommittee of the President's Executive Committee, which they claim was, as of February 1, 2018, "delegated all discretionary authority and powers to control and manage the assets of the Plans," and "is a fiduciary to the Plans by virtue of such delegation." Proposed Am. Compl. ¶ 3.

- *Allegations concerning a breach of the duty of candor*:

    Plaintiffs have also added a third count, alleging a breach of "the duty of candor" for failure to report the compensation received by the recordkeepers. Proposed Am. Compl. ¶¶ 151–53.

The proposed amended complaint continues to allege that Georgetown breached the duty of prudence. Proposed Am. Compl. ¶¶ 136–50. Plaintiffs' core claims – that Georgetown allowed participants to be charged excessive recordkeeping and administrative fees – remain. *See* Proposed Am. Compl. ¶¶ 10–21, 24–28, 30–32, 62–72. Plaintiffs continue to characterize the availability of "[f]ar too many investment choices" as evidence of "multiple flaws in [d]efendants' fiduciary

---

8       Both the original and proposed amended complaint refer to the "Variable Annuities" as investments in "eight CREF variable annuities-- the CREF Stock Account, the CREF Equity Index Account, the CREF Inflation-Linked Bond Account, the CREF Bond Market Account, the CREF Social Choice Account, the CREF Growth Account, the CREF Global Equities Account, [and] the CREF Money Market Account." Proposed Am. Compl. ¶ 11; Compl. ¶ 31.

decision-making process."  Proposed Am. Compl. at 24; *see* Proposed Am. Compl. ¶¶ 73–78. They also contend that the "remaining allegations regarding compensation received by Vanguard and Fidelity are relevant and material to [p]laintiffs' claims that [d]efendants failed to adequately evaluate the amount participants paid for recordkeeping and administrative services."  Pls.' Mot. at 2.

## LEGAL STANDARD

In general, a trial court "should freely give leave [to amend a complaint] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This Rule reflects "the principle that the purpose of pleading is to facilitate a proper decision on the merits."  *Foman v. Davis*, 371 U.S. 178, 182 (1962), citing *Conley v. Gibson*, 355 U.S. 41, 48 (1957) (internal quotation marks omitted).  A court may deny the motion only if amendment would cause undue delay or prejudice to the opposing party or if the proposed amendment would be futile.  *Id.* at 182; *see Atchinson v. District of Columbia*, 73 F.3d 418, 425–26 (D.C. Cir. 1996).

The delay and prejudice factors are closely linked; an amendment may be denied on the grounds of undue delay only if the delay causes undue prejudice to the party opposing the motion.  *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 330–31 (1971) ("[I]n deciding whether to permit such an amendment [under Rule 15(a)], the trial court was required to take into account any prejudice that [plaintiff] would have suffered as a result."); *Atchinson*, 73 F.3d at 426 ("Consideration of whether delay is undue, however, should generally take into account the actions of other parties and the possibility of any resulting prejudice."); *Mercantile Tr. Co. Nat'l Ass'n v. Inland Marine Prods. Corp.*, 542 F.2d 1010, 1012 (8th Cir. 1976) ("Mere delay is not a reason in and of itself to deny leave to amend.").  Determinations of undue delay are not "based solely on [the] time elapsed between the filing of the complaint and the request for leave to amend," *PCH*

13

*Mut. Ins. Co. v. Cas. & Sur., Inc.*, 271 F.R.D. 4, 7 (D.D.C. 2010) (alteration in original), citing

*Adair v. Johnson*, 216 F.R.D. 183, 186 (D.D.C. 2003), or on the prolonged nature of a case.   *See*

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1084 (D.C. Cir. 1998); *see*

*also Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 39 (D.C. Cir. 2014) ("[T]he grant

of leave to amend a complaint might often occasion some degree of delay and additional

expense.").   To demonstrate the necessary additional element of undue prejudice, "[the opposing

party] must show that it was unfairly disadvantaged or deprived of the opportunity to present facts

or evidence which it would have offered had the amendments been timely."   *Dooley v. United*

*Techs. Corp.*, 152 F.R.D. 419, 425 (D.D.C. 1993) (alteration in original), quoting *Foremost–*

*McKesson Inc. v. Islamic Rep. of Iran*, 759 F. Supp. 855, 858 (D.D.C. 1991); *see also Societe Liz,*

*S.A. v. Charles of the Ritz Grp., Ltd.*, 118 F.R.D. 2, 4 (D.D.C. 1987) (finding undue prejudice when

motion to amend was filed just prior to close of discovery and trial was fast approaching); *Indep.*

*Petrochem. Corp. v. Aetna Cas. & Sur. Co.*, Civ. A., No. 83-3347, 1987 WL 9232, at *2 (D.D.C.

Mar. 25, 1987) (finding undue prejudice when proposed amendment would prolong discovery after

previously announced deadline).   Undue prejudice sufficient to deny leave to amend can also be

established when an amendment "bears only a tangential relationship to the complaint or changes

the character of the litigation."   *PCH*, 271 F.R.D. at 7, quoting *Adair*, 216 F.R.D. at 186.

A plaintiff's motion for leave to amend a complaint should be denied as "futile" if the

proposed amendments would not survive a Rule 12(b)(6) motion to dismiss.   *Aguiar v. Drug Enf't*

*Admin.*, 992 F.3d 1108, 1113–14 (D.C. Cir. 2021), citing *Hettinga v. United States*,

677 F.3d 471, 480 (D.C. Cir. 2012).   In turn, "[t]o survive a [Rule 12(b)(6)] motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "[f]irst, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."   *Id.* at 678–79, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Iqbal*, 556 U.S. at 678, citing *Twombly*, 550 U.S. at 556.   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556.   A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.*

In evaluating a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in the plaintiff's favor, and the Court should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged."   *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).   Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions.   *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## ANALYSIS

### I.      Undue Delay

Defendants argue that leave to amend the complaint should be denied on the grounds of undue delay because all of the theories raised by plaintiffs in the amended complaint were available when they brought suit.  Defs.' Opp. at 32.  Defendants submit that plaintiffs have not "discovered new facts, so their request to introduce new allegations is unduly delayed."  *Id.* at 33.  They also contend that plaintiffs could have added the Subcommittee as a defendant in the original complaint. *Id.*

Plaintiffs point out that they filed their motion for leave to amend the complaint within the time limit set by the court – and stipulated to by the parties – after the case was reinstated, and so it is timely.  Pls.' Mot. at 13; *see* Reinstatement Order at 1 ("Plaintiffs shall file their Motion for Leave to File Amended Complaint within forty-five (45) days of the date of this Order[.]"); *Wilcox*, 987 F.3d at 145 (remanding case to the district court for "renewed consideration" of the motion to amend the complaint).

Defendants have not shown either that they have been "unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely," *Dooley*, 152 F.R.D. at 425, or that plaintiffs' amendment "bears only a tangential relationship to the complaint or changes the character of the litigation."  *PCH*, 271 F.R.D. at 7, quoting *Adair*, 216 F.R.D. at 186.  Rather, they have characterized the changes as attempts by plaintiffs to "double-down on legal theories already rejected by the [c]ourt."  Defs.' Opp. at 3. Because the amended complaint has not changed the character of the litigation, defendants have not shown that the amendments would cause undue prejudice.  Also, since the D.C. Circuit remanded this case for renewed consideration of this specific motion, the Court will not deny

plaintiffs' motion on the basis of undue delay.  Defendants' contention that plaintiffs are simply repeating legal theories that were already rejected in an opinion that governs this case may bear on the futility of the amendments, but it is not relevant to the issue of delay.

## II.      Futility

Like the original complaint, the proposed amended complaint could have been more clearly organized.  Plaintiffs have only generally identified the factual allegations that are meant to support each count.  *See* Proposed Am. Compl. ¶¶ 138–39 (Count I encompasses claims that annuities caused high administrative fees, and asset-based fees were unreasonable); Proposed Am. Compl. ¶ 146 (Count II encompasses claim that selection of TIAA Traditional Annuity investment option, which restricted withdrawals except in ten annual installments, was imprudent); Proposed Am. Compl. ¶¶ 151–53 (Count III encompasses claim that defendants failed to report indirect compensation received by either TIAA or Vanguard).  But they also allege that there are facts in the proposed amended complaint that are "applicable to all counts."  Proposed Am. Compl. at 15; *see, e.g.*, Proposed Am. Compl. ¶¶ 85–101 (for example, the allegations about other university plans).  Therefore, the Court will organize the opinion by investment option as the court previously assigned to the matter did in its Opinion, and it will address the jurisdictional and 12(b)(6) objections raised concerning each in turn.

In arguing that the proposed amendments to the complaint would be futile, defendants contend that:

> (1) plaintiffs' Vanguard allegations cannot be revived because the court dismissed them for lack of standing, Defs.' Opp. at 13–14;
>
> (2) plaintiffs' TIAA Traditional Annuity timed withdrawal claims cannot be considered because they were also dismissed on standing grounds, *id.* at 14–18;
>
> (3) plaintiffs cannot save their recordkeeping fees claims by

a. including examples of other universities' 403(b) plans, *id.* at 19–21,

b. arguing for the second time that the fees were unreasonable because "Georgetown employed an asset-based structure rather than a fixed, per-participant fee," *id.* at 21, 22–23, and offered too many investment options to participants, *id.* at 23,

c. alleging that defendants did not obtain the necessary disclosures from TIAA as required by Rule 408b-2, *id.* at 24–27;

(4) plaintiffs' new allegation that Georgetown breached its fiduciary duty of prudence by failing to understand that the eight variable annuities they offered as the investment options in the Plans were not actually annuities, *see* Proposed Am. Compl. ¶ 54, is premised on an incorrect assumption, and plaintiffs have not alleged that a reasonable fiduciary would have treated the TIAA variable annuities any differently, Defs.' Opp. at 27–29;

(5) plaintiffs cannot add a new count for breach of the duty of candor because there is no such duty under ERISA; if there were such a duty, it would not apply to Form 5500s submitted to the Labor Department; and submitting Form 5500s is not a fiduciary function. They add that the count is "akin to a misrepresentation claim," and that it fails for lack of the necessary specificity. *Id.* at 29–31.

The Court agrees that it would be futile to file the currently proposed version of the complaint, since the three counts would not withstand a motion to dismiss.

A. *Vanguard Claims*

Defendants maintain that because the court "already dismissed [p]laintiffs' challenge to the Vanguard funds for lack of standing," and "[t]o the extent [p]laintiffs are attempting to revive their Vanguard claims, the [c]ourt should again dismiss those claims." Defs.' Opp. at 14.

Plaintiffs maintain that the allegations in the proposed amended complaint "support an inference that [d]efendants failed to engage in a prudent process to monitor and control recordkeeping expenses and other administrative fees." Pls.' Reply at 6. They insist that they do not "seek to revive claims that the [c]ourt dismissed on Article III standing grounds." Pls.' Mot. at 2.

But this appears to be exactly what plaintiffs are trying to do.  The court already dismissed plaintiffs' claims based on the Vanguard funds on standing grounds, finding that "[p]laintiffs clearly [could not] allege an individual violation of ERISA as to the Vanguard funds, which is an investment option neither [p]laintiff selected."  Dismissal Op. at 19; *see id.* at 22 ("[D]ismissal will be granted on the [c]omplaint allegations concerning the Vanguard funds . . . .").  None of the new allegations, moreover, attempt to cure the standing problems previously identified.  *Compare* Proposed Am. Compl. ¶¶ 18, 108, 112–16, *with* Compl. ¶¶ 61, 64–68.

Because plaintiffs lack standing to challenge any imprudence relating to the Vanguard funds, including these claims in an amended complaint would be futile.  The proposed claims fail under Rule 12(b)(1) for lack of subject matter jurisdiction.[9]

B.  *TIAA Traditional Annuity Claims*

In the proposed amended complaint, plaintiffs allege again that the TIAA Traditional Annuity, which restricts participant withdrawals except in ten annual installments, was an imprudent choice of an investment.  Proposed Am. Compl. ¶ 117 (it was imprudent to "prohibit[] participants from re-directing their investment in that Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the

---

[9]      Plaintiffs contend that the allegations should be allowed to proceed because "once a plaintiff has established an Article III injury due to alleged mismanagement of the plan, he may [] 'seek relief under [ERISA] that sweeps beyond his own injury' because such claims are 'brought in a representative capacity on behalf of the plan as a whole.'"  Pls.' Reply at 4, citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009) (brackets in original).  This sidesteps the problem identified in the Opinion dismissing the original complaint: the lack of the predicate injury of their own.

While the Eighth Circuit in *Braden v. Wal-Mart Stores* opined that a plaintiff may seek relief under 29 U.S.C. § 1132(a)(2) that "sweeps beyond his own injury," 588 F.3d at 593, the court's prior Opinion already found that "for either [p]laintiff to have standing to sue about their *defined contribution Plan*, he must show fiduciary breaches that impair his individual account's value."  Dismissal Op. at 18 (emphasis added).  It explained:

> In certain circumstances, one or more [p]articipants may sue on behalf of the plan itself . . . .  In a defined contribution plan, however, an employer contributes a defined amount to an individual employee's individual account, and "fiduciary misconduct need not threaten the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive  .   .   .   .   [A]lthough [ERISA] § 502(a)(2) [29 U.S.C. § 1132(a)(2)] does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account."

Dismissal Op., quoting *LaRue*, 552 U.S. at 255–56.

ability to invest in equity funds and other investments as market conditions or participants'
investment objectives change."); *see also* Proposed Am. Compl. ¶ 146; Compl. ¶ 99.[10]

Plaintiffs acknowledge that the court previously determined that plaintiff McGuire lacked
standing to bring claims concerning this requirement because he never invested in the TIAA
Traditional Annuity, and therefore, he also lacked standing to represent other Plan participants
who did.  Pls.' Mot. at 3, citing Dismissal Op. at 22 ("[D]ismissal will . . . be granted as to Mr.
McGuire's claims concerning the requirement of the TIAA Traditional Annuity requirement that
funds be re-allocated over a ten-year period . . . .").  Given that language, they maintain that the
court's dismissal did not reach plaintiff Wilcox, and the claim survives as to him.  *See* Pls.' Mot.
at 3 ("The [c]ourt failed, however, to address Mr. Wilcox's claim regarding the 10-year restrictions
on withdrawals from the Traditional Annuity.").

Defendants point out that even though the court did not mention Wilcox by name in that
sentence, it found that he lacked standing to complain about the withdrawal restrictions applicable
to the TIAA Traditional Annuity for a different reason, and it dismissed the original complaint, in
its entirety, as to both plaintiffs.  Defs.' Opp. at 14–18; Dismissal Order.

While McGuire's problem was that he had not invested in the vehicle at all, the court
explained that it was dismissing Wilcox's claims concerning the 2.5% early-withdrawal charge
from the TIAA Traditional Annuity because Wilcox had not "attempted to withdraw funds or
change his investments."  Dismissal Op. at 18; *see id.* at 19 ("Wilcox concedes this point by not
contesting it.").  But that was not the only observation in the Dismissal Opinion.  The court also
noted that "[n]either [plaintiff] alleges that he has left or plans to leave Georgetown or that he

---

10      This is different from plaintiffs' claims about the "2.5% surrender charge," which is only
payable when a participant chooses to withdraw funds and receive a lump-sum payout.  Proposed
Am. Compl. ¶ 117; Compl. ¶ 99.

wishes to re-direct his investments."  Dismissal Op. at 8; *see also* Pls.' Mot. at 3, citing Dismissal

Op. at 17 ("The [c]ourt dismissed on Article III standing grounds [p]laintiffs' claims concerning .

. . time constraints on exiting the TIAA Traditional Annuity.").

The absence of factual allegations concerning an effort or intention on Wilcox's part to

make a withdrawal or to re-invest the funds in the TIAA Annuity supported the dismissal of both

aspects of the TIAA Traditional Annuity claim in the original complaint, and the fact that none

have been added in the proposed amended complaint means that there is no basis for a plausible

inference that Wilcox has been harmed in some way by the requirement that any withdrawal must

be implemented in ten separate installments.  Therefore, the claim still fails for lack of standing

and the amendment would be futile under Rule 12(b)(6).[11]

C.  *Recordkeeping Fees Claims*

a.  Other University Plans

Like the original complaint, the proposed amended complaint alleges that defendants

breached their fiduciary duty of prudence by failing to consolidate the Plans' recordkeeping

services with one provider, which they say would lower the Plans' recordkeeping fees.  Proposed

Am. Compl. ¶¶ 79–84; Compl. ¶¶ 43–47.  But in response to the Opinion dismissing the original

claims on that issue, plaintiffs have included examples of other "private university 403(b) plans

that include as investment options both annuities and mutual funds," which allegedly "have been

able to save millions of dollars by consolidating recordkeeping with a single service provider."

---

[11]    Because the Court finds that Wilcox's claims concerning the timed withdrawals were dismissed for lack of standing, it will not address defendants' other arguments as to why the claim should fail.  *See* Defs.' Opp. at 16–18 (arguing that Wilcox failed to file a timely breach of fiduciary duty claim, *id.* at 16; that the court already rejected plaintiffs' argument that the re-directing restrictions denied participants the ability to invest in equity funds and other investments, *id.* at 16–17; and that the requirements of 29 C.F.R. § 2550.408b-2(c)(3) do not apply to the restrictions on re-directing investments, *id.* at 17–18).

Pls.' Mot. at 14, citing Proposed Am. Compl. ¶¶ 17, 54, 86–101.  Plaintiffs argue that these examples add heft to their allegations that "a reasonable recordkeeping fee for the Voluntary Plan would have been a fixed amount between $500,000 and $650,000 and for the DC Plan an amount between $350,000 and $500,000 (approximately $35 per participant with an account balance)." Proposed Am. Compl. ¶ 67; Pls.' Mot. at 13 ("The [c]ourt found [p]laintiffs' allegations of excessive recordkeeping expenses by having three recordkeepers deficient because [p]laintiffs did not provide sufficient support for their contention that a single recordkeeper could have provided the same service across the three platforms for a fixed fee in the range of $35 per year for each participant. . . .  In particular, the [c]ourt noted that the [c]omplaint did not contain any allegations identifying university retirement plans that use a single recordkeeper for investment choices offered by multiple fund managers. . . .   The FAC amply cures these deficiencies.") (internal citations omitted).

Plaintiffs point to the following examples:

- **Loyola Marymount University ("LMU")**: Plaintiffs allege that "the fiduciaries of the [LMU] 403(b) defined contribution plan recognized that '[r]ecordkeeping must be consolidated and/or managed by a single party,' and that '[k]eeping two on-going recordkeepers . . . would mean that faculty/staff would pay higher fees and receive reduced services.'"  Proposed Am. Compl. ¶ 86 (quoting LMU's 403(b) Retirement Plan Review Project Overview).

    Plaintiffs also allege that "LMU selected Diversified as the new recordkeeper in part because Diversified did not require bundling investment products and did not require that particular investment funds be included among the menu options made available to plan participants. LMU was therefore able to offer 'best in class' funds in each fund category."  Proposed Am. Compl. ¶ 88.

    Plaintiffs included "additional reasons for why it did not select TIAA (and instead selected Diversified)," and allege that "LMU also recognized that the TIAA Traditional Annuity has a favorable historical return rate, but . . . come[s] at the expense of a severe lock-up period."  Proposed Am. Compl. ¶¶ 88–90.

- **Pepperdine University**: Plaintiffs allege that the fiduciaries of Pepperdine University's defined contribution plan "consolidat[ed] from four recordkeepers (Fidelity, TIAA, Vanguard, and Prudential) to a single recordkeeper" called Diversified, and "found that the benefits of consolidation include lower costs and more robust services." Proposed Am. Compl. ¶¶ 91–92; *see* Proposed Am. Compl. ¶¶ 93–94.

  > Further, "Pepperdine also recognized that the bundled model . . . demanded by certain providers is not in participants' interest." Proposed Am. Compl. ¶ 93.

- **Purdue University**:[12] Plaintiffs allege that the fiduciaries of Purdue University's defined contribution plan "decided to transition from five providers (TIAA, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity), which caused recordkeeping expenses to decline significantly." Proposed Am. Compl. ¶ 95.

  > They also claim that "Purdue reduced the number of investment options from 381 to 19." Proposed Am. Compl. ¶ 95.

- **California Institute of Technology ("Caltech")**: Plaintiffs allege that the Caltech "TIAA-CREF [Defined Contribution] Retirement Plan consolidated from multiple recordkeepers (TIAA and Fidelity) to a single recordkeeper (TIAA)." Proposed Am. Compl. ¶ 96.

  > Caltech also "eliminated over 100 Fidelity mutual fund options," and "negotiated over $15 million in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants." Proposed Am. Compl. ¶ 97.

- **University of Notre Dame**: Plaintiffs allege that "[i]n connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a '403(b) Plan Redesign Working Paper,' which set forth 403(b) best practices . . . [which noted that]

---

12      Purdue University may not be a useful comparator for ERISA purposes as it is not a private university.  Purdue University, Admission FAQ, https://polytechnic.purdue.edu/degrees/phd-technology/admissions/admission-faq ("Purdue University is a land-grant, public university established in 1867.").    ERISA does not apply to public university employees.  *See* 29 U.S.C. § 1003(b)(1) (ERISA provisions "shall not apply to any employee benefit plan if . . . such plan is a governmental plan"); 29 U.S.C. § 1002(32) (defining "governmental plan" as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing"); *Dickerson v. District of Columbia*, 70 F. Supp. 3d 311, 327 (D.D.C. 2014) ("ERISA unequivocally exempts governmental benefit plans—like those of District of Columbia employees [from the D.C. Public Schools]—from the scope of its coverage.").

recordkeeper consolidation provided 'many benefits to participants,' including cost savings."  Proposed Am. Compl. ¶¶ 98–99.

> The consultant also "recommended that plans unbundle investment management and administrative services, and replace revenue sharing arrangements with explicit, hard dollar administrative fees."  Proposed Am. Compl. ¶ 100 (internal quotation marks and alterations omitted).

Plaintiffs contend that these examples "demonstrate that Georgetown, by retaining multiple recordkeepers, maintained a costly and ineffective recordkeeping structure."  Pls.' Reply at 6; *see also* Proposed Am. Compl. ¶ 101 ("Unfortunately, [d]efendants have not implemented the types of changes described . . . with respect to other university retirement plans.").

Defendants respond that these examples "actually reinforce the fatal flaw in [plaintiffs'] legal challenge: although there may be different ways to structure a retirement plan, that does not mean that one structure reflects sound fiduciary practice while another represents fiduciary misconduct."  Defs.' Opp. at 19.[13]  Defendants tell the Court that the other universities "operate entirely different, pared-down plans compared to Georgetown's and . . . *do not come close* to realizing the cost savings that [p]laintiffs claim Georgetown was required to obtain."  *Id.* (emphasis in original); *see also* Defs.' Notice of Suppl. Authority Regarding Pls.' Mot. at 2,  quoting *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022).

The court previously dismissed plaintiffs' allegations concerning the Plans' excessive recordkeeping fees, noting that plaintiffs failed "to identify a single one of the any number of university plans that provide for a single recordkeeper with investment choices offered by multiple

---

[13]    Defendants include further details about the other universities' plans, and in particular how they have lost the ability to offer TIAA annuities.  *See* Defs.' Opp. at 19–20.  Plaintiffs urge the Court to disregard this information, since it comes from outside of the proposed amended complaint.  Pls.' Reply at 8.  The Court agrees that when determining whether the proposed amended complaint is futile, it may only evaluate whether the complaint, standing alone, could survive a motion to dismiss.  *See Aguiar*, 992 F.3d at 1113–14.

fund managers, much less one that offers the TIAA Traditional Annuity and other investment platforms through a single recordkeeper."  Dismissal Op. at 25 (alterations and citation omitted). In addition, the court observed that plaintiffs "provided[d] no factual support at all for their assertion that the Plans should pay only $35/year per participant in recordkeeping fees," and also failed to include any examples of "any non-TIAA entity performing recordkeeping for TIAA annuities . . . ."  *Id.* at 25–26.

Plaintiffs' new allegations do not cure these problems.  Although they have supplied examples of defined contribution plans that consolidated the recordkeeping function for all funds with a single provider, they do not include facts comparing the scope and quality of the recordkeeping services being provided; the number and variety of funds or tools and options offered to plan members; the size of the plans, the number of participants in the plans, or the total amount of assets under management; or even the recordkeeping fees paid by the plans.  *See* Proposed Am. Compl. ¶¶ 85–101.  Also, the new paragraphs do not answer the question of whether the single recordkeeper in these plans can perform the recordkeeping function for the TIAA annuities that Georgetown has traditionally offered.  Nor do they supply the detail needed to support using $35 as a benchmark.  *See generally* Proposed Am. Compl. ¶¶ 85–101.  Thus, while plaintiffs have taken one key step recommended in the Opinion dismissing the original complaint, they are still making conclusory assertions.  The fact that plaintiffs have identified universities that operate in a different fashion does not in and of itself support an inference that the decision to consolidate recordkeeping services would be equally beneficial or feasible for Georgetown, much less that Georgetown's approach constitutes *mis*management as opposed to different management. *See CommonSpirit*, 37 F.4th at 1169 (finding that plaintiff's comparison of CommonSpirit's recordkeeping fees to "some of the smallest plans on the market, which might offer fewer services

and tools to plan participants" was insufficient to support a plausible breach of prudence claim); *Albert v. Oshkosh Co.*, 47 F.4th 570, 579 (7th Cir. 2022) (determining that allegations that comparator plans paid an average recordkeeping fee of $32 to $35 per plan participant, whereas employer's plan paid an average fee of $87 per participant, were insufficient to state a breach of prudence claim because the complaint was devoid of allegations as to the quality or type of recordkeeping services the comparator plans provided); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) ("[T]he key to stating a plausible excessive-fees claim is to make a like-for-like comparison.").

It is true that some courts in other districts have let this issue move forward, finding that it would be more appropriately raised at the summary judgment stage. *See e.g.*, Op. and Order at 21, *Sacerdote v. New York Univ.*, No. 16-cv-6284 (KBF) [Dkt. # 79] (S.D.N.Y. Aug. 25, 2017) ("[B]ased on the facts here alleged . . . , the allegation that a prudent fiduciary would have chosen

fewer recordkeepers and thus reduced costs for Plan participants—the 'recordkeeping consolidation' allegation—is sufficient at this stage.").[14]

The question is a close one now that plaintiffs have attempted to respond directly to the suggestion contained in the Dismissal Opinion, and given the fact that defendants' objections to the new paragraphs are largely factual. And other district courts have let substantially similar allegations proceed notwithstanding the fact that one of the comparator "403(b) fiduciaries," Purdue, is not covered by ERISA at all. But the Court finds the appellate rulings summarized above and the district court's ruling in *Peck v. Munson Healthcare*, 2022 WL 17260807, (W.D. Mich. Nov. 9, 2022) to be more instructive. In *Peck*, the district court found that the plaintiff had compared sufficiently similar plans for the purpose of stating a claim under ERISA, by alleging that the comparators' plans were "of similar sizes with similar amounts of money under management, receiving a similar level of quality and services," and also by supporting that characterization with a chart comparing the similar plans' number of participants, assets, and recordkeeping fees. *See Peck*, 2022 WL 17260807, at *6; *but see Albert v. Oshkosh Corp.*, No. 20-C-901, 2021 WL 3932029, at *5 (E.D. Wis. Sept. 2, 2021), *aff'd*, 47 F.4th 570 (7th Cir. 2022), *reh'g denied*, No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022) ("The mere existence of purportedly lower fees paid by other plans says nothing about the reasonableness of the Plan's fee, and it does not make it plausible that another recordkeeper would have offered to provide the Plan with services at a lower cost.").

Because plaintiffs have not included the facts needed to support an inference that the plans added as examples are sufficiently similar to give rise to an inference of imprudence on Georgetown's part, it would be futile to allow plaintiffs to amend the complaint to include this information. The Court will therefore deny the motion for leave to amend as to the excessive

14      Plaintiffs also direct the Court to other district court rulings that permitted similar allegations about university 403(b) plans that consolidated recordkeeping services to move forward.  *See* Pls.' Reply at 6–7.  Although they posit that the "majority of federal courts" that have considered these claims have "found that these types of allegations state a claim," they cite only two examples where courts considered claims about other university plans: *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1353 (N.D. Ga. 2017), and *Kelly v. Johns Hopkins Univ.*, 2017 WL 4310229, at *2 (D. Md. Sept. 28, 2017).  *See* Pls.' Reply at 7.

        In *Henderson*, plaintiffs alleged that "[p]rudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees."  Am. Compl. ¶ 149, *Henderson v. Emory Univ.*, Civil Action No. 16-2920 [Dkt. # 30] (N.D. Ga. Nov. 21, 2016) ("*Henderson* Am. Compl.").  They identified the same set of other "403(b) plan fiduciaries:" Loyola Marymount, Pepperdine, Purdue, Caltech, and Notre Dame.  *Henderson* Am. Compl. ¶¶ 100–10.  Defendants moved to dismiss these claims, but the court found that "plaintiffs' allegation that a prudent fiduciary would have chosen one recordkeeper instead of three is sufficient to state a claim for relief," because plaintiffs had alleged, in part, that "similarly-sized plans have a single recordkeeper instead of multiple recordkeepers, which helps keep costs lower."  *Henderson*, 252 F. Supp. 3d at 1353.

        In *Kelly*, plaintiffs included the same allegation, verbatim, as the one in the *Henderson* complaint that "[p]rudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees."  Compl. ¶ 41, *Kelly v. Johns Hopkins Univ.*, Civil Action No. 16-2835 [Dkt. # 1] (D. Md. Aug. 11, 2016) ("*Kelly* Compl.").  They later amended the complaint and removed this language, but added examples of 403(b) fiduciaries that had consolidated recordkeeping: those at Loyola Marymount, Pepperdine, Purdue, Caltech, and Notre Dame.  Am. Compl. ¶¶ 83–91, *Kelly v. Johns Hopkins Univ.*, Civil Action No. 16-2835 [Dkt. # 27] (D. Md. Dec. 2, 2016) ("*Kelly* Am. Compl.").  The court denied defendants' motion to dismiss these claims, saying it was "persuaded . . . that allegations that a prudent fiduciary would have chosen fewer recordkeepers and run a competitive bidding process for the recordkeeping services supports a breach of fiduciary duty claim."  *Kelly*, 2017 WL 4310229, at *2.

        The single recordkeeper allegations in the *Henderson*, *Kelly*, and *Wilcox* complaints are virtually identical.  *Compare* Compl. ¶ 40 ("Prudent fiduciaries of defined contribution plans the size of the Plans use a single recordkeeper rather than hiring multiple recordkeepers."), *with Henderson* Am. Compl. ¶ 149, *and Kelly* Compl. ¶ 41; *compare* Proposed Am. Compl. ¶¶ 86–100 (containing allegations about Loyola Marymount, Pepperdine, Purdue, Caltech, and Notre Dame), *with Henderson* Am. Compl. ¶¶ 100–10 (same), *and Kelly* Am. Compl. ¶¶ 83–91 (same).  The language in these complaints indicates that a set of plaintiffs' lawyers across the country are pursuing similar claims based on a single template that utilizes the same five schools as comparators with almost the same level of supporting detail.  *See* Dismissal Op. at 1 ("This type of lawsuit seems to have taken higher education by storm, with suits brought all over the country.").

recordkeeping fees claims that are premised on comparisons to other university plans, but without prejudice to a renewed motion proposing an amended complaint that includes the necessary details.

      b.   Asset-Based Fees

Plaintiffs' proposed amended complaint alleges that "[d]efendants approved fees for TIAA that greatly exceed a reasonable fee for comparable services." Proposed Am. Compl. ¶ 12. They point to defendants' approval of "the payment of an asset-based fee for recordkeeping and administrative services, [which caused TIAA's] fees [to grow] to more than $2.1 million in 2014, when TIAA agreed to refund to the DC Plan $644,521." Proposed Am. Compl. ¶ 13; *see* Pls.' Mot. at 14–15. Plaintiffs claim that in 2014, "the minimum annual compensation TIAA received for recordkeeping and administrative services was $1.44 million . . . or $196 per participant." Proposed Am. Compl. ¶ 13. But according to the proposed amended complaint, defendants should have been able to negotiate a much lower fee. Proposed Am. Compl. ¶ 12; *see* Proposed Am. Compl. ¶¶ 64, 66 (alleging that a fixed (not asset-based) fee for recordkeeping would have been more prudent choice); Proposed Am. Compl. ¶ 140 ("Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plans' investment options . . . were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services."). Plaintiffs point to data from NEPC, LLC, "an independent, nationally-recognized, full-service investment consulting firm," which found that there was "a significant reduction in median administrative fees in 2014 to $70 per participant and, in 2016, for individual account plans with $1 billion in assets, a reduction to $37 per participant." Proposed Am. Compl. ¶¶ 12–13. Further, they allege that "asset-based fees for administrative services . . . continued to increase as the value of [plaintiffs'] accounts increased through additional contributions and investment

returns even though no additional services were being provided to [p]laintiffs as their fees went up." Proposed Am. Compl. ¶ 31; *see* Proposed Am. Compl. ¶ 139; Compl. ¶ 7.

Defendants observe that plaintiffs' assertions as to how much TIAA received in compensation for recordkeeping and administrative services are inconsistent. Defs.' Opp. at 22, citing Proposed Am. Compl. ¶ 12 (alleging that TIAA received more than $1,720,000 in compensation – $267 per participant); Pls.' Mot. at 14 (saying that TIAA received more than $2,000,000 in compensation, roughly $250 per participant). More importantly, though, defendants submit that "[p]laintiffs' fee allegations rest upon a more serious flaw. Plaintiffs' core claim is 'that a reasonable recordkeeping fee' for the Defined Contribution Plan would have been 'approximately $35 per participant.' . . . But [p]laintiffs' allegations concerning the Plans' supposed fees relate to more than just recordkeeping expenses." Defs.' Opp. at 22. Plaintiffs' tendency to blur the distinction between recordkeeping expenses and overall management or administrative expenses does make the proposed amended complaint and the motion difficult to follow and assess, as the fees appear to be something of a moving target, and it exacerbates the lack of clarity caused by plaintiffs' failure to link its complaints about various aspects of Plan management to the counts they chose to bring.

In any event, defendants urge the Court to find these proposed allegations to be futile on more straightforward grounds: because plaintiffs "already put these same allegations . . . before the Court—and the Court dismissed them." Defs.' Opp. at 21. And a review of the original complaint confirms that plaintiffs did advance similar claims relating to the asset-based fees the first time around. *See* Compl. ¶ 37 ("[P]rudent ERISA fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets."); Compl. ¶ 39 ("[I]t is a best practice among retirement plan fiduciaries

31

to acquire the share class for a particular investment choice that charges the lowest expense ratio and pays no revenue sharing, and for the fiduciary then to negotiate a fixed (not asset-based) fee for recordkeeping."); Compl. ¶ 57 ("Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plans' platform providers became even more excessive as the Plans' assets grew . . . ."); Compl. ¶ 58 ("Defendants failed prudently to monitor and control the compensation paid by the Plans for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plans' platform providers."); Compl. ¶ 122 ("For years [d]efendant[s] failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plans to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided."); Compl. ¶ 123 ("Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plans' investment options . . . were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.").

The Court fails to see how the renewed allegations concerning asset-based recordkeeping fees differ significantly from those in the original complaint, which was dismissed in its entirety. Most of plaintiffs' allegations about the asset-based fees are simply repeated, often verbatim, in the proposed amended complaint. *Compare* Proposed Am. Compl. ¶ 31, *with* Compl. ¶ 7; *compare* Proposed Am. Compl. ¶ 64, *with* Compl. ¶ 37; *compare* Proposed Am. Compl. ¶ 66, *with* Compl. ¶ 39; *compare* Proposed Am. Compl. ¶ 140, *with* Compl. ¶ 123. The only new information is contained in paragraphs 12 and 13, which do not include allegations that the asset-based fees are excessive in relation to the specific services being provided. *See Riley v. Olin Corp.*, No. 4:21-

CV-01328-SRC, 2022 WL 2208953, at *4 (E.D. Mo. June 21, 2022) (noting that NPEC survey only provided information "at a high level of generality," so "the Court [could not] accept it as a meaningful benchmark"); *see also* Defs.' Notice of Suppl. Authority Regarding Pls.' Mot. at 2.

Therefore, plaintiffs will not be permitted to revive their claims relating to the asset-based recordkeeping fees.

c.   Investment Options Menu

Defendants argue that even with the new material added, plaintiffs' allegations about the number of investment options are still inadequate because they do not cure the defects identified in the court's prior Dismissal Opinion.  Defs.' Opp. at 23.  The court previously determined:

> Plaintiffs provide no evidence that they were confused or overwhelmed by the available investment options or that they were unable to make decisions regarding those options.  To the contrary, both were invested in multiple investment options and had access to advisors who provide valuable one-on-one retirement planning services.

Dismissal Op. at 11–12 n.8 (internal quotation marks omitted).  Plaintiffs have added information about the "Benefit Advisory Committee, a committee formed by Georgetown to seek broad input into the development and analysis of all benefit plans made available to Georgetown University employees," which allegedly acknowledged that the number of investment choices was excessive. Proposed Am. Compl. ¶ 76.  Further, plaintiffs included a conclusory allegation that it was "highly doubtful that the Georgetown University employees charged with performing Georgetown's fiduciary responsibilities, such as Mr. Augostini or the members of the Subcommittee, read the prospectuses for those four hundred funds, much less the hundreds of other prospectuses for competing funds of the ones selected . . . ."  Proposed Am. Compl. ¶ 77.

But, as defendants suggest, these allegations do not cure the problems the court already identified with the complaint.  Plaintiffs have not alleged any facts to suggest that they were

unreasonably burdened by the number of available investment options – which, without explanation, they now estimate as "nearly four hundred" choices as opposed to the "three hundred total investment choices" that were previously alleged.  Proposed Am. Compl. ¶ 74; Compl. ¶ 10.[15] Nor is there any allegation that either plaintiff found himself unable to decide which options to select.  There is no factual support for the inference that a broader array of options is not appropriate for a plan of this size and the diversity of its members, and plaintiffs' snarky speculation that the fund managers simply could not have read that many prospectuses is not enough to fill the gap.  For that reason, plaintiffs' amended claims about the number of investment options will not be permitted to proceed.

> d.   408b-2 Disclosures

Plaintiffs argue that defendants "failed to properly investigate the amount of compensation paid to TIAA."  Pls.' Mot. at 14.  They have included new allegations concerning "the necessary disclosures from TIAA required by Rule 408b-2," which, according to plaintiffs, "failed to include a significant amount of compensation received by TIAA in the form of 'distribution fees'[16] and additional 'administrative expenses' that TIAA charged on all of the variable annuities and the TIAA-CREF Real Estate Account included as investment options in the Plans."  Pls.' Mot. at 6;

---

[15]    Plaintiffs assert that the numbers have gone up while at the same time, they take credit for the fact that the number of choices has been reduced.  *See* Proposed Am. Compl. ¶ 78 ("Defendants finally acknowledged the problems created by their failure to select a reasonable number of investment choices only after the filing of [p]laintiffs' original complaint, dramatically reducing the number of Fidelity and Vanguard funds in 2018.").

[16]    The parties also refer to a "distribution fee" as a "12b-1 fee."  Proposed Am. Compl. ¶ 23(a) n.9; Defs.' Opp. at 24; *see also* U.S. Sec. & Exchange Comm'n, *Distribution [and/or Service] (12b-1)              Fees*,              https://www.investor.gov/introduction-investing/investing-basics/glossary/distribution-andor-service-12b-1-fees ("So-called '12b-1 fees' are fees paid out of mutual fund or ETF assets to cover the costs of ***distribution*** – marketing and selling mutual fund shares – and sometimes to cover the costs of providing ***shareholder services***.") (emphasis in original).

*see* Proposed Am. Compl. ¶ 23(a).  According to plaintiffs, because of TIAA's role as a "service provider to the Plans," it was a "party in interest" that was bound to comply with 29 C.F.R. § 2550.408b-2(c) ("Rule 408b-2"), which required the disclosure of all direct and indirect compensation[17] that TIAA received to the Plans.  *See* Proposed Am. Compl. ¶¶ 6–9, 23. Plaintiffs allege that defendants "failed to obtain the necessary disclosures required by 408b-2," Proposed Am. Compl. ¶ 23, and that the disclosures were misleading.  Proposed Am. Compl. ¶ 23(b) ("[D]isclosures provided by TIAA reported that TIAA's compensation from the Traditional Annuity . . . was only 15 basis points. . . .  The 15 basis points disclosed by TIAA is misleading.").

Defendants argue that plaintiffs' new allegations are fundamentally flawed because: (1) Georgetown disclosed the "the total expense ratio" paid to TIAA on its website, and "the various layers of fees" paid to TIAA in the prospectuses; (2) TIAA was not required to disclose the spread between the earnings on TIAA's general account and the interest credited to investors in the Traditional Annuity because "the Traditional Annuity is not an 'investment' under the regulations and the 'spread' is not an 'expense' that TIAA was required to disclose or that Georgetown was required to review;" (3) plaintiffs cannot show that "any errors in TIAA's disclosures constitute a breach of *Georgetown's* fiduciary duties;" and (4) plaintiffs did not allege that "Georgetown's alleged failure to obtain 408b-2 disclosures harmed them."  Defs.' Opp. at 25–27 (emphasis in original).

---

17     "Direct compensation" is defined as "compensation received directly from the covered plan."   29 C.F.R. § 2550.408b-2(c)(viii)(B)(1).   "Indirect compensation" is defined as "compensation received from any source other than the covered plan, the plan sponsor, the covered service provider, or an affiliate."  *Id.* § 2550.408b-2(c)(viii)(B)(2).

Section 406(a) of ERISA describes the permitted transactions that may occur between a "plan and party in interest."[18]  29 U.S.C. § 1106(a).  It provides:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

29 U.S.C. § 1106(a)(1).

But "[t]he prohibitions provided in section 1106 of this title shall not apply to . . . [c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more

---

18      Georgetown does not appear to dispute that TIAA was a party in interest.  *See generally* Defs.' Mot. at 24–27.  A "party in interest," as to an employee benefit plan, means:

> (A)   any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;
>
> (B)   a person providing services to such plan;
>
> (C)   an employer any of whose employees are covered by such plan;
>
> (D)   an employee organization any of whose members are covered by such plan;
>
> (E)   an owner, direct or indirect, of 50 percent or more of—
>
>    (i)    the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation.
>    (ii)   the capital interest or the profits interest of a partnership, or
>    (iii)  the beneficial interest of a trust or unincorporated enterprise,
>
> which is an employer or an employee organization described in subparagraph (C) or (D)[.]

29 U.S.C. § 1002(14).

than reasonable compensation is paid therefor."  29 U.S.C. § 1108(b)(2)(A).  In connection with that proviso, though, Rule 408b-2 requires that "[t]he covered service provider . . . disclose . . . to a responsible plan fiduciary, in writing" a description of, among other things: all services; direct and indirect compensation; compensation that the provider reasonably expects to receive in connection with recordkeeping services; and expenses associated with each investment product, including the annual expense ratio.  29 C.F.R. § 2550.408b-2(c)(1)(iv).  In this circumstance, the covered service provider is TIAA, and the responsible plan fiduciary is Georgetown.[19]

Plaintiffs' attempt to transform TIAA's alleged failures into a breach of fiduciary duty by Georgetown cannot be supported by the allegations set forth in the proposed amended complaint. First, plaintiffs have not identified the fiduciary duty that Georgetown is alleged to have breached. ERISA does not specifically identify reviewing third-party disclosures as one of a fiduciary's duties.  *See* 29 C.F.R. § 2550.404a-1 (listing "[i]nvestment duties" that are part of ERISA section 404).   And Rule 408b-2 includes language that states that contractual arrangements between a covered plan and a covered service provider "are independent of fiduciary obligations under section 404 of the Act."  29 C.F.R. § 2550.408b-2(c)(1)(i).

But the bigger problem is that plaintiffs have not connected their allegations about TIAA's 408b-2 disclosures to any of the counts in the proposed amended complaint.  Count I concerns unreasonable administrative fees, Proposed Am. Compl. ¶¶ 136–42, and Count II concerns unreasonable investment management fees and imprudent investment options, Proposed Am.

---

19    The responsible plan fiduciary may argue that it "did not know that the covered service provider failed or would fail to make required disclosures and reasonably believed that the covered service provider disclosed the information required by paragraph (c)(1)(iv) or (vi) of this section," pursuant to the statute.  29 C.F.R. § 2550.408b-2(c)(1)(ix).

Compl. ¶¶ 143–50, and a close read of the complaint does not reveal where the TIAA Rule 408b-2 submissions fit in.

The new allegations are set out in the introductory paragraphs of the proposed amended complaint, Proposed Am. Compl. ¶¶ 7–10, 23, but they are never connected to any theory of liability after that.  Plaintiffs do not mention these facts again in the section of the complaint listing the alleged "multiple flaws in [d]efendants' fiduciary decision-making process," *see* Proposed Am. Compl. at 24, ¶¶ 73–116; they are not even included in the sub-section concerning "significant reporting and disclosure errors."  *See* Proposed Am. Compl. ¶¶ 105–16 (containing allegations about the Form 5500s).  Plaintiffs do cite Rule 408b-2 in the "imprudent investment options" section of the complaint, but they do not refer to the portion of the Rule concerning disclosures that a covered service provider must provide to a responsible plan fiduciary.  *See* Proposed Am. Compl. ¶¶ 117–26.

One could assume that the 408b-2 allegations are supposed to be relevant to Count III, which alleges that the defendants' failure to report recordkeepers' compensation breached a duty of candor.  Proposed Am. Compl. ¶¶ 151–53.  But plaintiffs' allegations in support of that count are limited to defendants' reporting of direct and indirect compensation paid for recordkeeping services on the Plans' Form 5500s, *see* Proposed Am. Compl. ¶¶ 151–53, and plaintiffs do not tie the receipt or review of TIAA's disclosures to that alleged breach at any point.

One paragraph could be read to include the TIAA disclosures as part of the general violation of fiduciary duty alleged in Count I.  Plaintiffs summarily claim that

> [d]efendants failed to monitor and control prudently the compensation paid
> by the Plans for recordkeeping and administrative services, particularly the
> asset-based revenue sharing received by the Plans' platform providers.  Had
> [d]efendants monitored the compensation paid to the Plans' platform
> providers and ensured that participants like [p]laintiffs were charged only
> reasonable fees for administrative and recordkeeping services, Plan

participants including [p]laintiffs would not have lost millions of dollars in their retirement savings in the last six years alone.

Proposed Am. Compl. ¶ 72.  But this allegation does not mention the 408b-2 disclosures at all, let alone refer to Georgetown's obligations toward covered service providers or the providers' obligations to the Plan.  *See also* Proposed Am. Compl. ¶¶ 62–72 (failing to mention Rule 408b-2 in allegations that defendants caused participants in the Plans to pay excessive administrative and recordkeeping fees).

Finally, plaintiffs have not alleged any facts that would support an inference that plaintiffs were harmed by the alleged failure to obtain or closely review the 408b-2 disclosures.  The proposed amended complaint alleges that "[d]efendants' failure to properly evaluate and assess the reasonableness of the recordkeepers' charges for recordkeeping and administrative expense, and [d]efendants' failure to evaluate and/or understand the terms and nature of the TIAA and Vanguard investment products," which they say, "are indicative of a flawed process and breaches of [d]efendants' duties of prudence and diligence," have "resulted in the payment by participants of millions of dollars in excessive and unreasonable fees."  Proposed Am. Compl. ¶ 32.  But this summary statement at the beginning of the pleading does not suggest that plaintiffs experienced any harm arising out of Georgetown's alleged failure to review TIAA's allegedly incomplete disclosures.

Therefore, plaintiffs have also failed to state a claim based on any alleged Rule 408b-2 violations, and adding them would be futile.

D. *Variable Annuities Claims*

The complaint previously alleged that Wilcox invested in one of the variable annuities, the CREF Bond Market Account; plaintiffs repeat this allegation in the proposed amended version. *See* Proposed Am. Compl. ¶ 39; Compl. ¶ 20.  The court's prior Opinion addressed one of the

variable annuities in detail: the CREF Stock Account in which plaintiff McGuire had invested. Dismissal Op. at 8, 10. It found that plaintiffs' allegation that defendants "failed to conduct an analysis of the CREF Stock Account performance and investments fees," which had it been conducted, would have "determined that the CREF Stock Account would not be expected to outperform the large cap retirement plan investment performance index after fees," was "based on a false premise and fail[ed] to state a plausible claim for relief." *Id.* at 22. This was because, the court reasoned, using the Russell 3000 index as a benchmark to evaluate the investment results was inappropriate and not indicative of imprudence of the part of defendants. *Id.* at 22–23. Further, the court rejected plaintiffs' argument that the fund underperformed other available investments because ERISA does not provide a cause of action for "underperforming funds," and "a fiduciary is not required to select the best performing fund." *Id.* at 23. But the Dismissal Opinion did not analyze the CREF Bond Account or the other variable annuities,[20] *see* Proposed Am. Compl. ¶ 11; Compl. ¶ 31 (stating that variable annuities also included the CREF Equity Index Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Growth Account, CREF Global Equities Account, and CREF Money Market Account), which were not the focus of the allegations in plaintiffs' original complaint. *See* Compl. ¶¶ 72–85 (containing allegations about CREF Stock Account); *see generally* Compl. (no allegations specific to other variable annuities).

Now, plaintiffs have added claims that "[d]efendants breached their fiduciary duty of prudence by failing to use sufficient diligence to understand that the eight variable annuities they

---

20      The court, though, did discuss the TIAA Real Estate Account, which it described as a "variable annuity account," although plaintiffs did not allege it was one. Dismissal Op. at 10; *see* Compl. ¶ 31. Plaintiff McGuire was invested in this account, Compl. ¶ 21, but because he did not suffer any harm as a result of his investment in it, the court dismissed plaintiffs' allegations that its fees were excessive. Dismissal Op. at 20–22.

offered as the investment options in the Plans were not actually annuities."  Pls.' Mot. at 15; *see* Proposed Am. Compl. ¶¶ 25–26, 53–54.

Plaintiffs assert that the term is a misnomer because "annuity payments are not made from the Variable Annuities," and "[i]nstead participants must use the value of their account invested in the Variable Annuities to purchase a separate annuity from TIAA."  Proposed Am. Compl. ¶ 25. Plaintiffs state that the "prospectus for the variable annuities further reveals that upon a participant's sale of her interest in the variable annuity, or on her death, she or her estate receives nothing except the balance in the account."  Pls.' Mot. at 15, citing Proposed Am. Compl. ¶ 54. "Moreover, the so-called Variable Annuities actually transfer mortality risk to the participants." Proposed Am. Compl. ¶ 26; *see* Proposed Am. Compl. ¶ 25 (referring to 0.005% mortality and expense risk charge paid to TIAA).

For these reasons, plaintiffs assert that "the TIAA variable annuities are merely pools of equity- and fixed-securities or cash-equivalents . . . and they are no more difficult or more complicated to administer than mutual funds that are routinely offered in both 401(k) and 403(b) plans."  Pls.' Mot. at 15–16; *see* Proposed Am. Compl. ¶¶ 53–54.  Further, they allege that "a Plan [p]articipant who invests in the Variable Annuities pays hefty expenses for services or features that provide value to no one except TIAA."  Proposed Am. Compl. ¶ 56.

Defendants respond that plaintiffs' allegations are premised on an incorrect assumption, and that the proposed amended complaint does not allege facts to show that a reasonable fiduciary would have treated the TIAA variable annuities any differently.  Defs.' Opp. at 27–29.

It is important to note at the outset that Georgetown did not name the investment vehicle; it offered it as an option to Plan members.  So it is not clear how plaintiffs' allegations concerning the true nature of the TIAA variable annuity – which through its name alone places the buyer on

notice that it is not an annuity with "fixed" payouts – give rise to a cause of action against the University.  Moreover, plaintiffs do not identify the source of any fiduciary duty to put investors on notice that they should look at an investment option's prospectus and not simply the label applied by TIAA to understand how it operated.  As the Opinion already issued in this case set forth, an "annuity" is "essentially a long-term insurance contract that guarantees regular payments at retirement and for the life of the holder."  Dismissal Op. at 3, citing Black's Law Dictionary (10th ed. 2014); *see NationsBank of N. Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 254 (1995) ("Annuities are contracts under which the purchaser makes one or more premium payments to the issuer in exchange for a series of payments, which continue either for a fixed period or for the life of the purchaser or a designated beneficiary.").  "When a purchaser invests in a 'variable' annuity, the purchaser's money is invested in a designated way and payments to the purchaser vary with investment performance.  In a classic 'fixed' annuity, in contrast, payments do not vary."  *NationsBank*, 513 U.S. at 254.

The prospectus for the variable annuities – which plaintiffs repeatedly cite and quote in the proposed amended complaint[21] – informed participants that "CREF deducts expenses for the net assets of each class of each Account each Valuation Day for, among other services and expenses, investment management, administration and distribution services."  CREF Suppl. No. 2 to the

---

[21]    In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997); *see* Fed. R. Civ. P. 10(c).  A document may be incorporated by reference even if it "is not attached by the plaintiff," as long as it "is referred to in the complaint and integral to the plaintiff's claim." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (internal brackets and quotation marks omitted). Here, the prospectus is explicitly referenced in the proposed amended complaint.  *See* Proposed Am. Compl. ¶¶ 25, 25 n.11, 26, 54.

Statutory        Prospectus        Dated        May        1,        2022,        at 25,        available        at

http://connect.rightprospectus.com/TIAA/TADF/194408803/P?site=VA        (last        accessed

Mar. 14, 2023) ("Prospectus").  The prospectus explained:

> CREF also deducts a mortality and expense risk charge that is paid to TIAA
> to guarantee that CREF participants transferring funds to TIAA for the
> immediate purchase of lifetime payout annuities will not be charged more
> than the rate stipulated in the CREF Contract.
>
> . . . .
>
> For one-life annuities, two-life annuities and annuities for a fixed-period,
> how much you or your beneficiary receive in annuity payments from any
> Account will depend in part on the shared mortality experience of the
> annuity fund (annually revalued or monthly revalued) from which the
> payments are made.  For example, if the people receiving income from an
> Account's annually revalued annuity fund live longer, as a group, than
> expected, the amount payable to each individual will be less than if they as
> a group die sooner than expected.  So the "mortality risk" of each Account's
> annuity fund is shared among those who receive income from it and is not
> guaranteed by either CREF or TIAA.

*Id.* at 26, 48.

The language in the prospectus and the 0.005% mortality and expense risk charge[22] do not

appear to foreclose the characterization of this investment classification as "variable annuities," or

---

22   Defendants correctly point out that "the SEC's investor guide on variable annuities advises investors that the mortality and expense risk charge is 'typically in the range of 1.25% per year'—that is, 250 times TIAA CREF's assessment."  Defs.' Opp. at 29, 29 n.25, citing U.S. Sec. & Exchange Comm'n, *Variable Annuities: What You Should Know*, at 11 (Sept. 2007), https://www.sec.gov/investor/pubs/sec-guide-to-variable-annuities.pdf; *see also* U.S. Sec. & Exchange Comm'n, *Updated Investor Bulletin: Variable Annuities* (Oct. 30, 2018), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_variableannuities ("You will pay several fees and expenses when you invest in a variable annuity. . . . Often, they will include the following: . . . **Base contract fee** – This fee (often referred to as 'Mortality and Expense (M&E) Risk Charge') is equal to a certain percentage of your account value, typically in the range of 1.25% per year.  This fee compensates the insurance company for insurance risks it assumes under the annuity contract.  A portion of this fee is sometimes used to pay commissions to your financial professional for selling the variable annuity to you.").

transform them into something else, and the prospectus lays out the risks and factors that could affect the size of the payments.

But the larger problem is that plaintiffs have provided no factual support for their assertion that the structure of the TIAA variable annuities contributed to excess recordkeeping fees, or that a reduction in this expense could have been achieved without changing participants' benefits. As the court has previously explained, "[a] claim that fiduciaries were imprudent by allowing excessive fees 'must be supported by facts that take the particular circumstances into account.'" Dismissal Op. at 26, citing Op. and Order at 13, *Sacerdote v. New York Univ.*, Case No. 16-cv-6284 [Dkt. # 348] (S.D.N.Y. July 31, 2018).

Plaintiffs have still not provided facts to support their claims that the variable annuities were imprudent to offer as investment options, and therefore, adding these allegations would be futile as well.

E.  *Breach of the Duty of Candor*

Plaintiffs propose to add an entirely new count for breach of the duty of candor. Proposed Am. Compl. ¶¶ 151–53. The proposed amended complaint claims that defendants' failure to report all direct and indirect compensation received by the Plans' recordkeepers on what is called a Form 5500, submitted to the Department of Labor pursuant to 29 C.F.R. § 2520.103-1(b)(1), violated the fiduciary duty of candor, in contravention of section 404(a) of ERISA. Proposed Am. Compl. ¶¶ 151–53, citing 29 U.S.C. § 1109(a).

Defendants argue first that "ERISA mentions no such duty and there appears to be no case law on the existence or content of an ERISA duty of candor in this Circuit." Defs.' Opp. at 29. Second, they maintain that even if a duty of candor applied to ERISA disclosures, the duty would not apply to Form 5500s, which are filed with the Department of Labor. *Id.* at 30. Third, they

44

argue that "submitting Form 5500s to the Department of Labor is not a fiduciary function."  *Id.*

Finally, they posit that plaintiffs' claim "is akin to a misrepresentation claim," *id.* at 31, and since

plaintiffs do not also allege reliance or any harm, the claim must be rejected.  *Id.*

> Section 404(a) of ERISA states:
>
>> Any person who is a fiduciary with respect to a plan who breaches any of
>> the responsibilities, obligations, *or duties imposed upon fiduciaries by this
>> subchapter* shall be personally liable to make good to such plan any losses
>> to the plan resulting from each such breach, and to restore to such plan any
>> profits of such fiduciary which have been made through use of assets of the
>> plan by the fiduciary, and shall be subject to such other equitable or
>> remedial relief as the court may deem appropriate, including removal of
>> such fiduciary.

29 U.S.C. § 1109(a) (emphasis added).  The "fiduciary duties" set out in the statute refer to the

"[p]rudent man standard of care," *id.* § 1104(a), but do not specifically mention anything about a

"duty of candor."  *See Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*,

472 U.S. 559, 570 (1985) ("The manner in which trustee powers may be exercised . . . is further

defined in the statute through the provision of strict standards of trustee conduct, also derived from

the common law of trusts—most prominently, a standard of loyalty and a standard of care.").  "In

determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts."

*Tibble*, 575 U.S. at 528–29.  And while the Restatement of Trusts and other well-known treatises

which "the Supreme Court has relied on," *Clark v. Feder Semo & Bard, P.C.*, 739 F.3d 28, 31

(D.C. Cir. 2014), make clear that trustees have a duty of prudence, loyalty, and impartiality, the

duty of candor is not mentioned.  *See* Restatement (Third) of Trusts §§ 77–79 (2007); Bogert, *et
al.*, The Law of Trusts and Trustees § 541 (2013).

Plaintiffs cite the Supreme Court's decision in *Varity Corp. v. Howe*, 516 U.S. 489 (1996),

for the proposition that "ERISA fiduciaries owe a duty of candor to Plan participants and

beneficiaries."  Pls.' Reply at 16.  In that case, the Court was considering whether the petitioner's

deceptive statements "violated ERISA-imposed fiduciary obligations." *Varity Corp.*, 516 U.S. at 506. The Court did write, as plaintiffs point out, that "lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA," but that uncontroversial observation simply placed honesty under the umbrella of the duty of loyalty; it did not purport to create an independent duty of candor. *Id.* (citing cases that found that "ERISA fiduciary duty includes common-law duty of loyalty," which "requires trustee to deal fairly and honestly with beneficiaries"), citing *Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983), and *Cent. States*, 472 U.S. at 570–71. A recent Third Circuit decision cited by the plaintiffs came to the same conclusion. *See* Pls.' Reply at 16, citing *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 98 (3d Cir. 2012) ("A fiduciary's duties of loyalty and prudence under ERISA § 404 encompass a duty to communicate candidly . . . .").

Further, even if the duty of candor is cognizable under ERISA, plaintiffs have not supplied any legal basis for the Court to find that any duty of candor even applies to filing Form 5500s with the Department of Labor. *See* Proposed Am. Compl. ¶¶ 22, 69, 151. Plaintiffs' claim that the "Plans' 5500's are essentially the Plans' annual tax returns," Proposed Am. Compl. ¶ 105, is not a sufficient allegation that goes to show that filing the Form 5500s was a fiduciary function – that is, a duty owed to the Plan participants as opposed to the federal government – and that any alleged omissions on this form constitute a violation of ERISA.

Because the duty of candor claim cannot be construed as an independent cause of action,[23] and plaintiffs have not alleged facts to show that such a duty applies to filing Form 5500s, plaintiffs fail to state a claim in their proposed amended complaint on this basis.

## CONCLUSION

For these reasons, plaintiffs' Motion Seeking Leave to File an Amended Complaint [Dkt. # 58], will be **DENIED**.[24]

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 31, 2023

---

23      The Court further notes that plaintiffs originally alleged:

>       DOL rules expressly require that plan service providers report all direct and indirect compensation received for the year in connection with the services they provide.  None of the Plans' 5500's filed since 2009 disclose any amount of indirect compensation being received by TIAA.  Whether these egregious reporting errors were caused by TIAA's reporting deficiencies or by the University's misrepresentation of TIAA's accurate reporting, the implication is the same: [d]efendants failed in their obligations to the Plans and their participants to adequately evaluate and report the Plans' expenses.

Compl. ¶ 59.  This allegation – which is the same as what they now say underlies the breach of the duty of candor – contributed to their claims that defendants breached the duty of *prudence*.

24      This also dispenses with the claims against the proposed new defendant, the Subcommittee.  *See* Proposed Am. Compl. ¶ 3.